# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARCUS BERNARD WILLIAMS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:07-cv-1276-KOB** |
| | ) | |
| **STATE OF ALABAMA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

This death penalty habeas case comes before the court following remand from the Eleventh Circuit Court of Appeals for an evidentiary hearing on Marcus Bernard Williams's failure-to-investigate claims. *Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015). Mr. Williams alleges that trial counsel's failure to investigate his background prevented the defense from presenting a constitutionally adequate mitigation case during the penalty phase of his trial. (Doc. 5 at 40-65). The court held an evidentiary hearing at which Mr. Williams presented witnesses and exhibits. The court finds that Mr. Williams is not entitled to relief under 28 U.S.C. § 2254 because he has not established that he suffered prejudice as a result of counsel's failure to investigate and present evidence of his background as mitigation evidence in the penalty phase of his trial.

# I. INTRODUCTION

On November 6, 1996, Mr. Williams returned home after a night of drinking and smoking marijuana with friends. *Williams v. State*, 795 So. 2d 753, 761 (Ala. Crim. App. 1999). Upon arriving home, he desired to have sexual relations with a young female neighbor, Melanie Dawn Rowell. *Id*. Mr. Williams entered Ms. Rowell's apartment through an unlocked window, then proceeded to her bedroom where he climbed on top of her and attempted to remove her clothes. *Id*. Ms. Rowell struggled to stop him, so he strangled her until she was motionless, then had sexual intercourse with her for fifteen to twenty minutes. *Id*. at 761-62. Ms. Rowell's cause of death was asphyxia due to strangulation. *Id*. at 762. Mr. Williams stole Ms. Rowell's purse before leaving her apartment. *Id*. at 762. He was later arrested and taken into custody where he gave an incriminating statement admitting his involvement in Ms. Rowell's death. *Id*. DNA testing confirmed that semen and blood found at the crime scene were consistent with Mr. Williams's genetic profile. *Id.* at 766-67.

# II. PROCEDURAL HISTORY

Court-appointed attorneys Erskine Funderburg and Tommie Wilson[1] represented Mr. Williams at trial. (Vol. 4, Tab 27 at 2). Because of the overwhelming

---

[1] Ms. Wilson died on March 6, 2015. (*See* Petitioner's Exhibit 12).

evidence of Mr. Williams's guilt, his attorneys argued only that although he intended to rape Ms. Rowell, he did not intend to kill her. (Vol. 3, Tab 11 at 494-504). Despite their efforts, on February 24, 1999, the jury found Mr. Williams guilty of capital murder for intentionally causing the death of Ms. Rowell during a rape or attempted rape, in violation of Alabama Code § 13A-5-40(a)(3) (1975). (Vol. 4, Tab 14 at 534-36).

The penalty phase of Mr. Williams's trial was held the next day, before the same jury. (*See* Vol. 3, Tab 15 - Tab 24). Trial counsel called only two witnesses, Mr. Williams's mother, Charlene Williams, and his aunt, Eloise Williams. (Vol. 3, Tab 19). The Eleventh Circuit Court of Appeals summarized their testimony:

> Charlene Williams told the jury that she was sixteen years old and unmarried when Mr. Williams was born, and that Mr. Williams had faced certain difficulties as a child. For example, she testified that Mr. Williams sometimes lived with her grandmother and aunt; had no relationship with his father and lacked adult male figures in his life; and had to stop playing school sports after injuring his knee. Mr. Williams's counsel also elicited testimony that portrayed him in a negative light, such as the fact that he was a high school dropout; he "started hanging with a rough crowd"; he got kicked out of the Job Corp[s] for fighting; and upon returning home, he stopped going to church and "wanted to sleep all day and stay up all night." FN.1.
>
> > FN.1. A capital defendant's history of violent and aggressive behavior is generally considered an aggravating factor. *See Holsey v. Warden*, 694 F.3d 1230, 1269-70 (11th Cir. 2012).

Eloise Williams also testified about Mr. Williams's unstable home life. She told the jury that he had moved from place to place as a child and lived with different family members; he became sad and withdrawn at times because he did not see his mother often; he had been a good student with no significant criminal history; and he had struggled emotionally after the deaths of his grandfather and uncle. However, as with Charlene, counsel also elicited evidence from Eloise that was likely more harmful than helpful. For example, Eloise told the jury that Mr. Williams had a quick temper; he had been arrested for fighting as a teenager; FN.2, he had not maintained regular employment after leaving high school; and not long before the crime, he started drinking and using drugs. Eloise ended on a positive note, telling the jury that since Mr. Williams had been in jail, he had stayed out of trouble and expressed remorse for his crime.

> FN.2. The fact that Mr. Williams's counsel told the jury about these adolescent brushes with the law is noteworthy because the State could not have offered evidence of Mr. Williams's juvenile arrests to establish any aggravating factors. In Alabama, "juvenile charges, even those that result in an adjudication of guilt, are not convictions and may not be used to enhance punishment." *Thompson v. State*, 503 So.2d 871, 880 (Ala.Crim.App. 1986) *aff'd sub nom. Ex parte Thompson*, 503 So.2d 887 (Ala. 1987).

Neither Charlene nor Eloise was asked about Mr. Williams's history of sexual abuse.

*Williams*, 791 F.3d at 1269-70. The jury deliberated only thirty minutes before returning an 11 to 1 verdict, recommending that Mr. Williams be sentenced to death. (Vol. 3, Tab 24 at 596-97).

At the April 6, 1999 sentencing hearing, Mr. Williams testified, expressing his remorse. (Vol. 4 at 607-11). The victim's mother, Donna Rowell, testified about the

impact of her daughter's death on the family, especially Ms. Rowell's young children. (*Id*. at 604-06). The trial court found one aggravating circumstance – that Mr. Williams killed the victim while committing or attempting to commit a rape, robbery, burglary, or kidnapping. (*Id*. at 630). The trial court found as mitigating factors Mr. Williams's lack of a criminal history, his unstable home life as a child, his frustration from an injury ending his hopes of an athletic career, his obtaining a GED, and his remorse. (*Id*. at 631-38). The trial court found the aggravating factor outweighed the mitigating factors, and sentenced Mr. Williams to death. (*Id*. at 639).

The Alabama Court of Criminal Appeals affirmed Mr. Williams's conviction and death sentence on December 10, 1999. *See Williams v. State*, 795 So. 2d 753 (Ala. Crim. App. 1999). The Alabama Supreme Court affirmed his conviction and sentence on January 12, 2001. *See Ex parte Williams*, 795 So. 2d 785 (2001). The United States Supreme Court denied certiorari review on October 1, 2001. *See Williams v. Alabama*, 535 U.S. 900 (2001).

In August, 2004, Mr. Williams filed an amended Rule 32 petition in the trial court. The trial court denied the Rule 32 petition on the merits, without holding an evidentiary hearing. (Vol. 13, Tab 59). The Alabama Court of Criminal Appeals affirmed the denial of Rule 32 relief. (Vol. 13, Tab 60).

In 2007, Mr. Williams filed the present § 2254 petition in this court, arguing *inter alia*, that trial counsel were ineffective for failing to conduct an adequate mitigation investigation. (Doc. 5 at 40-65). This court denied the petition on April 12, 2012. (*See* Docs. 27, 28). The Eleventh Circuit Court of Appeals remanded the case, instructing this court to "determine whether Mr. Williams is entitled to an evidentiary hearing and to reconsider his failure-to-investigate claims *de novo*." *Williams*, 791 F.3d at 1277.

Mr. Williams filed a motion for an evidentiary hearing on March 3, 2017. (Doc. 51). On October 4, 2017, the court granted Mr. Williams's motion for an evidentiary hearing on his failure-to-investigate claim. (Doc. 60).

This court held an evidentiary hearing on May 14 - 16, 2018. Mr. Williams testified at the evidentiary hearing, and presented the testimony of Tina Watson, Erskine Funderburg, Billy Stephens, Sharenda Williams, Dr. Kenneth Benedict, Eloise Williams, Charlene Williams, LaCharo Williams, Marlon Bothwell, and Dr. Matthew Mendel. The State of Alabama presented testimony from Dr. Glen King. The court paid close attention to the testimony, and has carefully reviewed the transcript of the evidentiary hearing, along with the exhibits presented at the hearing.

# III. LEGAL STANDARD

To determine whether counsel were ineffective, the court begins with the instruction from *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court established a two-pronged analysis for determining whether counsel's performance was ineffective. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687.

A petitioner must establish both parts of the *Strickland* standard: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was *deficient*; *and*, that the deficient performance *prejudiced his defense*. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). "Because a petitioner's failure to show either deficient performance or prejudice is fatal to a *Strickland* claim, a court need not address both *Strickland prongs* if the petitioner fails to satisfy either of them." *Kokal v. Sec'y, Dep't of Corr*., 623 F.3d 1331, 1344 (11th Cir. 2010) (citations omitted). As stated in *Strickland*, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

## A.    The Performance Prong

To satisfy the performance prong, a petitioner must establish that counsel's performance was unreasonable by the preponderance of the evidence. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)).

The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. *Stewart*, 476 F.3d at 1209. The court does not consider "what the best lawyers would have done"; instead the court must determine "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

Judicial scrutiny of counsel's performance must be highly deferential, because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. This strong presumption of competent assistance creates a heavy burden of persuasion: "*petitioner must establish that no competent counsel would have taken the action that*

*his counsel did take*." *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added).

The court can not grant relief on ineffectiveness grounds unless a petitioner shows that "*no reasonable lawyer*, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (emphasis added).

When examining counsel's performance at the penalty phase of trial, the court must decide "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Stewart*, 476 F.3d at 1209 (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006). To meet the requirements of *Strickland*, counsel does not need to investigate "every conceivable line of mitigating evidence" regardless of its likelihood of benefitting the defendant at sentencing. *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d 1231, 1250 (11th Cir. 2017) (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

In fact, the *Strickland* standard does not even "require defense counsel to present mitigating evidence at sentencing in every case." *Id.* Rather, the *Strickland* standard for counsel's performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. And, of course, reasonableness depends upon the context of the particular case. *See Wiggins*, 539 U.S. at 522-23. This objective

standard of reasonableness means that "whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight" does not matter; counsel's actual motivation is not relevant but instead "what reasonably could have motivated counsel." *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d at 1250 (quoting *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008)).

### B.    The Prejudice Prong

A petitioner also must meet a high burden to establish that his lawyer's deficient performance caused prejudice to his case. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). The petitioner does not meet that high burden merely by showing "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (quoting *Strickland*, 466 U.S. at 693). Instead, a petitioner must show "'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

In evaluating whether the petitioner has shown a reasonable probability that, if counsel had not been deficient, he would not have been sentenced to death, the court must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h]

it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009)

(quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)); *see also Sears v. Upton*,

561 U.S. 945, 956 (2010) (holding that a proper prejudice analysis under *Strickland*

must take into account the newly uncovered mitigation evidence, along with the

mitigation evidence introduced during the penalty phase of the trial, to assess whether

a reasonable probability arises that the petitioner would have received a different

sentence after a constitutionally sufficient mitigation investigation.).

## IV. THE EVIDENTIARY HEARING

In his amended petition, Mr. Williams alleges that trial counsel were ineffective

during the penalty phase of the trial because they failed to adequately investigate and

present mitigation evidence to show that he should not have been sentenced to death.

(Doc. 5 at 38-65).

Specifically, he claims that trial counsel were ineffective because they failed

to collect documentary evidence and hire a mitigation specialist; failed to thoroughly

investigate Mr. Williams's history, including that he was sexually abused as a child;

failed to interview Mr. Williams's closest friend Alister Cook[2]; failed to adequately

---

[2] Cook, described as "Marcus' closest friend[]" during the period leading up to his arrest," and Mr. Williams had been friends since they were eight or nine years old. (*See* Doc. 5 at 49). Mr. Williams and Cook had been drinking together the night of the murder. (*Id*. at 47).

interview and prepare the penalty phase witnesses; failed to compile Mr. Williams's history of abuse and neglect; failed to investigate his family history of mental illness; failed to show that Mr. Williams's background contributed to his committing capital murder; and failed to present his redeeming characteristics. (*Id*.). Mr. Williams argued that an evidentiary hearing would allow him to produce witnesses whose testimony could prove his claim that counsel's failure to investigate was constitutionally ineffective. (Doc. 51 at 5-26).

Mr. Williams argues that, had counsel performed an adequate penalty phase investigation, they would have learned, and been able to present evidence that: a) his childhood was defined by chaos, abandonment, and abuse; b) his difficult upbringing was influenced by "an extensive history of dissolution and dysfunction" in his family; c) the family history of alcoholism contributed to his early and excessive use of alcohol; d) he was sexually abused by an older boy when he was a child; e) his family has an extensive history of childhood sexual abuse; and f) his traumatic childhood experiences were psychologically damaging. (Doc. 88 at 50-102).

Mr. Williams called witnesses at the evidentiary hearing who testified to the facts he claims should have been discovered by trial counsel and presented during the penalty phase. He argues that if counsel had performed an adequate penalty phase

investigation, they would have learned and been able to present the following evidence.

## A.     Childhood Defined by Chaos, Abandonment, and Abuse

Charlene Williams testified that Mr. Williams, her second child, was born when she was sixteen years old. (Doc. 92 at 158-59). Before he was born, his older sister Aquea was sent to New York to live with her paternal grandmother, and never returned to live with Charlene. (*Id*. at 159-60). His father, Michael Daniels, was not involved in his life when Mr. Williams was "small," but "became involved later on in life," when he was around thirteen or fourteen. (*Id*. at 161).

During his early years, Charlene and Mr. Williams "bounced from place to place." (Doc. 88 at 53). They lived with Charlene's grandparents, Ralph and Beulah Williams, in "the old house," a dilapidated house without a bathroom, heating, air conditioning, or hot water (Doc. 92 at 116, 206); they lived with family friends, Della and Will Bothwell (Doc. 93 at 7, 23); they lived with Charlene's friend Olivia Mostella and her three children in Ashville, Alabama (Doc. 92 at 161-62); and they moved to Missouri with the Mostellas for about four months. (*Id.* at 166-67). Eloise Williams testified that when they lived with the Mostellas, Charlene and Olivia left the children alone at home with Olivia's elderly mother while they went out partying and drinking. (Doc. 92 at 112). Mr. Williams testified that when they lived with

Olivia, her son, Mario Mostella, sexually assaulted him three or four times, over the course of "a couple of years," beginning at the age of four. (Doc. 91 at 118-19). When they returned to Ashville, Charlene lived with her grandmother for a while; with Mary Mostella, Olivia Mostella's mother, for a while; moved into an apartment in Gadsden; then finally moved back to Ashville. (*Id*. at 167-68).

During this time, Charlene gave birth to three more children. (*Id*.). When Mr. Williams was around nine years old, Charlene began a six-year relationship with Jeff Deavers, who was physically and verbally abusive to her, "sometimes" in front of Mr. Williams. (Doc. 92 at 170-74).

Charlene had poor parenting skills: she left the children to fend for themselves; they were not supervised appropriately; and at times, they were not clean or "well taken care of." (*Id*. at 117). During the time period when Mr. Williams was around five to ten years old, family members tried to help Charlene by taking her children in to live with them. (*Id.* at 117-21).

Eventually, when Mr. Williams was about seven or eight years old, he moved in with his aunt Eloise Williams. (*Id*. at 119, 169). During this time, Mr. Williams moved back and forth between the homes of his great grandmother, Beulah Williams, and his aunt Eloise Williams. (Doc. 92 at 169). Eloise took him to Sunday School and church, helped him with his homework, and allowed him to play baseball. (*Id*. at 119-

20, 124-26). While he lived with Eloise, Mr. Williams was "sullen, withdrawn, unhappy," and had issues with bed-wetting. (*Id*. at 125-26).

Mr. Williams lived with Eloise until he was twelve or thirteen years old. (*Id*. at 127). Eloise testified that when Mr. Williams was in middle school, he started getting in trouble at school, "getting in fights, stealing and just different things." (Doc. 92 at 126-27). At one point, Eloise caught him peeping through the bathroom door at her. (*Id*. at 127). When Mr. Williams was twelve or thirteen years old, Eloise took him back to live with Charlene because he wanted to live with Charlene. (*Id*.).

When he was fourteen years old, Mr. Williams finally met his father, Michael Daniels, and moved in with him for about nine months. (Doc. 91 at 116). Dr. Matthew Mendel, a clinical psychologist, testified at the evidentiary hearing that Mr. Williams had "wondered about, questioned, struggled and worried about" his father his entire life, hoping that the reason his father never came to visit him was because he did not know Mr. Williams existed. (Doc. 93 at 42).

Mr. Williams argues that rather than investigating his family history and presenting "available evidence of Marcus's abandonment by his mother, as well as the itinerant and dysfunctional lifestyle he was subject to while he was with her," trial counsel elicited testimony in the penalty phase from Charlene, minimizing the

instability in Mr. Williams's life, and leaving the jury with the impression that he "spent lots of time with his mother." (Doc. 88 at 65).

Specifically, Mr. Williams points to the following portions of Charlene's testimony in the penalty phase:

Q.    Where was [Mr. Williams] when he wasn't with you?

A.    He lived with my grandmother and my aunt. They helped me because I was a young girl.

. . . .

Q.    Prior to this time, had Marcus been a problem child to you in any way?

A.    No, he had never been.

Q.    Did you spend a lot of time with him when he was growing up?

A.    Yes. Marcus was the baby for five and a half years.

(*Id.*) (quoting Vol. 3, Tab 19 at 554, 558).

He adds that at the sentencing hearing, Eloise testified only generally about Marcus being "left from one place to another" and not "hav[ing] a stable home." (*Id.*) (quoting Vol. 3, Tab 19 at 561). Mr. Williams argues that the penalty phase of his trial contained no testimony about the "domestic violence and abuse" he experienced in the various places he lived. (*Id.*). Mr. Williams argues that the testimony presented

at the evidentiary hearing paints a "vastly different picture of his background" than the limited testimony presented at his trial. (*Id*. at 65-66) (quoting *Williams v. Allen*, 542 F.3d at 1342).

### B. Extensive Family History of Dissolution and Dysfunction

Mr. Williams alleges that compounding the failure to present evidence of his "dysfunctional upbringing," trial counsel also failed to present available evidence of his "troubled family history." (*Id*. at 66). He claims that the dysfunction of his childhood was part of an "easily discernable pattern." (*Id*.). Charlene testified that she, her sister, and her brother were raised by their grandparents, Ralph and Beulah Williams; she did not meet her father until she was three years old; her mother, Laura Williams, "moved away to New York" and never contacted her after she left; and that her mother died a violent death when Charlene was twelve years old. (Doc. 92 at 148-51, 193).

Charlene became sexually active at age thirteen, became pregnant with Mr. Williams's older sister at the age of fourteen, and started drinking at age fifteen. (*Id*. at 155-57). Charlene eventually gave birth to Mr. Williams and three more children, LaCharo, and twins, Sharenda, and Sharay, all of whom were raised in different homes. (*Id*. at 167-68). Mr. Williams maintains that the "distance created by

Charlene's abandonment and separation of her children made it difficult for them to bond, and develop loving relationships, as a family." (Doc. 88 at 70).

Mr. Williams's sister Sharenda Williams testified at the evidentiary hearing that she and Mr. Williams "did spend time together" during Mr. Williams's teenage years after he left Aunt Louise's home. (Doc. 91 at 150). She clarified that they spent a minimal amount of time together because after being adopted by her Aunt Louise, she lived a "much more strict lifestyle" and was "very involved in church." (*Id*.). Mr. Williams's sister LaCharo Williams testified at the evidentiary hearing that due to their age difference, her relationship with Mr. Williams did not really develop until after he was arrested. (Doc. 92 at 214).

Mr. Williams contends that the "treatment that Marcus and his siblings received from caregivers reinforced this sense of distance." (Doc. 88 at 71). Sharenda testified at the evidentiary hearing that their uncle Robert Williams was "very strict" with Mr. Williams, while he treated her "like a girl," letting her get away with anything. (Doc. 91 at 148).

Mr. Williams adds that although "the circumstances of all of Charlene's children were precarious, [his] nomadic existence was especially so." (Doc. 88 at 71). Mr. Williams points out Dr. Mendel's testimony from the evidentiary hearing:

I think that the chaos, the lack of stability and the sense of abandonment, betrayal, the contrast he experienced in his life from seeing why was my younger sister adopted by this aunt, this great aunt, and not me. Why was my other younger sister kept and raised by our mother and not me, why was my younger brother adopted by this family, unrelated family down the road and raised in a stable household, why was my older sister taken in by her father and raised in a – I don't know much about that family, but at least a relatively consistent home, and why was I bounced around.

He experienced a sense of being unwanted, rejected, abandoned, betrayed throughout his life, and I think that's had an enormous impact on him.

(*Id*.) (quoting Doc. 93 at 41-42).

Mr. Williams asserts that defense counsel should have investigated and presented evidence of his dysfunctional family history because conditions within the family can influence a defendant's upbringing and experiences. (Doc. 88 at 71-72) (citing *Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1251 (11th Cir. 2012) (explaining that, during penalty phase proceedings in 1994, "[the defendant's] life story actually began with [his mother's] story about her life prior to [his] birth because, according to Dr. Larson, what she had experienced prior to that event had a profound effect on the person [the defendant] eventually became"). He points out that courts have held that failing to investigate and present available evidence of a "chaotic, abusive, neglectful family" was deficient. (*Id*. at 72) (citing *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008) and *Frierson v. Woodford*, 463 F.3d 982,

989 (9th Cir. 2006) ("[A] failure to investigate and present, at the penalty phase of a capital trial, evidence of . . . a dysfunctional family or social environment may constitute ineffective assistance of counsel.")).

Mr. Williams argues that his life was impacted by the "early sexual activity, excessive alcohol use, neglect and abandonment of children, and frayed familial bonds" that persisted generation after generation in his family. (*Id.* at 72). He contends that, with the evidence of his troubled family history, counsel "could have described the cycles of generational abusive and neglectful parenting that repeat the same behaviors and lead to the same outcomes." (*Id.*) (quoting *Johnson*, 544 F.3d at 605). He maintains that counsel were deficient for failing to present the available evidence of his dysfunctional family history to the jury. (*Id.*).

## C. Family History of Alcoholism Contributed to Mr. Williams's Early and Excessive Use of Alcohol

Mr. Williams asserts that he was raised in a family of alcoholics. (Doc. 88 at 72). Eloise testified that when she married into the Williams family, she "learned that they did a lot of drinking and partying." (Doc. 92 at 99). Mr. Williams's great-grandmother, Beulah Williams, with whom he lived from time to time, was unable to properly care for the children left with her. (Doc. 91 at 146, Doc. 92 at 155). Beulah, described as a good person who "did like to drink and party," worked through the week, but got drunk on the weekends, to the point that she became incoherent and

would pass out or urinate on herself. (Doc. 92 at 100, 152, Doc. 91 at 146). Eloise testified at the evidentiary hearing that almost all of Beulah's family, including Eloise's husband Robert, had problems with drinking. (Doc. 92 at 106-07). Sharenda testified that during the times she and Mr. Williams spent time with Eloise and Robert, Robert was a heavy drinker who "drank probably almost every day at some point," to the point of intoxication. (Doc. 91 at 147).

Charlene testified that she was a heavy drinker from the age of fifteen until she was "like about thirty-two," having been influenced to drink by Beulah and other relatives who drank excessively. (Doc. 92 at 155-56). Charlene drank mostly on the weekends, sometimes to the point of intoxication. (Doc. 91 at 141; Doc. 92 at 156). She drank while she lived with the Mostellas,[3] and she drank while she was in a relationship with Jeff Deavers. (Doc. 92 at 112; Doc. 91 at 140). Dr. Mendel stated in his report that Charlene's "pattern of drinking and going out rather than watching her children left Marcus susceptible to Mario's sexual predation." (Petitioner's Exhibit 5 at 8).

Mr. Williams's childhood friend, Marlon Bothwell, testified that he and Mr. Williams began drinking probably between the ages of twelve and fourteen, but Mr.

---

[3] Eloise testified that while Charlene and Mr. Williams lived with the Mostellas, Charlene and Olivia "were still partying and doing different things, drinking, leaving the children." (Doc. 92 at 112).

Williams's alcohol consumption increased so much when he was about sixteen or seventeen, that he often saw Mr. Williams drunk. (Doc. 93 at 15-17). Dr. Mendel testified that Mr. Williams "was drinking heavily by his high school years," having begun drinking "much more following a couple of very negative difficult experiences in his life." (*Id*. at 77). Dr. Mendel stated in his report that because alcoholism runs in families, Mr. Williams's "alcohol abuse and likely dependence are probably 'multiply-determined,' stemming from a familial pattern of alcoholism as well as Marcus' specific traumatic life circumstances." (Petitioner's Exhibit 5 at 8).

Dr. Mendel explained that alcoholism often runs in families because of the modeling and example shown by family members drinking. (Doc. 93 at 75-76). He added that "people generally accept that there is a genetic basis for a predisposition towards addiction, including alcoholism." (*Id.* at 76). Dr. Glen King, a clinical psychologist, testified that "but for [Mr. Williams's] substance abuse, in terms of this crime, I don't think we would be here." (Doc. 92 at 86). Dr. Mendel agreed with Dr. King's conclusion that "if there wasn't the alcohol, we wouldn't – this wouldn't have happened and we wouldn't be here today." (Doc. 93 at 82).

Mr. Williams argues that by failing to present expert testimony on excessive use of alcohol at the penalty phase, counsel deprived the jury of this critical explanation for his conduct. (Doc. 88 at 77). He argues that although Mr. Funderburg

testified that the defense theory for the penalty phase of the trial was that Mr. Williams was not in his right mind, due to alcohol and marijuana use, he presented "paltry" evidence about Mr. Williams's substance abuse. (*Id*.) (citing Doc. 91 at 90).

Mr. Williams points out that although counsel asked Charlene two questions "conceivably related to alcohol use" in the penalty phase, those questions were not helpful because they pertained to Mr. Williams's time in Job Corps, not during his childhood or the time of the crime. (*Id*.) (citing Vol. 3, Tab 19 at 557). Mr. Williams also points out that during the penalty phase, Eloise offered, without being asked about alcohol or drugs, that she "began to notice he had changed – drinking, you know and maybe drugs." (*Id*.) (citing Vol. 3, Tab 19 at 565).

Mr. Williams argues that "without any specifics of when Marcus began drinking, and with no explanation for why Marcus was drinking – such as his genetic predisposition to alcoholism, the excessive drinking modeled by close relatives who reared him, and his traumatic childhood experiences – the jury was left to conclude that Marcus's drinking, which was only vaguely mentioned, was merely a personal failing." (*Id*.) He maintains that it was unreasonable for counsel not to present available evidence of Mr. Williams's dysfunctional upbringing and family history of substance abuse. (*Id*.)

**D. Sexual Abuse by an Older Boy**

Mr. Williams testified that between the ages of four and six, he was sexually abused three or four times by Mario Mostella, while he and Charlene lived with the Mostella family. (Doc. 91 at 118-20). Mr. Williams stated that at the time it was happening, he thought it was a game when Mario would "touch" and "penetrate" him from behind while Charlene was away. (*Id.*). Mr. Williams did not tell anyone about the sexual assaults because he was ashamed. (*Id.* at 121).

Dr. Mendel described this as "pretty classic grooming behavior." (Doc. 93 at 165). He testified that Mr. Williams's account of his childhood sexual abuse is "extremely credible" and that he has no doubt that it happened. (*Id*. at 85-86).

Dr. Mendel stated in his report that at the time Mr. Williams was being molested by Mario, Mr. Williams "did not think there was anything wrong with what was going on." (Petitioner's Exhibit 5 at 5). He noted that male victims of childhood sexual abuse do not often tell anyone about the sexual abuse until they enter the justice system or substance abuse treatment. (*Id*.). Mr. Williams told Dr. Mendel that he became sexually active at a young age and was promiscuous throughout his adolescence and early adulthood because he wanted to prove to himself that he is not gay. (*Id.* at 6). Dr. Mendel opined that Mr. Williams became hypersexual, becoming

sexually active at the age of ten,[4] and having from one hundred fifty to two hundred sexual partners by the time he was arrested, in an effort to prove that he is not gay. (Doc. 93 at 55-56).

Mr. Williams was also exposed to sexuality by his family members. While they lived with the Mostellas, Mr. Williams bathed with Charlene and shared a bed with her. (Doc. 92 at 165). Dr. Benedict, a neuropsychologist specializing in developmental psychopathology, testified that Mr. Williams was "also exposed to adult sexual relations when living with his mother, when she would have . . . her boyfriends in the same bed that she shared with" Mr. Williams. (Doc. 91 at 176).

Mr. Williams testified that when he was about ten years old, his teenage cousin Brian Williams "allowed [Mr. Williams] to watch him have sex as a way of showing [Mr. Williams] how to do it with a woman." (Doc. 91 at 120). Dr. Mendel testified that Mr. Williams told him that Brian was "always talking about sex and telling him about sex." (Doc. 93 at 64). Dr. Mendel explained that premature exposure to sexuality "basically tends to feed hypersexualization. So you get these, basically you get these kids who are thinking about sex and wanting to do and explore sexual things

---

[4] Dr. Mendel testified that prepubescent sexual intercourse is "the biggest red flag" indicating sexual abuse. (Doc. 93 at 124).

before they are physically, psychological or emotionally ready to do that. They're not adults." (*Id*. at 65).

Mr. Williams also engaged in other sexually inappropriate behavior. In his affidavit, Dr. Benedict stated that Mr. Williams told him that when he was a child, he would sneak outside to peep on his mother's friends while they used the outhouse. (Petitioner's Exhibit 7 at 12). Eloise testified that while Mr. Williams lived with her, she once caught him peeping at her through the bathroom door. (Doc. 92 at 127). Charlene testified that when Mr. Williams was fifteen, Lottie Turner told her that Mr. Williams was "peeping in her window." (*Id*. at 184).

Dr. Mendel testified that Mr. Williams's sexual promiscuity reassured him that he was not gay and made Mr. Williams feel like a man. (Doc. 93 at 58). Dr. Mendel opined that Mr. Williams's lack of a serious girlfriend made it less likely that he would tell anyone about his sexual abuse. (*Id*. at 84). Dr. Mendel explained in his report that because male victims who fear they might be gay after being sexually abused often try to compensate for their fears by becoming stereotypically "macho," Mr. Williams's compensatory hyper-masculinization resulted in aggressive and violent behavior in his pre-teen years. (Petitioner's Exhibit 5 at 7).

Mr. Williams's compensatory hyper-masculinization continued into his teenage years. Marlon Bothwell testified that Mr. Williams was bullied in high school and

often got into fights after school. (Doc. 93 at 10-20). Marlon recalled that Mr. Williams became more aggressive after a fight in which Mr. Williams was slammed, head-first, into the ground. (*Id*. at 13).

Mr. Williams dropped out of high school in his senior year. (Doc. 91 at 103). He joined the Job Corps, but was kicked out for fighting. (Doc. 93 at 60-61). Dr. Mendel stated in his report that when Mr. Williams returned home to Ashville after being kicked out of Job Corps, he was "drinking constantly, always drunk, with a pervasive sense of hopelessness and despair he had felt only once previously in his life, in the aftermath of his knee surgery during his senior year of high school." (Petitioner's Exhibit 5 at 9). Dr. Mendel further stated in his report that the "critical factors in Marcus' progression toward his crimes[5] were his chronic states of hypersexuality and of aggression, which fused together in his acts of sexual violence; the acute state of hopelessness secondary to his expulsion from JobCorps; along with alcohol as a disinhibiting agent." (*Id*.).

Dr. Mendel explained that male victims of sexual abuse are much less likely to disclose their abuse; the length of time between sexual abuse in males and eventual disclosure is much longer; and people are more likely to suspect sexual abuse in

---

[5] Mr. Williams maintains that he killed Melanie Rowell only ten days after his expulsion from Job Corps. (Doc. 88 at 86).

female victims. (Doc. 93 at 74). Dr. Mendel stated in his report that "[m]ale victims often do not tell about their sexual abuse until they enter either the justice system or substance abuse treatment." (Petitioner's Exhibit 5 at 5). He concluded that "the fact that [Mr. Williams] did not tell about his abuse is not at all unusual and should not be considered a counter-indication of the presence of sexual abuse." (Petitioner's Exhibit 5 at 5).

Mr. Williams points out that consistent with other male victims who finally disclose childhood abuse after entering the justice system, he shared details of his sexual abuse with the first attorney who asked him about it. (Doc. 88 at 95-96). Mr. Williams testified that trial counsel never asked him if he had been sexually abused, but that if counsel had asked, he would have told them:

> Q.    Why did you tell [Rule 32 counsel] about what had happened to you during your childhood when you previously had not talked about it?
>
> A.    He asked me about it. And I didn't, at first, I didn't tell him anything. And over time, I got comfortable, more comfortable with him and he asked me about it again and that's when I told him.
>
> Q.    Why didn't you tell your trial lawyers about sexual abuse and about some of the things you have told the Court here today about your background?
>
> A.    They didn't ask.

(Doc. 91 at 122).

Mr. Williams maintains that exploring his sexual abuse history was especially important because, as Dr. Mendel testified, a large number of people who commit acts of sexual violence were themselves sexually abused. (Petitioner's Exhibit 5 at 9) (citing Doc. 93 at 122). Mr. Williams argues that although childhood abuse is particularly mitigating in capital cases, counsel's failure to investigate his background meant the jury never heard "this account of [his] psychological trajectory from an abusive childhood to sexual violence." (Doc. 88 at 87).

At the evidentiary hearing, Mr. Funderburg justified his decision not to present evidence concerning Mr. Williams's sexual history:

Q. Is it also fair to say that you would want to avoid any testimony that might show or tend to show the future dangerousness of your client, like he's going to do it again?

A. In this case?

Q. Yes.

A. Yes. We had another crime that had occurred that we had to keep out. Marcus had been involved in a similar act from when this case occurred until his arrest.

So, at the time he was found guilty of this, we, I think, entered into a plea agreement on the other charge as well, which the State tried to get it in, but we were able to keep it out.

Q. You wouldn't have wanted, certainly, to offer any testimony that might tend to indicate that your client was predisposed to sexual violence?

A.     Absolutely not.

Q.     And in that judgment that might have made a jury even more likely to give death, fair to say?

A.     Yes, that's one of the biggest reasons we did not want to call Marcus in the case, even though he had given statements, we couldn't put him up on the stand and run the risk of that other conduct somehow coming in.

(Doc. 91 at 76).

Mr. Williams argues that counsel's failure to present available evidence of sexual abuse was not a strategic choice, because counsel failed to ask Mr. Williams or anyone else about sexual abuse and failed to "conduct any reasonable investigation" of Mr. Williams's background. (Doc. 88 at 88). Mr. Williams maintains that if counsel had investigated and presented evidence of Mr. Williams's childhood sexual abuse, the jury would have had "powerfully mitigating context for his behavior." (Doc. 88 at 89). Mr. Williams points out that the Eleventh Circuit Court of Appeals has held that sexual abuse evidence is not a "double-edged sword," *Williams v. Alabama*, 791 F.3d at 1277, and that "'both the Supreme Court and [the Eleventh Circuit] have recognized the long-lasting effects child sexual abuse has on its victims.' *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016) (citing *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008); *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc))." (Doc. 88 at 89).

Mr. Williams adds that his arrest for breaking into Lottie Turner's house and attempting to rape her is "is entirely consistent with the portrait of [his] psychological unraveling, stemming from his childhood sexual abuse." (*Id*. at 89-90). Mr. Williams points to the portion of his confession to the murder in which he wrote, "I have a problem and I want help." (*Id*. at 90) (quoting Petitioner's Exhibit 1 at 1039). He concludes that without the context of Mr. Williams's history of childhood sexual abuse, the jury was given no explanation for his "confounding, and harmful, behavior," which allowed the jury to sentence him to death for an "awful, and apparently inexplicable, crime." (*Id*.).

### E.      Extensive Family History of Childhood Sexual Abuse

Mr. Williams points out that under the ABA Guidelines applicable at the time of his trial, "counsel had a duty to collect information pertaining to 'family and social history (including physical, sexual or emotional abuse),' and to 'obtain names of collateral persons or sources to verify, corroborate, explain and expand upon [the] information obtained.'" (Doc. 88 at 90) (quoting *Williams v. Allen*, 542 F.3d at 1339) (citing 1989 ABA Guidelines 11.4.1(D)). He explains that "several interviews are often necessary to bring out all the relevant information, particularly when sensitive matters such as child abuse or sexual abuse are involved." (*Id*.) (quoting *Alabama Capital Defense Trial Manual*, at 588 (3d ed. 1997)). Mr. Williams contends that if

trial counsel had investigated his background, they would have learned the following details about childhood sexual abuse and incest in his family.

In his report, Dr. Mendel detailed the pervasive history of sexual abuse of children by older relatives in Mr. Williams's family. Dr. Mendel stated that Mr. Williams's great-grandmother, Beulah, was reportedly raped by her uncle; his grandmother Laura's first child was fathered by her cousin; his aunt Veronica was molested as a child by her aunt's boyfriend; and his cousin Brian Williams, in addition to allowing Mr. Williams to watch him having sex with his girlfriend, molested Mr. Williams's sister LaCharo and his cousin Zakia Fomby. (Petitioner's Exhibit 5 at 6). Charlene testified that when LaCharo was "about twelve," she told her that Brian Williams "tried to molest her." (Doc. 92 at 190). Despite Brian "den[ying] it all," Charlene tried to talk to the police about it, but "didn't get to talk to the police" because "there wasn't none at the station where [she] went." (*Id*. at 190-91).

Dr. Mendel testified that he was "struck by the level of sexual abuse across multiple generations" of Mr. Williams's family. (Doc. 93 at 40). He stated that in evaluating Mr. Williams, he considered the history of sexual abuse in Mr. Williams's family because it "very much runs in families." (*Id*. at 68). He added that a family history of sexual abuse is a risk factor for future sexual abuse. (*Id*. at 74). Mr. Williams argues that Brian Williams's abuse of LaCharo and Zakia lends credibility

to Mr. Williams's account of Brian's inappropriate behavior, and confirms that Brian's sexual interactions with Marcus were predatory, not playful or minor. (Doc. 88 at 93).

Mr. Williams asserts that his family history of sexual abuse, and the lack of intervention by the adults in his family, provides context for his own abuse, and explains his reluctance to disclose his own sexual abuse as a child. (*Id*. at 94). Dr. Mendel testified that the family's unresponsiveness to other instances of sexual abuse "affects the degree of disclosure or the likelihood of disclosure." (Doc. 93 at 69). Dr. Mendel opined that Mr. Williams and other victims in his family feared that they would not be believed if they reported their abuse. (*Id*. at 69-70; Petitioner's Exhibit 5 at 6). Dr. Mendel contends that if Mr. Williams's trial attorneys had conducted in depth interviews with him and his family, as required under the ABA Guidelines, they too would have learned about the sexual abuse in his background and family history. (Doc. 93 at 96).

## F.     Psychologically Damaging Childhood Experiences

Dr. Benedict testified that the following risk factors present in Mr. Williams's early life increased the likelihood that Mr. Williams would have a "bad outcome in life": the family history of intergenerational sexual abuse; being born out of wedlock to a teenage mother who did not have help with parenting; the family's limited

resources and conditions that would constitute poverty or would border on poverty; very poor boundaries in the family with respect to sexuality and drinking; exposure to adult sexuality and adult substance abuse at a young age; being sodomized or sexually molested as a child; Mr. Williams's own precocious or early sexual activity; and his early use of alcohol. (Doc. 91 at 167-68, 175-78). Dr. Benedict concluded that Mr. Williams's greatest risk factor was the "lack of consistent caretaking by his mother with whom he tried to establish a relationship and wanted a relationship with, you know, to the present day, but her inconsistency and the various reunions and separations from her." (*Id*. at 175).

Dr. Benedict testified that the instability in Mr. Williams's childhood, and his inability to develop an attachment with a primary caretaker were traumatic for him. (*Id*. at 180). Dr. Mendel testified that Mr. Williams had a "lot of anger toward his mother for not being there," and that the "chaos, the abandonment, the betrayal, the loss, the lack of stability, [and] the lack of predictability" were the "biggest factor[s] in his childhood." (Doc. 93 at 44, 118).

Dr. Benedict testified that it was very difficult for Mr. Williams to reconcile the different expectations his various caretakers had of him:

It's very difficult for a child and even teenagers to experience such radically different sets of expectation in parenting styles.

So, if there are essentially very few boundaries, very few rules and very limited oversight in the home of his mother, we heard testimony today about the very strict and regimented environment he grew up or he experienced when he was living with [his aunt Eloise Williams].

It's very difficult for kids to reconcile those differences and to know what message to take.

(Doc. 91 at 180-82).

Dr. Benedict also testified that Mr. Williams's childhood sexual abuse was traumatic. (*Id*. at 181). Dr. Mendel testified that Mr. Williams was "groomed" into sexual activity at a young age, and taught that it was a secret. (Doc. 93 at 49-51, 100-01). Dr. Benedict testified that being molested at a young age by someone older "comes with the kind of power differential that characterizes abusive situations, sexual or physical aggression or emotional aggression." (Doc. 91 at 181). Dr. Mendel explained that even before Mr. Williams knew that what was happening with Mario was inappropriate, he knew it was something he should hide:

> [T]he time that Marcus says that he came close to telling was when on – after one of the incidents of sexual abuse, he and Mario came out of the – that shack, the Bachelor's Kip and Marcus' mother, Mario's mother and I believe Mario's sister were walking toward them and asked, one of them asked, they all asked, what were you guys doing in there.
>
> I think independently Marcus would have blurted out exactly what they were doing, but instead, Mario said something, Mario lied, said, oh, we were, you know, doing whatever in there, Marcus doesn't recall exactly what. So that's why he didn't tell at that point.

As time went on and he got more of a sense that this was sexual, this was shameful, this was something to be embarrassed about, he did, as most male victims do, which is to keep it – keep it hidden.

(Doc. 93 at 51).

Dr. Benedict explained that Mr. Williams was also exposed to "general disinhibited behavior that would take a number of forms in his life," including exposure to relatives with serious drinking problems, and exposure to domestic violence between his mother and her long time boyfriend, Jeff Deavers. (Doc 91 at 181-82). Dr. Benedict concluded that as a result of these traumatic experiences, Mr. Williams turned to alcohol, hypersexuality, and hypermasculine aggression as a way to "guard against some psychological problem." (*Id*. at 183-84).

Mr. Williams argues that despite trial counsel's knowledge that he "was not in his right mind" at the time of the crime, counsel "presented no expert testimony to explain his psychological trajectory from a childhood of abuse" to commission of the crime."[6] (Doc. 88 at 101). Instead, counsel "painted an incomplete and unhelpful picture" at the penalty phase, by relying on limited testimony that never mentioned Mr. Williams's family history of domestic violence, alcoholism, and sexual abuse. (*Id.*).

---

[6] Trial counsel Erskine Funderburg testified that in mitigation, counsel were arguing that Mr. Williams was "not in his right mind but not because of a mental disease, it was because of the alcohol and the marijuana." (Doc. 91 at 90).

Mr. Williams also faults trial counsel for failing to present expert testimony to give a favorable opinion as to his "capacity for rehabilitation." (*Id*.). Both Dr. Benedict and Dr. Mendel testified that treatment was available, including when Marcus was a child, to ameliorate the damage from his traumatic experiences, and that Marcus would have benefitted from such treatment. (Doc. 91 at 182, 197-98; Doc. 93 at 63-64). Dr. Mendel opined that if Mr. Williams had been able to discuss his traumatic experiences with someone, "we would have seen way less dramatic and self-destructive and destructive to others acts on [Mr. Williams's] part." (Doc. 93 at 62-63).

Dr. Benedict testified that Mr. Williams's psychological condition has improved significantly since his discussions with experts and his attorneys while he has been incarcerated. (Doc. 91 at 194). In addition, Dr. Mendel and Dr. King, the State's expert, both testified that, but for alcohol, Marcus's crime would not have happened. (Doc. 92 at 86; Doc. 93 at 82).

## V. ANALYSIS

Mr. Williams argues that counsel were deficient in failing to uncover and present the potentially mitigating evidence he presented at the evidentiary hearing, and that he was prejudiced by counsel's failures. He maintains that he was "cooperative and willing to assist in his defense"; that he offered to "provide

information about his background, but counsel w[ere] unresponsive"; and that his friends and family were "available and willing to provide mitigating information, but they were not contacted or interviewed." (Doc. 90 at 10). Mr. Williams argues that absent counsel's errors, counsel would have been able to present several more non-statutory mitigating circumstances pertaining his excruciating life history, including poverty, abandonment, sexual abuse, and alcoholism. (*Id*. at 32-34). He argues that in light of this new mitigating evidence, taken as a whole, "there is a reasonable probability that at least one juror would have chosen life imprisonment instead of death." (*Id*. at 35).

To prove counsel were deficient, Mr. Williams must show that counsel's performance was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Professionally competent assistance includes a duty to conduct a reasonable investigation. *Id*. at 690-91. To provide constitutionally adequate representation to a defendant in a capital trial, "counsel must perform a thorough investigation where it appears necessary to do so." *Frazier v. Bouchard*, 661 F.3d 519, 531 (11th Cir. 2011). To determine whether trial counsel's decision not to investigate Mr. Williams's background was reasonable, this court must "assess 'all the circumstances' and 'consider whether the known evidence would lead a

reasonable attorney to investigate further.'" *Id.* (quoting *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010)).

However, a court may decline to reach *Strickland*'s performance prong if it is convinced that the prejudice prong cannot be satisfied. *Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995) (citing *Strickland*, 466 U.S. at 697) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *see also Wong v. Belmontes*, 558 U.S. 15, 19 (2009) (assuming, for purposes of analysis, that counsel's performance was deficient because prejudice inquiry was dispositive to the claim); and *Frazier*, 661 F.3d at 530 (holding that the court "need not reach an ultimate conclusion on the matter, for we may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied"). Because the court concludes that Mr. Williams cannot make the requisite showing of prejudice under *Strickland*'s second prong, the court assumes without deciding that counsel failed to perform an adequate mitigation investigation, and will address *Strickland*'s prejudice prong.

To prove prejudice, a petitioner must show there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Jones v. Sec'y,*

*Florida Dep't of Corr*., 834 F.3d 1299, 1312 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 695). In evaluating that probability, this court must "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." *Id*. (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009)). Mr. Williams cannot show a reasonable probability that if counsel had investigated and presented the evidence presented in the evidentiary hearing at the penalty phase of his trial, that he would not have been sentenced to death.

Mr. Williams argues that "clearly a breakdown in the adversarial process" occurred in his case because despite the abundance of available mitigating evidence produced at the evidentiary hearing, counsel presented almost no mitigation at sentencing. (Doc. 88 at 103). He contends that the mitigation evidence omitted by counsel paints a vastly different picture of Mr. Williams's background than the testimony counsel presented in the penalty phase. (*Id*.). He concludes that he was "denied an individualized sentencing determination by counsel's failure to present 'precisely the type of evidence' that is relevant to assessing his moral culpability. *Williams v. Alabama*, 791 F.3d at 1277." (*Id*. at 106).

Mr. Williams contends that the mitigating evidence counsel could have presented in the penalty phase must be weighed against the sole aggravator the

prosecution argued in the penalty phase. (Doc. 90 at 32). However, a "principled re-weighing of aggravating and mitigating circumstances" requires the court to consider "both the additional evidence that defense counsel could have presented on [Mr. Williams's] behalf in mitigation as well as the additional evidence that the prosecution could have presented to the jury in aggravation." *Frazier*, 661 F.3d at 532.

During the penalty phase of Mr. Williams's trial, the state argued only one aggravating circumstance, "[t]hat the capital offense was committed while the defendant was engaged in commission of or an attempt to commit rape, robbery, burglary or kidnapping." (Vol. 3, Tab 18 at 552; Vol. 3, Tab 23 at 584; Vol. 4 at 601). The court specifically instructed the jury that it could not consider any other aggravating circumstance. (Vol. 3, Tab 23 at 584).

As mitigating circumstances, trial counsel argued, and the jury considered, that Mr. Williams was only twenty-one years old at the time of the crime; that he was under the influence of alcohol at the time of the crime; that he had no significant prior criminal history; that he came from a troubled family background; that he cooperated with law enforcement in confessing to the crime; that he had no disciplinary issues

while in jail awaiting trial; and that he expressed remorse for the crime.[7] (Vol. 3, Tab 21 at 573-74).

If Mr. Williams were granted a new sentencing in this case, his counsel would no doubt argue the same statutory and non-statutory mitigating factors, along with the new mitigating evidence presented at the evidentiary hearing. And no doubt, the state would again argue the same aggravating circumstance it argued previously, that Mr. Williams killed the victim while committing or attempting to commit a rape, robbery, burglary, or kidnapping.

However, if Mr. Williams were granted a new sentencing hearing, the state would not be limited to the sole aggravating circumstance it originally argued. *See Frazier*, 661 F.3d at 533. In addition to the aggravating circumstance that the capital offense was committed while Mr. Williams was engaged in the commission of or an

---

[7] In sentencing Mr. Williams, the trial court found the following mitigating circumstances existed: Mr. Williams's lack of a criminal history; his unstable home life as a child; his frustration from an injury ending his hopes of an athletic career; his obtaining a GED; and his remorse. (Vol. 4 at 631-38). The trial court found the following mitigating factors argued by the defense did not exist: Mr. Williams's age at the time of the offense; his capacity to appreciate the criminality of his conduct due to marijuana and alcohol use at the time of the offense; and his cooperation with law enforcement. (*Id*. at 636-37).

The trial court took judicial notice of Mr. Williams's conviction in the Turner burglary case. (*Id*. at 634). The trial court did not "consider this subsequent act by [Mr. Williams] for any purposes of aggravation," but did consider it as evidence of his state of mind in determining that Mr. Williams's capacity to appreciate the criminality of his actions due to his use of marijuana and alcohol, and his cooperation with law enforcement were not mitigating circumstances in his case. (*Id*. at 634-37).

attempt to commit rape, robbery, burglary or kidnapping, in a new hearing, the state could present evidence that just eighteen days after the murder of Ms. Rowell, Mr. Williams confessed to, and was charged with first degree burglary, in a crime eerily similar to the rape and murder of Ms. Rowell.

On November 24, 1996, Mr. Williams was arrested after breaking into the home of Lottie Turner during the night and attempting to rape her. (*See* Petitioner's Exhibit 2 at 509 - 511). In recounting the events of that night, Ms. Turner informed the police that she was asleep in her home, when she awoke to find Mr. Williams on her bed, wearing no pants. (*Id*. at 509). Mr. Williams told her not to look at him; that he had "wanted her for a long time"; and that he had "had all her girls and they gave good blow jobs." (*Id*.). When Mr. Williams began rubbing his penis between her breasts, Ms. Turner began to struggle, begging for her life. (*Id*.). After Mr. Williams "put his hand up in her vagina" and "found that she was on her period by the blood and pad," he told her to "suck his penis." (*Id*.). Ms. Turner continued to resist Mr. Williams until "it got daylight," then he exited her home out the window through which he had entered. (*Id*. at 510). Ms. Turner identified Mr. Williams as the perpetrator. (*Id*.).

After being arrested, Mr. Williams confessed in a written statement, to breaking into Ms. Turner's house "with sex in mind." (Petitioner's Exhibit 1 at 525). Mr.

Williams explained that he had been drinking and "smok[ing] a lot [of] weed" all day, when he and his friend Alister Cook left the party around midnight to go pick up some girls. (*Id*.). Mr. Williams got "upset" and "snapped" when his plans "didn't work out with those females." (*Id*.). Mr. Williams described the crime as follows:

> I walk around to the back of [Lottie Turner's] house and I put my gloves on try to open two bedroom windows, no luck so I tried the ___ one and I was in there. I took off my clothes outside and went in through the window. I found her in bed so I stripped on down out of my underwear and enter the bedroom crawling to the foot of her bed. I went to raise up and crawl on top of her. She wakes up. She tries to hit [me] with something so we tussle and finally I got [her] pin down. I started fondling her breast and rubbing my penis on her breast. At this time I [was] holding her down. I told her all I wanted was sex and not to hurt her. I told her this several times. She grabs my shirt when I was about to leave so I could not leave until she realized that I wasn't going to hurt her. It was 6:30 am [when] she finally let go. So I grab[b]ed my glove and my boxers and jumped out of the window. I threw my clothes on and ran into the woods . . . .

(*Id*.). Mr. Williams blamed the crime on "lack of sex and too much alcohol and drugs." (*Id*.). Mr. Williams also apologized "for the two women [he had] hurt," and asked for help "find[ing] his true self again." (*Id*.).

On May 20, 1997, Mr. Williams was indicted by a St. Clair County grand jury on a charge of first degree burglary in the Lottie Turner case. *See* https://v2.alacourt.com, *State of Alabama v. Marcus Bernard Williams*, Case No. CC-

1997-000083.00.[8] On March 2, 1999, less than a week after the guilt and penalty phases of his capital murder trial, and a month before the sentencing hearing, Mr. Williams entered a plea of guilty to first degree burglary, and was sentenced to twenty-five years' imprisonment. (*Id*.). Although the state could have presented evidence of this similar crime at the penalty phase of the trial,[9] it did not do so.[10]

---

[8] The court takes judicial notice of the state court records available on the state's Alacourt website. *See Keith v. DeKalb County, Ga.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of DeKalb County Superior Court Online Judicial System pursuant to Federal Rule of Evidence 201); *see also Grider v. Cook*, 522 Fed. Appx. 544, 545 n.2 (11th Cir. 2013) ("the district court was permitted to take judicial notice of Grider's state court criminal proceedings").

[9] Alabama Code § 13A-5-49(2) provides that a prior conviction of a felony involving the use or threat of violence to the person can be used as an aggravating circumstance. Because Mr. Williams had not been convicted in the Turner burglary case at the time of the penalty phase of his trial, the state could not have argued that case as an aggravating circumstance. However, the state could have argued at the penalty phase, that the Turner case evidenced Mr. Williams's future dangerousness. Alabama Courts have held that remarks on future dangerousness are proper in determining "what weight should be afforded the aggravating circumstances that the State had proven." *Floyd v. State*, CR-13-0623, 2017 WL 2889566 at 63 (Ala. Crim. App. July 7, 2017). As the *Floyd* court explained:

Although future dangerousness is not an aggravating circumstance under § 13A-5-49, Ala. Code 1975, "future dangerousness [is] a subject of inestimable concern at the penalty phase of the trial" and evidence and argument about future dangerousness are permissible. *McGriff v. State*, 908 So.2d 961, 1013 (Ala. Crim. App. 2000), *rev'd on other grounds*, 908 So.2d 1024 (Ala. 2004). *See also Whatley v. State*, 146 So.3d 437, 481-82 (Ala. Crim. App. 2010) (holding that evidence of a capital defendant's future dangerousness is admissible during the penalty phase of the trial under § 13A-5-45(d), Ala. Code 1975); and *Arthur v. State*, 575 So.2d 1165, 1185 (Ala. Crim. App. 1990) (holding that prosecutor's remark during penalty phase of capital trial that the defendant would kill again if given the chance was "proper because [it] concerned the valid sentencing factor of [the defendant's] future

If Mr. Williams were granted a new sentencing hearing, the state could certainly argue in addition to the aggravating circumstance that the murder was committed while Mr. Williams was committing or attempting to commit a rape, robbery, burglary, or kidnapping, that Mr. Williams's criminal history includes a very similar crime that is highly relevant to Mr. Williams's future dangerousness. Given the availability of this additional, highly prejudicial evidence, this court cannot find that, but for trial counsel's failure to investigate and present at the penalty phase the additional mitigating evidence presented at the evidentiary hearing, a reasonable probability exists that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant the death penalty.

To be sure, the evidence presented at the evidentiary hearing, pointing out Mr. Williams's chaotic childhood, including sexual abuse by an older boy, his dysfunctional family history, including alcoholism and childhood sexual abuse, and the psychological impact it had on Mr. Williams, would have presented the jury with a more complete picture of Mr. Williams to use in making its sentencing

---

dangerousness.").

*Id.*

[10] Mr. Williams's trial counsel, Erskine Funderburg, testified at the evidentiary hearing that the state tried to get the Turner case into evidence in the guilt phase of the trial, "but [defense counsel] were able to keep it out." (Doc. 91 at 76).

recommendation. But, as counsel feared, such evidence could have just as likely raised concerns about Mr. Williams's propensities to commit similar crimes. And, the jury was also not aware of the highly damaging evidence of Mr. Williams's similar crime, just a couple of weeks after the rape and murder of Ms. Rowell. The totality of evidence likely to have been presented had counsel discovered and presented the evidence presented at evidentiary the hearing could have just as likely encouraged the jury to vote for the death penalty as to vote against it. *See Stanley v. Zant*, 697 F.2d 955, 969 (11th Cir. 1983) ("[M]itigation may be in the eye of the beholder.")

After re-weighing the original aggravating and mitigating circumstances, the additional evidence trial counsel could have presented in mitigation, and the additional, highly damaging evidence the state could have presented, the court finds that Mr. Williams has not made the requisite showing of prejudice required by *Strickland*.

## V. CONCLUSION

Based on the foregoing, the petition for writ of habeas corpus is due to be **DENIED**. The court will enter a separate final judgment contemporaneously with this Memorandum Opinion.

# VI. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted).

This court finds that Mr. Williams's claim does not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be **DENIED**.

**DONE** and **ORDERED** this 17th day of April, 2019.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE