FILED

2021 Sep-23  AM 08:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARCUS BERNARD WILLIAMS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:07-cv-1276-KOB** |
| | ) | |
| **STATE OF ALABAMA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

This death penalty habeas case comes before the court following remand from the Eleventh Circuit Court of Appeals for an evidentiary hearing on Marcus Bernard Williams's failure-to-investigate claims. *See Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015). Mr. Williams alleges that trial counsel's failure to investigate his background prevented the defense from presenting a constitutionally adequate mitigation case during the penalty phase of his trial. (Doc. 5 at 40-65). The court held an evidentiary hearing on May 14-16, 2018 at which Mr. Williams presented witnesses and exhibits.

The road from the evidentiary hearing to this point took a mistaken detour. After initially denying Mr. Williams' habeas motion after the evidentiary hearing, the court granted his motion for reconsideration and vacated its initial

Memorandum Opinion and Order denying habeas relief under 28 U.S.C. § 2254. (Docs. 94, 95, & 102).  The court vacated its rulings because it made a manifest error of law in assessing Mr. Williams' future dangerousness in weighing the mitigating and aggravating circumstances.  (Doc. 102). So, the court set out to carefully re-weigh all of the aggravating and mitigating evidence in light of the relevant and binding case law.

After careful reconsideration of the record and applicable law, the court admits that it initially decided the failure to investigate claims wrongly.  As the court will explain below, Mr. Williams' counsel failed to reasonably investigate Mr. Williams' background for mitigation and that failure prejudiced Mr. Williams.  So, for the following reasons, the court will GRANT Mr. Williams' habeas motion on all of his failure-to-investigate claims EXCEPT counsels' failure to interview Mr. Williams' closest friend Alister Cook, failure to investigate his family history of mental illness, and the failure to present his redeeming characteristics because Mr. Williams has failed to show prejudice on these three claims.

## I. INTRODUCTION

On November 6, 1996, Mr. Williams returned home after a night of drinking and smoking marijuana with friends. *Williams v. State*, 795 So. 2d 753, 761 (Ala. Crim. App. 1999). Upon arriving home, he desired to have sexual relations with a

2

young female neighbor, Melanie Dawn Rowell.  Mr. Williams entered Ms. Rowell's

apartment through an unlocked window, then proceeded to her bedroom where he

climbed on top of her and attempted to remove her clothes.   Ms. Rowell struggled

to stop him, so he strangled her until she was motionless, then had sexual

intercourse with her for fifteen to twenty minutes.  *Id*. at 761-62.

Ms. Rowell's cause of death was asphyxia due to strangulation. Mr. Williams

stole Ms. Rowell's purse before leaving her apartment. He was later arrested and

taken into custody for the burglary and attempted rape of Lottie Turner on

November 24, 1996. While in custody for that burglary, Mr. Williams gave

incriminating statements admitting his involvement in Ms. Rowell's death. DNA

testing confirmed that semen and blood found at the Rowell crime scene were

consistent with Mr. Williams's genetic profile.  *Id*. at 762, 766-67.

## II. PROCEDURAL HISTORY

Court-appointed attorneys Erskine Funderburg and Tommie Wilson[1]

represented Mr. Williams at trial. (Vol. 4, Tab 27 at 2). Because of the

overwhelming evidence of Mr. Williams's guilt, his attorneys argued only that,

although he intended to rape Ms. Rowell, he did not intend to kill her. (Vol. 3, Tab

11 at 494-504). Despite their efforts, on February 24, 1999, the jury found Mr.

---

[1] Ms. Wilson died on March 6, 2015. (*See* Doc. 84-84).

Williams guilty of capital murder for intentionally causing the death of Ms. Rowell

during a rape or attempted rape, in violation of Alabama Code § 13A-5-40(a)(3)

(1975). (Vol. 4, Tab 14 at 534-36).

The penalty phase of Mr. Williams's trial was held the next day, before the

same jury. (See Vol. 3, Tab 15 - Tab 24). Trial counsel called only two witnesses,

Mr. Williams's mother, Charlene Williams, and his aunt, Eloise Williams. (Vol. 3,

Tab 19). The Eleventh Circuit Court of Appeals summarized their testimony:

> Charlene Williams told the jury that she was sixteen years old and
> unmarried when Mr. Williams was born, and that Mr. Williams had
> faced certain difficulties as a child. For example, she testified that Mr.
> Williams sometimes lived with her grandmother and aunt; had no
> relationship with his father and lacked adult male figures in his life;
> and had to stop playing school sports after injuring his knee. Mr.
> Williams's counsel also elicited testimony that portrayed him in a
> negative light, such as the fact that he was a high school dropout; he
> "started hanging with a rough crowd"; he got kicked out of the Job
> Corp[s] for fighting; and upon returning home, he stopped going to
> church and "wanted to sleep all day and stay up all night." FN.1.

>> FN.1. A capital defendant's history of violent and
>> aggressive behavior is generally considered an
>> aggravating factor. *See Holsey v. Warden*, 694 F.3d 1230,
>> 1269-70 (11th Cir. 2012).

> Eloise Williams also testified about Mr. Williams's unstable
> home life. She told the jury that he had moved from place to place as a
> child and lived with different family members; he became sad and
> withdrawn at times because he did not see his mother often; he had
> been a good student with no significant criminal history; and he had
> struggled emotionally after the deaths of his grandfather and uncle.

However, as with Charlene, counsel also elicited evidence from Eloise that was likely more harmful than helpful. For example, Eloise told the jury that Mr. Williams had a quick temper; he had been arrested for fighting as a teenager; FN.2, he had not maintained regular employment after leaving high school; and not long before the crime, he started drinking and using drugs. Eloise ended on a positive note, telling the jury that since Mr. Williams had been in jail, he had stayed out of trouble and expressed remorse for his crime.

> FN.2. The fact that Mr. Williams's counsel told the jury about these adolescent brushes with the law is noteworthy because the State could not have offered evidence of Mr. Williams's juvenile arrests to establish any aggravating factors. In Alabama, "juvenile charges, even those that result in an adjudication of guilt, are not convictions and may not be used to enhance punishment." *Thompson v. State*, 503 So.2d 871, 880 (Ala.Crim.App. 1986) aff'd sub nom. *Ex parte Thompson*, 503 So.2d 887 (Ala. 1987).

> Neither Charlene nor Eloise was asked about Mr. Williams's history of sexual abuse.

*Williams*, 791 F.3d at 1269-70. The jury deliberated only thirty minutes before returning an 11 to 1 verdict, recommending that Mr. Williams be sentenced to death. (Vol. 3, Tab 24 at 596-97).

At the April 6, 1999 sentencing hearing, Mr. Williams testified, expressing his remorse. (Vol. 4 at 607-11). The victim's mother, Donna Rowell, testified about the impact of her daughter's death on the family, especially Ms. Rowell's young children. (*Id*. at 604-06). The trial court found one aggravating circumstance–that

Mr. Williams killed the victim while committing or attempting to commit a rape, robbery, burglary, or kidnapping. (*Id*. at 630). The trial court found as mitigating factors Mr. Williams's lack of a criminal history, his unstable home life as a child, his frustration from an injury ending his hopes of an athletic career, his obtaining a GED, and his remorse. (*Id*. at 631-38). The trial court found the aggravating factor outweighed the mitigating factors, and sentenced Mr. Williams to death. (*Id*. at 639).

The Alabama Court of Criminal Appeals affirmed Mr. Williams's conviction and death sentence on December 10, 1999. *See Williams v. State*, 795 So. 2d 753 (Ala. Crim. App. 1999). The Alabama Supreme Court affirmed his conviction and sentence on January 12, 2001. *See Ex parte Williams*, 795 So. 2d 785 (2001). The United States Supreme Court denied certiorari review on October 1, 2001. *See Williams v. Alabama*, 535 U.S. 900 (2001).

In August, 2004, Mr. Williams filed an amended Rule 32 petition in the trial court. The trial court denied the Rule 32 petition on the merits, without holding an evidentiary hearing. (Vol. 13, Tab 59). The Alabama Court of Criminal Appeals affirmed the denial of Rule 32 relief. (Vol. 13, Tab 60).

In 2007, Mr. Williams filed the present § 2254 petition in this court, arguing inter alia, that trial counsel were ineffective for failing to conduct an adequate

mitigation investigation. (Doc. 5 at 40-65). This court denied the petition on April 12, 2012. *See* (Docs. 27, 28). The Eleventh Circuit Court of Appeals remanded the case, instructing this court to "determine whether Mr. Williams is entitled to an evidentiary hearing and to reconsider his failure-to-investigate claims de novo." *Williams*, 791 F.3d at 1277.

Mr. Williams filed a motion for an evidentiary hearing on March 3, 2017. (Doc. 51). On October 4, 2017, the court granted Mr. Williams's motion for an evidentiary hearing on his failure-to-investigate claims. (Doc. 60).

This court held an evidentiary hearing on May 14-16, 2018. Mr. Williams testified at the evidentiary hearing, and presented the testimony of the following witnesses: Tina Watson, the legal secretary for Tommy Wilson, Mr. Williams' trial counsel who was deceased at the time of the evidentiary hearing; Erskine Funderburg, Mr. Williams' trial counsel; Billy Stephens, the person Ms. Wilson purportedly sought to hire as a mitigation investigator; Sharenda Williams and LaCharo Williams, Mr. Williams' sisters; Eloise Williams, Mr. Williams' aunt; Charlene Williams, Mr. Williams' mother; and Marlon Bothwell, Mr. Williams' childhood friend.  Mr. Williams also called two experts, clinical psychologist Dr. Matthew Mendel and neuropsychologist Dr. Kenneth Benedict, as mitigation witnesses.  The State of Alabama presented expert testimony from Dr. Glen King.

The court paid close attention to the testimony, and carefully reviewed the transcript of the evidentiary hearing, along with the exhibits presented at the hearing. (Docs. 91-93).

The court entered its initial Memorandum Opinion and Order denying habeas relief under 28 U.S.C. § 2254 (docs. 94 & 95), and Mr. Williams filed a motion to reconsider under Fed. R. Civ. P. 59 (doc. 98). The court granted the motion to reconsider because it made a manifest error of law in assessing Mr. Williams' future dangerousness in weighing the mitigating and aggravating circumstances and vacated its initial Memorandum Opinion and Order denying relief. (Doc. 102). Now, after careful and thorough reconsideration, the court will GRANT Mr. Williams' habeas motion for ineffective assistance of counsel on all of the failure-to-investigate claims EXCEPT counsels' failure to interview Mr. Williams' closest friend Alister Cook, failure to investigate his family history of mental illness, and failure to present his redeeming characteristics because Mr. Williams has failed to show prejudice on these three claims.

### III. LEGAL STANDARD

To determine whether counsel were ineffective, the court begins with the instruction from *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court established a two-pronged analysis for determining whether counsel's

performance was ineffective. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687.

A petitioner must establish both parts of the *Strickland* standard: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was deficient; and, that the deficient performance prejudiced his defense. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).

## A.     The Performance Prong

To satisfy the performance prong, a petitioner must establish by a preponderance of the evidence that counsel's performance was unreasonable. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313).  Deficient performance is "'representation [that] f[alls] below an objective standard of reasonableness.'" *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 551 (11th Cir. 2015) (citing *Strickland*, 466 U.S. at 688).

The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. *Stewart*, 476 F.3d at 1209. The court

9

does not consider "what the best lawyers would have done"; instead the court must determine "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

Judicial scrutiny of counsel's performance must be highly deferential, because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. This strong presumption of competent assistance creates a heavy burden of persuasion: "petitioner must establish that *no competent counsel would have taken the action that his counsel did take*." *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). The court can grant relief on ineffectiveness grounds only if a petitioner shows that "no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

This court's review of counsel's performance must not be made with the benefit of hindsight. As the Eleventh Circuit has instructed, "[t]he widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight—except perhaps the rule that we will not

judge trial counsel's performance through hindsight." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995).

When examining counsel's performance at the penalty phase of trial, the court must decide "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart*, 476 F.3d at 1209 (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)). To meet the requirements of *Strickland*, counsel does not need to investigate "every conceivable line of mitigating evidence" regardless of its likelihood of benefitting the defendant at sentencing. *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d 1231, 1250 (11th Cir. 2017) (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

In fact, the *Strickland* standard does not even "require defense counsel to present mitigating evidence at sentencing in every case." *Id.* Rather, the *Strickland* standard for counsel's performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. And, of course, reasonableness depends upon the context of the particular case. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). So, the district court must make a case-by-case determination regarding whether a mitigation investigation was reasonable under the facts of that particular case. *Hardwick*, 803 F.3d at 552.

Counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel; "it can, on occasion, be justified as a strategic choice." *Hardwick*, 803 F.3d at 551 (citing *Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir. 1987)). "Strategic choices made *after thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690 (emphasis added). So, counsel's decision not to investigate or present mitigating evidence is "only reasonable, and thus due deference, to the extent that it is based on a professionally reasonable investigation." *Hardwick*, 803 F.3d at 551.

### B.    The Prejudice Prong

A petitioner also must meet a high burden to establish that his lawyer's deficient performance caused prejudice to his case. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). The petitioner does not meet that high burden merely by showing "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (citing *Strickland*, 466 U.S. at 693). Instead, a petitioner must show "'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695). "A reasonable probability is a probability sufficient to

12

undermine confidence in the outcome, which is a lesser showing than a preponderance of the evidence." *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1360 (11th Cir. 2020) (internal quotation marks and citations omitted) (quoting *Strickland*, 466 U.S. at 694).

In evaluating whether the petitioner has shown a reasonable probability that, if counsel had not been deficient the petitioner would not have been sentenced to death, the court must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)); *see also Sears v. Upton*, 561 U.S. 945, 956 (2010) (holding that a proper prejudice analysis under *Strickland* must take into account the newly uncovered mitigation evidence, along with the mitigation evidence introduced during the penalty phase of the trial, to assess whether a reasonable probability arises that the petitioner would have received a different sentence after a constitutionally sufficient mitigation investigation).

## IV. THE EVIDENTIARY HEARING

In his amended petition, Mr. Williams alleges that trial counsel were ineffective during the penalty phase of the trial because they failed to adequately

13

investigate and present mitigation evidence to show that he should not have been sentenced to death. (Doc. 5 at 38-65).

Specifically, he claims in his amended petition that trial counsel were ineffective because they failed to conduct an adequate mitigation investigation into Mr. Williams' background, including their failure to collect documentary evidence and hire a mitigation specialist; failure to thoroughly investigate Mr. Williams's history, including that he was sexually abused as a child; failure to interview Mr. Williams's closest friend Alister Cook[2]; failure to adequately interview and prepare the penalty phase witnesses; failure to compile Mr. Williams's history of abuse and neglect; failure to investigate his family history of mental illness; failure to show that Mr. Williams's background contributed to his committing capital murder; and failure to present his redeeming characteristics. (*Id.*).

Mr. Williams called witnesses at the evidentiary hearing who testified to the facts that he claims trial counsel should have discovered and presented during the penalty phase of Mr. Williams' trial.  And, Mr. Williams also called two experts, clinical psychologist Dr. Matthew Mendel who specializes in child sexual abuse,

---

[2] Described as "Marcus' closest friend[] during the period leading up to his arrest," Cook and Mr. Williams had been friends since they were eight or nine years old. (*See* Doc. 5 at 49). Mr. Williams and Cook had been drinking together the night of the murder. (*Id.* at 47).

and neuropsychologist Dr. Kenneth Benedict, as mitigation witnesses to explain the effects of the sexual abuse, alcoholism, abandonment and overall family dysfunction on Mr. Williams.  The State of Alabama presented expert testimony from Dr. Glen King to counter Mr. Williams' experts' opinions.  Both sides also submitted evidentiary materials, including Mr. Williams' trial counsels' files and the experts' written opinions.

Mr. Williams argues that if counsel had performed an adequate penalty phase mitigation investigation, they would have learned and been able to present the following evidence:

### A.     Sexual Abuse by an Older Boy

Mr. Williams testified at the evidentiary hearing that, between the ages of four and six, he was sexually abused three or four times by an older boy Mario Mostella, while he and his mother Charlene lived with the Mostella family. (Doc. 91 at 118-20).  Mr. Williams' amended habeas petition indicates that Mario was "then about age fifteen" when he "repeatedly subjected [Marcus] to anal rape." (Doc. 5).  Mr. Williams testified at the evidentiary hearing that "Mario is probably about ten years older."  (Doc. 91 at 123).  Mr. Williams did not know the exact year that Mario was born but just knew Mario was older than Mr. Williams. (*Id*. at 128). And Dr. Mendel's report indicates that Mr. Williams *estimated* that Mario was

15

about ten years older than Mr. Williams, making Mario about fourteen to sixteen years old at the time of the abuse.  (Doc. 87-1 at 117).  Mr. Williams' sexual abuse by Mario occurred at times when Mario was at least an age to babysit Mr. Williams. (Doc. 91 at 203).

Eloise Williams testified that she thought Mario was "maybe six or seven" or "maybe ten" when Mr. Williams and Charlene moved in with the Mostella family, but did not know Mario's true age.  Charlene testified at the evidentiary hearing that Mario was "like eight or nine" when she and Mr. Williams moved in with the Mostellas.  (Doc. 92 at 162).  Eloise described Mario as being on the "rough side" and "in and out of trouble . . . a bully, pushy," and Charlene described Mario as "just being a bad, bad little boy or so."  (Doc. 92 at 111-112, 162).

Mr. Williams testified that all but one of the instances of sexual abuse by Mario occurred in Ashville, Alabama in an old shack called Bachelor's Kip behind the Mostella's home when Mario was babysitting him.  Mr. Williams testified that one of the instances of sexual abuse occurred in "Ohio."  Eloise Williams testified that Charlene and Mr. Williams moved out of state with the Mostellas to Ohio at some point when Marcus was younger.  (Docs. 91 at 119-120 & 92 at 114).  But Charlene testified that she and Mr. Williams went to visit the Mostellos in Missouri, not Ohio, and ended up staying for about four months.  (Doc. 92 at 216-217).

16

Mr. Williams stated that at the time the abuse was happening, he thought it was a game when Mario Mostella would "touch" and "penetrate" him from behind while Charlene was away. (*Id*.). Mr. Williams testified at the evidentiary hearing and told Dr. Benedict that Mario would "touch my groin area and have me touch him in the same area" but only Mario penetrated Mr. Williams from behind.  (Docs. 87-1 at 87 & 91 at 119).  But Mr. Williams told Dr. Mendel that "I don't remember [Mario] asking me to touch him."  (Doc. 87-1 at 118).  And Mr. Williams told the State's expert Dr. King that the sexual abuse by Mario involved "anal penetration of Mr. Williams and also of Mario" and that the abuse by Mario involved "you do me and I do you."  (Doc. 85-2 at 4).

Dr. Mendel described Mario's actions as "pretty classic grooming behavior." (Doc. 93 at 165). Dr. Mendel stated in his report that at the time Mr. Williams was being molested by Mario, Mr. Williams "did not think there was anything wrong with what was going on." (Doc. 84-31 at 5).  But Dr. Mendel explained that by the time Mr. Williams became sexually active with a female at the age of ten he began to feel shame about Mario's sexual abuse of him.  (Doc. 93 at 52).  Mr. Williams testified at the evidentiary hearing that he felt shame, was depressed, and had thoughts of hurting and killing himself as a result of the sexual abuse by Mario. (Doc. 91 at 121).

While he lived with Eloise after his sexual abuse by Mario, Mr. Williams was "sullen, withdrawn, unhappy," and had issues with bed-wetting. (*Id*. at 125-26). Charlene testified that Mr. Williams started wetting the bed "between five and six or something like that." (Doc. 92 at 166). Dr. Benedict stated that bed-wetting was "another factor associated with [Mr. Williams'] shame and lack of control." (Doc. 87-1 at 84). And Mr. Williams reported to Dr. King that he started having nightmares at the age of seven or eight about "either falling off a cliff or drowning" that would occur once or twice a week. (Doc. 85-2 at 6).

Dr. Mendel testified that he assessed Mr. Williams' account of sexual abuse by Mario "with the greatest level of skepticism," especially where Mr. Williams did not tell anyone until after his criminal charges. (Doc. 93 at 85). But Dr. Mendel found Mr. Williams's account of his childhood sexual abuse "extremely credible" and testified that he has no doubt that it happened even though Mr. Williams did not tell anyone about the sexual abuse until around 2005 because he was ashamed and did not think that his mother would believe him. Dr. Mendel also testified that "if there was not the sexual abuse, particularly by Mario, if there was not the sexual abuse, we would not be sitting here today." And Dr. Mendel opined that "if the sexual abuse hadn't happened, there would not have been sexual violence. I believe that very strongly . . . ." (Docs. 92 at 121 & 93 at 85-86, 120).

18

Dr. Mendel explained that male victims of sexual abuse are much less likely to disclose their abuse; the length of time between sexual abuse in males and eventual disclosure is much longer; and people are more likely to suspect sexual abuse in female victims. (Doc. 93 at 74). Dr. Mendel stated in his report that "[m]ale victims often do not tell about their sexual abuse until they enter either the justice system or substance abuse treatment." (Doc. 84-31 at 5). He concluded that "the fact that [Mr. Williams] did not tell about his abuse is not at all unusual and should not be considered a counter-indication of the presence of sexual abuse." (Doc. 84-31 at 5).

Mr. Williams points out that consistent with other male victims who finally disclose childhood abuse after entering the justice system, he shared details of his sexual abuse with the first attorney who asked him about it. (Doc. 88 at 95-96). Mr. Williams testified that trial counsel never asked him if he had been sexually abused, but that if counsel had asked, he would have told them:

> Q.    Why did you tell [Rule 32 counsel] about what had happened to you during your childhood when you previously had not talked about it?
>
> A.    He asked me about it. And I didn't, at first, I didn't tell him anything. And over time, I got comfortable, more comfortable with him and he asked me about it again and that's when I told him.

Q. Why didn't you tell your trial lawyers about sexual abuse and about some of the things you have told the Court here today about your background?

A. They didn't ask.

(Doc. 91 at 122).

Mr. Williams told Dr. Mendel that he became sexually active at the young age of ten and was promiscuous throughout his adolescence and early adulthood because he wanted to prove to himself that he is not gay. (*Id*. at 6). Dr. Mendel testified that prepubescent sexual intercourse is "the biggest red flag" indicating sexual abuse. (Doc. 93 at 124). Dr. Mendel also opined that Mr. Williams became hypersexual, having from one hundred fifty to two hundred sexual partners by the time he was arrested, in an effort to prove that he is not gay. (Doc. 93 at 55-56).

Mr. Williams was also exposed to sexuality by his family members. While they lived with the Mostellas, Mr. Williams bathed with Charlene and shared a bed with her. (Doc. 92 at 165). Dr. Benedict, a neuropsychologist specializing in developmental psychopathology, testified that Mr. Williams was "also exposed to adult sexual relations when living with his mother, when she would have . . . her boyfriends in the same bed that she shared with" Mr. Williams, although Mr. Williams said that he did not actually witness his mother having sexual relations. (Doc. 91 at 176). Dr. Benedict reported that Mr. Williams would wake up in his

mother's bed "to find other men in the same bed . . . indicating that premature exposure to adult sexuality occurred very early in his life." (Doc. 87-1 at 87).

Mr. Williams testified that when he was about ten years old, his teenage cousin Brian Williams "allowed [Mr. Williams] to watch him have sex as a way of showing [Mr. Williams] how to do it with a woman." (Doc. 91 at 120). Dr. Mendel testified that Mr. Williams told him that Brian was "always talking about sex and telling him about sex." (Doc. 93 at 64). Dr. Mendel explained that premature exposure to sexuality "basically tends to feed hypersexualization. So you get these, basically you get these kids who are thinking about sex and wanting to do and explore sexual things before they are physically, psychological or emotionally ready to do that. They're not adults." (*Id*. at 65).

Mr. Williams also engaged in other sexually inappropriate behavior. In his affidavit, Dr. Benedict stated that Mr. Williams told him that when he was a child he would sneak outside to peep on his mother's friends while they used the outhouse. (Doc. 84-33 at 12). Eloise testified that while Mr. Williams lived with her, she once caught him peeping at her through the bathroom door. (Doc. 92 at 127). Charlene testified that when Mr. Williams was fifteen, Lottie Turner told her that Mr. Williams was "peeping in her window." (*Id*. at 184).

Dr. Mendel testified that Mr. Williams's sexual promiscuity reassured him

21

that he was not gay and made Mr. Williams feel like a man. (Doc. 93 at 58). Dr. Mendel opined that Mr. Williams's lack of a serious girlfriend made it less likely that he would tell anyone about his sexual abuse. (*Id*. at 84). Dr. Mendel explained in his report that because male victims who fear they might be gay after being sexually abused often try to compensate for their fears by becoming stereotypically "macho," Mr. Williams's compensatory hyper-masculinization resulted in aggressive and violent behavior in his pre-teen years. (Doc. 84-31 at 7).

Mr. Williams's compensatory hyper-masculinization continued into his teenage years. Mr. Williams' friend Marlon Bothwell testified that Mr. Williams was bullied in high school and often got into fights after school. (Doc. 93 at 10-20). Marlon recalled that Mr. Williams became more aggressive after a fight in which Mr. Williams was slammed, head-first, into the ground. (*Id*. at 13).

Mr. Williams dropped out of high school in his senior year. (Doc. 91 at 103). He joined the Job Corps, but was kicked out for fighting. (Doc. 93 at 60-61). Dr. Mendel stated in his report that when Mr. Williams returned home to Ashville after being kicked out of Job Corps, he was "drinking constantly, always drunk, with a pervasive sense of hopelessness and despair he had felt only once previously in his life, in the aftermath of his knee surgery during his senior year of high school." (Doc. 84-31 at 9). Dr. Mendel further stated in his report that the "critical factors in

Marcus' progression toward his crimes were his chronic states of hypersexuality and of aggression, which fused together in his acts of sexual violence; the acute state of hopelessness secondary to his expulsion from JobCorps;[3] along with alcohol as a disinhibiting agent." (*Id*.).

Mr. Williams maintains that exploring his sexual abuse history was especially important because, as Dr. Mendel testified, a large number of people who commit acts of sexual violence were themselves sexually abused. *See* (Docs. 84-31 at 9 & 93 at 122). Mr. Williams argues that although childhood abuse is particularly mitigating in capital cases, counsel's failure to investigate his background meant the jury never heard "this account of [his] psychological trajectory from an abusive childhood to sexual violence." (Doc. 88 at 87).

At the evidentiary hearing, Mr. Funderburg justified his decision not to present evidence concerning Mr. Williams's "future dangerousness" or propensity for sexual violence, including that eighteen days after Mr. Williams committed the rape and murder of Ms. Rowell, he attempted to rape Lottie Turner:

> Q.    Is it also fair to say that you would want to avoid any testimony that might show or tend to show the future dangerousness of your client, like he's going to do it again?

---

[3] Mr. Williams maintains that he killed Melanie Rowell only ten days after his expulsion from Job Corps. (Doc. 88 at 86).

A.    In this case?

Q.    Yes.

A.    Yes. We had another crime that had occurred that we had to keep out. Marcus had been involved in a similar act from when this case occurred until his arrest.

So, at the time he was found guilty of this, we, I think, entered into a plea agreement on the other charge as well, which the State tried to get it in, but we were able to keep it out.

Q.    You wouldn't have wanted, certainly, to offer any testimony that might tend to indicate that your client was predisposed to sexual violence?

A.    Absolutely not.

Q.    And in that judgment that might have made a jury even more likely to give death, fair to say?

A.    Yes, that's one of the biggest reasons we did not want to call Marcus in the case, even though he had given statements, we couldn't put him up on the stand and run the risk of that other conduct somehow coming in.

(Doc. 91 at 76).

Mr. Williams argues that counsel's failure to present available evidence of sexual abuse was not a strategic choice because counsel failed to ask Mr. Williams or anyone else about sexual abuse and failed to "conduct any reasonable investigation" of Mr. Williams's background. (Doc. 88 at 88). Mr. Williams maintains that if counsel had investigated and presented evidence of Mr. Williams's

24

childhood sexual abuse, the jury would have had "powerfully mitigating context for his behavior." (Doc. 88 at 89). Mr. Williams points out that the Eleventh Circuit Court of Appeals has held that sexual abuse evidence is not a "double-edged sword," *Williams v. Alabama*, 791 F.3d at 1277, and that "'both the Supreme Court and [the Eleventh Circuit] have recognized the long-lasting effects child sexual abuse has on its victims.' *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016) (citing *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008); *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc))." (Doc. 88 at 89).

Mr. Williams adds that his arrest for breaking into Lottie Turner's house and attempting to rape her "is entirely consistent with the portrait of [his] psychological unraveling, stemming from his childhood sexual abuse." (Doc. at 89-90). Mr. Williams points to the portion of his confession to the murder in which he wrote, "I have a problem and I want help." (*Id*. at 90) (quoting Doc. 84-11 at 39). He concludes that without the context of Mr. Williams's history of childhood sexual abuse, the jury was given no explanation for his "confounding, and harmful, behavior," which allowed the jury to sentence him to death for an "awful, and apparently inexplicable, crime." (Doc. 88 at 90).

25

## B.      Extensive Family History of Childhood Sexual Abuse

Mr. Williams points out that under the ABA Guidelines applicable at the time of his trial, "counsel had a duty to collect information pertaining to 'family and social history (including physical, sexual or emotional abuse),' and to 'obtain names of collateral persons or sources to verify, corroborate, explain and expand upon [the] information obtained.'" (Doc. 88 at 90) (quoting *Williams v. Allen*, 542 F.3d at 1339) (citing 1989 ABA Guidelines 11.4.1(D)). He explains that "several interviews are often necessary to bring out all the relevant information, particularly when sensitive matters such as child abuse or sexual abuse are involved." (*Id.*) (quoting *Alabama Capital Defense Trial Manual*, at 588 (3d ed. 1997)). Mr. Williams contends that if trial counsel had investigated his background, they would have learned the following details about childhood sexual abuse and incest in his family.

In his report, Dr. Mendel detailed the pervasive history of sexual abuse of children by older relatives in Mr. Williams's family. Dr. Mendel stated that Mr. Williams's great-grandmother, Beulah, was reportedly raped by her uncle; his grandmother Laura's first child was fathered by her cousin; his aunt Veronica was molested as a child by her aunt's boyfriend; and his cousin Brian Williams, in addition to allowing Mr. Williams to watch him having sex with girls, molested Mr.

26

Williams's sister LaCharo and his cousin Zakia Fomby. (Doc. 84-31 at 6). Charlene

testified that when LaCharo was "about twelve," she told her that Brian Williams

"tried to molest her." (Doc. 92 at 190). Despite Brian "den[ying] it all," Charlene

tried to talk to the police about it, but "didn't get to talk to the police" because

"there wasn't none at the station where [she] went." (*Id*. at 190-91).

Dr. Mendel testified that he was "struck by the level of sexual abuse across

multiple generations" of Mr. Williams's family. (Doc. 93 at 40). He stated that in

evaluating Mr. Williams, he considered the history of sexual abuse in Mr.

Williams's family because it "very much runs in families." (*Id*. at 68). He added

that a family history of sexual abuse is a risk factor for future sexual abuse by the

victim. (*Id*. at 74). Mr. Williams argues that Brian Williams's abuse of LaCharo

and Zakia lends credibility to Mr. Williams's account of Brian's inappropriate

behavior, and confirms that Brian's sexual interactions with Marcus were

predatory, not playful or minor. (Doc. 88 at 93).

Mr. Williams asserts that his family history of sexual abuse, and the lack of

intervention by the adults in his family, provides context for his own abuse, and

explains his reluctance to disclose his own sexual abuse as a child. (*Id*. at 94). Dr.

Mendel testified that the family's unresponsiveness to other instances of sexual

abuse "affects the degree of disclosure or the likelihood of disclosure." (Doc. 93 at

27

69). Dr. Mendel opined that Mr. Williams and other victims in his family feared that they would not be believed if they reported their abuse. (*Id*. at 69-70; Doc. 84-31 at 6). Dr. Mendel contends that if Mr. Williams's trial attorneys had conducted in depth interviews with him and his family, as required under the ABA Guidelines, they too would have learned about the sexual abuse in his background and family history. (Doc. 93 at 96).

### C.   Family History of Alcoholism Contributed to Mr. Williams's Early and Excessive Use of Alcohol

Mr. Williams asserts that he was raised in a family of alcoholics. (Doc. 88 at 72). Eloise testified that when she married into the Williams family, she "learned that they did a lot of drinking and partying." (Doc. 92 at 99). Mr. Williams's great-grandmother, Beulah Williams, with whom he lived from time to time,  was unable to properly care for the children left with her. (Doc. 91 at 146, Doc. 92 at 155). Beulah, described as a good person who "did like to drink and party," worked through the week, but got drunk on the weekends, to the point that she became incoherent and would pass out or urinate on herself. (Doc. 92 at 100, 152, Doc. 91 at 146).

Eloise testified at the evidentiary hearing that almost all of Beulah's family, including Eloise's husband Robert, had problems with drinking. (Doc. 92 at 106-

07). Sharenda testified that during the times she and Mr. Williams spent with Eloise and Robert, Robert was a heavy drinker who "drank probably almost every day at some point," to the point of intoxication. (Doc. 91 at 147). And Sharenda testified that Robert, who was angry with Mr. Williams for walking away from the stove while grease was heating on the stove, walked Mr. Williams over to Eloise's daycare, argued with and grabbed Mr. Williams, and body slammed Mr. Williams to the ground. (Doc. 91 at 148-149).

Charlene testified that she was a heavy drinker from the age of fifteen until she was "like about thirty-two," having been influenced to drink by Beulah and other relatives who drank excessively. (Doc. 92 at 155-56). Charlene drank mostly on the weekends, sometimes to the point of intoxication. (Doc. 91 at 141; Doc. 92 at 156). She drank while she lived with the Mostellas,[4] and she drank while she was in a relationship with Jeff Deavers who was abusive towards her. (Doc. 92 at 112; Doc. 91 at 140). Dr. Mendel stated in his report that Charlene's "pattern of drinking and going out rather than watching her children left Marcus susceptible to Mario's sexual predation." (Doc. 84-31 at 8).

Mr. Williams's childhood friend, Marlon Bothwell, testified that he and Mr.

---

[4] Eloise testified that while Charlene and Mr. Williams lived with the Mostellas, Charlene and Olivia Mostella "were still partying and doing different things, drinking, leaving the children." (Doc. 92 at 112).

Williams began drinking probably between the ages of twelve and fourteen, but Mr. Williams's alcohol consumption increased so much when he was about sixteen or seventeen that he often saw Mr. Williams drunk. (Doc. 93 at 15-17). Dr. Mendel testified that Mr. Williams "was drinking heavily by his high school years" and began drinking "much more following a couple of very negative difficult experiences in his life." (*Id*. at 77). Dr. Mendel stated in his report that, because alcoholism runs in families, Mr. Williams's "alcohol abuse and likely dependence are probably 'multiply-determined,' stemming from a familial pattern of alcoholism as well as Marcus' specific traumatic life circumstances." (Doc. 84-31 at 8).

Dr. Mendel explained that alcoholism often runs in families because of the modeling and example shown by family members drinking. (Doc. 93 at 75-76). He added that "people generally accept that there is a genetic basis for a predisposition towards addiction, including alcoholism." (*Id*. at 76). Dr. Glen King, a clinical psychologist who testified on behalf of the State of Alabama, testified that "but for [Mr. Williams's] substance abuse, in terms of this crime, I don't think we would be here." (Doc. 92 at 86). Dr. Mendel agreed with Dr. King's conclusion that "if there wasn't the alcohol, we wouldn't – this wouldn't have happened and we wouldn't be here today." (Doc. 93 at 82).

Mr. Williams argues that by failing to investigate and present expert

testimony at the penalty phase on both his and his families excessive use of alcohol, counsel deprived the jury of this critical explanation for his conduct. (Doc. 88 at 77). He argues that, although Mr. Funderburg testified that the defense theory for the penalty phase of the trial was that Mr. Williams was not in his right mind because of alcohol and marijuana use, he presented "paltry" evidence about Mr. Williams's substance abuse. (*Id*.) (citing Doc. 91 at 90).

Mr. Williams points out that, although counsel asked Charlene two questions "conceivably related to alcohol use" in the penalty phase, those questions were not helpful because they pertained to Mr. Williams's time in Job Corps, not during his childhood or the time of the crime. (*Id*.) (citing Vol. 3, Tab 19 at 557). Mr. Williams also points out that during the penalty phase, Eloise offered, without being asked about alcohol or drugs, that she "began to notice he had changed – drinking, you know and maybe drugs." (*Id*.) (citing Vol. 3, Tab 19 at 565).

Mr. Williams argues that "without any specifics of when Marcus began drinking, and with no explanation for why Marcus was drinking–such as his genetic predisposition to alcoholism, the excessive drinking modeled by close relatives who reared him, and his traumatic childhood experiences–the jury was left to conclude that Marcus's drinking, which was only vaguely mentioned, was merely a personal failing." (*Id*.) He maintains that counsel was unreasonable for failing to investigate

and present available evidence of Mr. Williams's family history of substance abuse. (*Id*.)

### D.    Childhood Defined by Chaos, Abandonment, and Abuse

Charlene testified that Mr. Williams, her second child, was born when she was sixteen years old. (Doc. 92 at 158-59). Before he was born, his older sister Aquea was sent to New York to live with her paternal grandmother, and never returned to live with Charlene. (*Id*. at 159-60). His father, Michael Daniels, was not involved in his life when Mr. Williams was "small," but "became involved later on in life," when he was around thirteen or fourteen. (*Id*. at 161).

During his early years, Charlene and Mr. Williams "bounced from place to place." (Doc. 88 at 53). They lived with Charlene's grandparents, Ralph and Beulah Williams, in "the old house," a dilapidated house without a bathroom, heating, air conditioning, or hot water (Doc. 92 at 116, 206); they lived with family friends, Della and Will Bothwell (Doc. 93 at 7, 23); they lived with Charlene's friend Olivia Mostella and her three children in Ashville, Alabama (Doc. 92 at 161-62); and they moved to Missouri with the Mostellas for about four months. (*Id*. at 166-67).

Eloise Williams testified that when Charlene and Mr. Williams lived with the Mostellas, Charlene and Olivia left the children alone at home with Olivia's elderly mother while they went out partying and drinking. (Doc. 92 at 112). Mr. Williams

testified that when they lived with Olivia, her son, Mario Mostella, sexually abused him three or four times, over the course of "a couple of years," beginning at the age of four. (Doc. 91 at 118-19). When they returned to Ashville, Charlene lived with her grandmother for a while; with Mary Mostella, Olivia Mostella's mother, for a while; moved into an apartment in Gadsden; then finally moved back to Ashville. (*Id*. at 167-68).

During this time, Charlene gave birth to three more children. (*Id*.). When Mr. Williams was around nine years old, Charlene began a six-year relationship with Jeff Deavers, who was physically and verbally abusive to her, "sometimes" in front of Mr. Williams. (Doc. 92 at 170-74). Mr. Williams testified that one time when he was twelve or thirteen years old, he saw Mr. Deavers strike Charlene with his bare hands. In response, Mr. Williams "grabbed a knife and tried to stab him." (Doc. 91 at 118). Although Mr. Williams previously told Dr. Benedict that Mr. Deavers was the one with the knife, the state's expert Dr. King testified that discrepancy was not a "significant difference in the dynamics of that event." (Doc. 92 at 59).

Charlene had poor parenting skills: she left the children to fend for themselves; they were not supervised appropriately; and at times, they were not clean or "well taken care of." (*Id*. at 117). During the time period when Mr. Williams was around five to ten years old, family members tried to help Charlene

by taking her children in to live with them. (*Id*. at 117-21).

Eventually, when Mr. Williams was about seven or eight years old, Charlene abandoned Mr. Williams and could no longer care for him.  So, he moved in with his aunt Eloise Williams. (*Id*. at 119, 169).  During this time, Mr. Williams moved back and forth between the homes of his great grandmother, Beulah Williams, his aunt Elvis, his aunt Veronica Fomby, and his aunt Eloise Williams. (Docs. 91 at 116 & 92 at 169). Eloise took him to Sunday School and church, helped him with his homework, and allowed him to play baseball. (Doc. 92 at 119-20, 124-26).

Mr. Williams lived with Eloise on and off until he was twelve or thirteen years old. (*Id*. at 127).  Eloise testified that when Mr. Williams was in middle school, he started getting in trouble at school, "getting in fights, stealing and just different things." (Doc. 92 at 126-27). At one point, Eloise caught him peeping through the bathroom door at her. (*Id*. at 127). When Mr. Williams was twelve or thirteen years old, Eloise took him back to live with Charlene because he wanted to live with his mother. (Doc. 92 at 127). Eloise testified that Charlene was not happy about Mr. Williams living with her and that he stayed with Charlene "not very long."  Mr. Williams then went to live with his Aunt Elvis Williams and then "he went floating around to different places after that."  (Doc. 92 at 128).

When he was fourteen years old, Mr. Williams finally met his father, Michael

34

Daniels, and moved in with him for about nine months. (Doc. 91 at 116). Dr.

Mendel testified at the evidentiary hearing that Mr. Williams had "wondered about,

questioned, struggled and worried about" his father his entire life, hoping that the

reason his father never came to visit him was because he did not know Mr.

Williams existed. (Doc. 93 at 42).

Mr. Williams argues that rather than investigating his family history and

presenting "available evidence of Marcus's abandonment by his mother, as well as

the itinerant and dysfunctional lifestyle he was subject to while he was with her,"

trial counsel elicited testimony in the penalty phase from Charlene, minimizing the

instability in Mr. Williams's life, and leaving the jury with the impression that he

"spent lots of time with his mother." (Doc. 88 at 65).

Specifically, Mr. Williams points to the following portions of Charlene's

testimony in the penalty phase:

Q.    Where was [Mr. Williams] when he wasn't with you?

A.    He lived with my grandmother and my aunt. They helped me
      because I was a young girl.

. . . .

Q.    Prior to this time, had Marcus been a problem child to
      you in any way?

A.    No, he had never been.

35

> Q.   Did you spend a lot of time with him when he was
>      growing up?
>
> A.   Yes. Marcus was the baby for five and a half years.

(*Id.*) (quoting Vol. 3, Tab 19 at 554, 558).

He adds that at the sentencing hearing, Eloise testified only generally about Marcus being "left from one place to another" and not "hav[ing] a stable home." (*Id.*) (quoting Vol. 3, Tab 19 at 561). Mr. Williams argues that the penalty phase of his trial contained no testimony about the "domestic violence and abuse" he experienced in the various places he lived. (*Id.*). Mr. Williams argues that the testimony presented at the evidentiary hearing paints a "vastly different picture of his background" than the limited testimony presented at his trial. (*Id.* at 65-66) (quoting *Williams v. Allen*, 542 F.3d at 1342).

### E.   Extensive Family History of Dissolution and Dysfunction

Mr. Williams alleges that compounding the failure to thoroughly investigate and present evidence of his "dysfunctional upbringing," trial counsel also failed to present available evidence of his "troubled family history." (Doc. 88 at 66). He claims that the dysfunction of his childhood was part of an "easily discernable pattern." (*Id.*). Charlene testified that she, her sister, and her brother were raised by their grandparents, Ralph and Beulah Williams; she did not meet her father until she

was three years old; her mother, Laura Williams, "moved away to New York" and never contacted her after she left; and that her mother died a violent death when Charlene was twelve years old. (Doc. 92 at 148-51, 193).

Charlene became sexually active at age thirteen, became pregnant with Mr. Williams's older sister at the age of fourteen, and started drinking at age fifteen. (*Id*. at 155-57). Charlene eventually gave birth to Mr. Williams and three more children, LaCharo, and twins, Sharenda, and Sharay, all of whom were raised in different homes. (*Id*. at 167-68). Mr. Williams maintains that the "distance created by Charlene's abandonment and separation of her children made it difficult for them to bond, and develop loving relationships, as a family." (Doc. 88 at 70).

Mr. Williams's sister Sharenda Williams testified at the evidentiary hearing that she and Mr. Williams "did spend time together" during Mr. Williams's teenage years after he left Aunt Eloise's home. (Doc. 91 at 150). She clarified that they spent a minimal amount of time together because after being adopted by her Aunt Eloise, she lived a "much more strict lifestyle" and was "very involved in church." (*Id*.). Mr. Williams's sister LaCharo Williams testified at the evidentiary hearing that because of their age difference her relationship with Mr. Williams did not really develop until after he was arrested. (Doc. 92 at 214).

Mr. Williams contends that the "treatment that Marcus and his siblings

37

received from caregivers reinforced this sense of distance." (Doc. 88 at 71).

Sharenda testified at the evidentiary hearing that their uncle Robert Williams was

"very strict" with Mr. Williams, while he treated her "like a girl," letting her get

away with anything. (Doc. 91 at 148).

Mr. Williams adds that although "the circumstances of all of Charlene's

children were precarious, [his] nomadic existence was especially so." (Doc. 88 at

71). Mr. Williams points out Dr. Mendel's testimony from the evidentiary hearing:

> I think that the chaos, the lack of stability and the sense of
> abandonment, betrayal, the contrast he experienced in his life from
> seeing why was my younger sister adopted by this aunt, this great aunt,
> and not me. Why was my other younger sister kept and raised by our
> mother and not me, why was my younger brother adopted by this
> family, unrelated family down the road and raised in a stable
> household, why was my older sister taken in by her father and raised in
> a – I don't know much about that family, but at least a relatively
> consistent home, and why was I bounced around.
>
> He experienced a sense of being unwanted, rejected, abandoned,
> betrayed throughout his life, and I think that's had an enormous impact
> on him.

(*Id.*) (quoting Doc. 93 at 41-42).

Mr. Williams asserts that defense counsel should have investigated and

presented evidence of his dysfunctional family history because conditions within

the family can influence a defendant's upbringing and experiences. (Doc. 88 at 71-

72) (citing *Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1251 (11th Cir.

2012) (explaining that, during penalty phase proceedings in 1994, "[the defendant's] life story actually began with [his mother's] story about her life prior to [his] birth because, according to Dr. Larson, what she had experienced prior to that event had a profound effect on the person [the defendant] eventually became"). He points out that courts have held that failing to investigate and present available evidence of a "chaotic, abusive, neglectful family" was deficient. (Doc. 88 at 72) (citing *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008) and *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[A] failure to investigate and present, at the penalty phase of a capital trial, evidence of . . . a dysfunctional family or social environment may constitute ineffective assistance of counsel.")).

Mr. Williams argues that his life was impacted by the "early sexual activity, excessive alcohol use, neglect and abandonment of children, and frayed familial bonds" that persisted generation after generation in his family. He contends that, with the evidence of his troubled family history, counsel "could have described the cycles of generational abusive and neglectful parenting that repeat the same behaviors and lead to the same outcomes."  (Doc. 88 at 72) (quoting Johnson, 544 F.3d at 605). He maintains that counsel were deficient for failing to present the available evidence of his dysfunctional family history to the jury. (Doc. 88 at 72).

39

## F.      Psychologically Damaging Childhood Experiences

Dr. Benedict testified that the following risk factors present in Mr.

Williams's early life increased the likelihood that Mr. Williams would have a "bad

outcome in life": the family history of intergenerational sexual abuse; being born

out of wedlock to a teenage mother who did not have help with parenting; the

family's limited resources and conditions that would constitute poverty or would

border on poverty; very poor boundaries in the family with respect to sexuality and

drinking; exposure to adult sexuality and adult substance abuse at a young age;

being sodomized or sexually molested as a child; Mr. Williams's own precocious or

early sexual activity; and his early use of alcohol. (Doc. 91 at 167-68, 175-78). Dr.

Benedict concluded that Mr. Williams's greatest risk factor was the "lack of

consistent caretaking by his mother with whom he tried to establish a relationship

and wanted a relationship with, you know, to the present day, but her inconsistency

and the various reunions and separations from her." (*Id*. at 175).

Dr. Benedict also testified that Mr. Williams's childhood sexual abuse was

traumatic. (*Id*. at 181). Dr. Mendel testified that Mr. Williams was "groomed" into

sexual activity at a young age, and taught that it was a secret. (Doc. 93 at 49-51,

100-01). Dr. Benedict testified that being molested at a young age by someone older

"comes with the kind of power differential that characterizes abusive situations,

sexual or physical aggression or emotional aggression." (Doc. 91 at 181). Dr.

Mendel explained that even before Mr. Williams knew that what was happening

with Mario was inappropriate, he knew it was something he should hide:

> [T]he time that Marcus says that he came close to telling was when on
> – after one of the incidents of sexual abuse, he and Mario came out of
> the – that shack, the Bachelor's Kip and Marcus' mother, Mario's
> mother and I believe Mario's sister were walking toward them and
> asked, one of them asked, they all asked, what were you guys doing in
> there.
>
> I think independently Marcus would have blurted out exactly
> what they were doing, but instead, Mario said something, Mario lied,
> said, oh, we were, you know, doing whatever in there, Marcus doesn't
> recall exactly what. So that's why he didn't tell at that point.
>
> As time went on and he got more of a sense that this was sexual,
> this was shameful, this was something to be embarrassed about, he
> did, as most male victims do, which is to keep it – keep it hidden.

(Doc. 93 at 51).

Dr. Benedict testified that the instability in Mr. Williams's childhood, and his

inability to develop an attachment with a primary caretaker were traumatic for him.

(*Id*. at 180). Dr. Mendel testified that Mr. Williams had a "lot of anger toward his

mother for not being there," and that the "chaos, the abandonment, the betrayal, the

loss, the lack of stability, [and] the lack of predictability" were the "biggest factor[s]

in his childhood." (Doc. 93 at 44, 118).

Dr. Benedict testified that it was very difficult for Mr. Williams to reconcile

the different expectations his various caretakers had of him:

> It's very difficult for a child and even teenagers to experience such radically different sets of expectation in parenting styles.
>
> So, if there are essentially very few boundaries, very few rules and very limited oversight in the home of his mother, we heard testimony today about the very strict and regimented environment he grew up or he experienced when he was living with [his aunt Eloise Williams].
>
> It's very difficult for kids to reconcile those differences and to know what message to take.

(Doc. 91 at 180-82).

Dr. Benedict explained that Mr. Williams was also exposed to "general disinhibited behavior that would take a number of forms in his life," including exposure to relatives with serious drinking problems, and exposure to domestic violence between his mother and her long time boyfriend, Jeff Deavers. (Doc 91 at 181-82). Dr. Benedict concluded that, as a result of these traumatic experiences, Mr. Williams turned to alcohol, hypersexuality, and hypermasculine aggression as a way to "guard against some psychological problem." (*Id*. at 183-84).

Mr. Williams argues that despite trial counsel's knowledge that he "was not in his right mind" at the time of the crime, counsel "presented no expert testimony to explain his psychological trajectory from a childhood of abuse to commission of

the crime."[5] (Doc. 88 at 101). Instead, counsel "painted an incomplete and unhelpful picture" at the penalty phase, by relying on limited testimony that never mentioned Mr. Williams's family history of domestic violence, alcoholism, and sexual abuse. (*Id*.).

Mr. Williams also faults trial counsel for failing to present expert testimony to give a favorable opinion as to his "capacity for rehabilitation." (*Id*.). Both Dr. Benedict and Dr. Mendel testified that treatment was available, including when Marcus was a child, to ameliorate the damage from his traumatic experiences, and that Marcus would have benefitted from such treatment. (Doc. 91 at 182, 197-98; Doc. 93 at 63-64). Dr. Mendel opined that if Mr. Williams had been able to discuss his traumatic experiences with someone, "we would have seen way less dramatic and self-destructive and destructive to others acts on [Mr. Williams's] part." (Doc. 93 at 62-63).

Dr. Benedict testified that Mr. Williams's psychological condition has improved significantly since his discussions with experts and his attorneys while he has been incarcerated. (Doc. 91 at 194). In addition, Dr. Mendel and even Dr. King, the State's expert, both testified that, but for alcohol, Marcus's crime would not

---

[5] Trial counsel Erskine Funderburg testified that in mitigation, counsel were arguing that Mr. Williams was "not in his right mind but not because of a mental disease, it was because of the alcohol and the marijuana." (Doc. 91 at 90).

have happened. (Doc. 92 at 86; Doc. 93 at 82).

## V. ANALYSIS

Mr. Williams argues that counsel were deficient in failing to investigate and present the potentially mitigating evidence he presented at the evidentiary hearing, and that he was prejudiced by counsel's failures. He maintains that he was "cooperative and willing to assist in his defense"; that he offered to "provide information about his background, but counsel w[ere] unresponsive"; and that his friend and family were "available and willing to provide mitigating information, but they were not contacted or interviewed." (Doc. 90 at 10). Mr. Williams argues that absent counsel's errors, counsel would have been able to present several more non-statutory mitigating circumstances pertaining to his excruciating life history, including sexual abuse, alcoholism, abandonment, and poverty. (*Id*. at 32-34). He argues that in light of this new mitigating evidence, taken as a whole, a reasonable probability exists that the jury would have reached a different result.  (*Id*. at 35). For the following reasons, this court agrees.

### A.  Deficient Performance

Mr. Williams claims that counsel were deficient for failing to investigate and present at the penalty phase non-statutory mitigating evidence about his background, including his prior sexual abuse by an older male, his family history of

44

sexual abuse, his family history of alcoholism, and his family cycle of overall chaos and dysfunction. This court agrees that counsels' performance was deficient for failing to reasonably investigate Mr. Williams' background for mitigation.

The Supreme Court has held that, based on standards applicable in 1999 when Mr. Williams was tried, attorneys representing capital defendants were obligated "to conduct a thorough investigation of the defendant's background." *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding that counsel's mitigation investigation "fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred to as 'guides to determining what is reasonable'"). Counsel's failure to conduct an adequate background investigation or to pursue all reasonably available mitigating evidence can satisfy *Strickland*'s deficient performance prong. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011).

To determine whether trial counsel conducted a reasonable background investigation or made a reasonable decision to not conduct a background investigation, the court must "put itself in counsel's shoes, review the information of which he was or should have been aware, and determine what a reasonable attorney would have done under those circumstances." *Hardwick v. Sec., Fla.*

45

*Dep't of Corrections*, 803 F.3d 541, 552 (11th Cir. 2015) (citing *Strickland*, 466 U.S. at 690). This court must "assess 'all the circumstances' and 'consider whether the known evidence would lead a reasonable attorney to investigate further.'" *See Frazier v. Bouchard*, 661 F.3d 519, 531 (11th Cir. 2011) (quoting *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010)).  So, the court must consider what Mr. Williams' counsel knew about him, his criminal charges, and his background and "what counsel then failed to do and learn about [Mr. Williams] and his childhood background."  *See Hardwick*, 803 F.3d at 552.

In Mr. Williams' case, counsels' failure to conduct an adequate and thorough background investigation for possible mitigating circumstances was unreasonable and deficient. The court will first explain what Mr. Williams' counsel knew or should have known about Mr. Williams and his case, including knowledge of potential sources of mitigation.  Then the court will set out in what ways counsel failed to conduct a reasonable investigation into Mr. Williams' background and discuss what mitigation evidence a reasonable investigation would have uncovered.

### 1.  What Counsel Knew or Should Have Known

#### a.  Counsel Knew the Penalty Phase was Pivotal

When the trial court first appointed Ms. Wilson and Mr. Funderburg to represent Mr. Williams in his capital murder case, they knew or should have known

that the penalty phase would be pivotal to Mr. Williams' defense.  As the Eleventh

Circuit acknowledged in this case, Mr. Williams' defense counsel faced

"overwhelming evidence of [Mr. Williams'] guilt." *Williams v. Alabama*, 791 F.3d

1267, 1269 (11th Cir. 2015).  In light of Mr. Williams' three detailed statements to

investigators admitting his guilt and the DNA evidence corroborating Mr. Williams'

statements and linking him directly to the crime (doc. 84-25 at 7), no reasonable

attorney would have basically disregarded the penalty phase of the trial and

conducted virtually no background investigation for mitigating evidence.

Where the evidence clearly supports the guilt of a defendant, reasonable

counsel would focus their efforts on the penalty phase of the trial.  *See Johnson v.*

*Sec., DOC*, 643 F.3d 907, 932 (11th Cir. 2011) ("Given the overwhelming evidence

of guilt, any reasonable attorney would have known, as [counsel] testified he

actually did know, that the sentence stage was the only part of the trial in which

Johnson had any reasonable chance of success."); *Collier v. Turpin*, 177 F.3d 1184,

1202 (11th Cir. 1999) ("Although counsel . . . recognized that the sentencing phase

was the most important part of the trial given the overwhelming evidence of guilt,

they presented almost none of the readily available evidence of Collier's

background and character that would have led the jury to eschew the death

penalty.").

Because the penalty phase of Mr. Williams' trial was pivotal to his case given the overwhelming evidence of Mr. Williams' guilt, no reasonable counsel would have failed to conduct a thorough mitigation investigation into Mr. Williams' background.  *See Hardwick v. Sec., Fla. Dep't Corr.*, 803 F.3d 541, 552 (11th Cir. 2015) (finding deficient performance and prejudice where "[c]ounsel knew, or should have known, that Hardwick's defense in the penalty phase—specifically the presence or absence of mitigating evidence—would be pivotal").

And the prevailing norms at the time of Mr. Williams' trial underscored the importance of the penalty phase of the trial, especially when a defendant has confessed to the crime.  According to the 1989 ABA Guidelines 1.1, commentary, in many death penalty cases, "no credible argument for innocense exists, so that the life or death issue of punishment is the *real focus* of the entire case."  (Emphasis added).

Trial counsel knew from the beginning that Mr. Williams' "life depended on the penalty-phase presentation."  *See Maples v. Comm'r Ala. Dep't Of Corr.*, 729 F. App'x 817, 825 (11th Cir. 2018) (finding deficient performance could be based on counsel's unreasonably cursory preparation for the penalty-phase when counsel "knew from the onset that Maple's life depended on the penalty-phase presentation.").  Mr. Funderburg admitted at the evidentiary hearing that he knew at

48

the outset of the case that Mr. Williams' confessions would likely be admitted into evidence, so counsel would "have to prepare for the penalty phase in advance of the trial." And Mr. Funderburg testified that knowing "in all likelihood the confession is going to go in," counsel would then "focus on mitigation because if you can get a mitigating factor and convince a jury, then you can get possibly life without [the possibility of parole]." (Doc. 91 at 52 & 88).

Mr. Funderburg also testified that he ordered the *Alabama Capital Defense Trial Manual* that discusses the importance of mitigation evidence for the penalty phase of a capital murder trial. *See* (Doc. 91 at 52).  That manual explains that, during the penalty phase of a capital murder trial, counsel "will be faced with giving an account of how the defendant came to be on trial for life.  *Defense counsel cannot do this without a clear understanding of the circumstances and influences surrounding that life*." *Ala. Capital Def. Trial Manual*, at 3 (3d ed. 1997) (emphasis added). So, Mr. Funderburg knew that mitigation evidence and the penalty phase were key to Mr. Williams' defense; yet, as the court will discuss in detail *infra*, counsel conducted virtually no mitigation investigation.

And the record shows that Ms. Wilson also knew the importance of the penalty phase and an adequate mitigation investigation in light of Mr. Williams' confessions and overwhelming evidence of guilt.  Ms. Wilson's case file contains a

note presumably in her hand-writing that indicates that the primary focus of Mr.

Williams' case and "best issue" would be to argue for life imprisonment without the

possibility of parole and to avoid the death penalty. *See* (Doc. 84-26 at 69).

Ms. Wilson also expressed to the trial court in her June 4, 1997 "Ex Parte

Application for Investigative Expenses" the importance of the penalty phase and

counsel's mitigation efforts. Specifically, she stated that "Defense counsel has an

ethical, legal and constitutional duty to conduct a *thorough inquiry into all aspects*

*of this case*," including any mitigation factors. (Doc. 84-14 at 55) (emphasis

added). Her motion contains a section titled "MITIGATING CIRCUMSTANCES"

in which Ms. Wilson states that the jury and judge will be "constitutionally

required" to consider as mitigating factors "any aspects of [Mr. Williams']

character or record and any of the circumstances of the offense that [he] proffers on

a basis for a sentence less than death," including "any of the diverse frailties of

human kind." (Doc. 84-14 at 56) (quotations and citations omitted).

Ms. Wilson, citing the 1989 ABA Guidelines applicable in death penalty

cases at that time, acknowledged in the motion that counsel must direct an

investigator to "interview people with knowledge of all aspects of Marcus Bernard

Williams' background" and that an investigator is "*essential* to obtaining

documentary evidence and discovering mitigating information." (Doc. 84-14 at 56)

50

(emphasis added).  Ms Wilson also admitted in that motion that counsel at that point—about *seven months after her appointment* to represent Mr. Williams on November 26, 1996—had not conducted an "adequate investigation into critical matters relevant to guilt, level of culpability and appropriate punishment."  (Doc. 84-14 & 84-17).  She stated in the motion that a "*constitutionally sufficient investigation* into these aspects of the life and character of [Mr. Williams] will *require* . . . the services of an investigator to assist in the identification of potential witnesses, and a *thorough investigation into [his] past*. . . ."  (Doc. 84-14 at 57) (emphasis added).  And Ms. Wilson tellingly admitted in the motion that "*counsel would be remiss and constitutionally ineffective if she did not conduct a thorough investigation of all aspects of Marcus Bernard Williams' case*."  (Doc. 84-14 at 54-58) (emphasis added).

And the trial court granted Mr. Wilson's motion and awarded counsel $1,500.00 to hire an investigator to assist with a thorough mitigation investigation for the penalty phase of Mr. Williams' trial.  The trial judge's order granting this relief was "conditioned upon the defendant's attorney providing to the Court the name of said investigator to be used and the costs of services to be provided for a determination of reasonableness."  (Docs. 84-51 at 42, 73 & 91 at 35). As the court will discuss thoroughly *infra*, counsel failed to use those funds to hire an

51

investigator to assist with mitigation or for any other mitigation efforts.

So, Ms. Wilson and Mr. Funderburg knew and acknowledged that a mitigation investigation into Mr. Williams' background and the penalty phase would play a vital role in their ability to effectively represent him and in fact obtained court-ordered funds to assist counsel in that mitigation investigation. But, as discussed thoroughly *infra*, instead of focusing on the penalty phase of the trial and conducting a thorough and adequate mitigation investigation into Mr. Williams' background, counsel unreasonably conducted virtually no mitigation efforts in this case.

### b. Counsel Knew Mr. Williams Wanted Help for His Sexual Crime

Counsel also knew that Mr. Williams' crime for which he was on trial for his life involved a rape and murder; that eighteen days after the rape and murder of Ms. Rowell, Mr. Williams broke into Ms. Turner's home and attempted to rape her; and that, at the time he confessed to these sexual crimes, Mr. Williams wrote in his statement to law enforcement that "*I have a problem and I want help*." (Doc. 84-11 at 39).

Mr. Williams' counsel, knowing the importance of a thorough mitigation investigation for the penalty phase, would have to explain to the jury how Mr. Williams came to be on trial for his life for committing the rape and murder. *See*

*Ala. Capital Def. Trial Manual*, at 3 ("counsel will be faced with giving an account of how the defendant came to be on trial for life").  Given the sexual nature of Mr. Williams' crime and his statements to investigators regarding his "problem" in committing sexual crimes, reasonable counsel would have thoroughly explored *why* Mr. Williams stated that he had a "problem" that led him to commit a sexual offense ; what was the problem; and why he felt that he needed help.  When asked at the evidentiary hearing "Given the sexual nature of the offense, would a full psychological evaluation have been warranted?" Mr. Funderburg stated "That, I don't know."  (Doc. 91 at 48).  But a reasonable attorney would have at least known that the sexual nature of the crime and Mr. Williams' plea for help for his conduct warranted some investigation into that issue.

That reasonable investigation would involve *at the least* questioning Mr. Williams *thoroughly* about his prior sexual history, including why he felt that he had a problem committing sexual crimes; at what age he became sexually active; whether he had been exposed to any deviant sexual actions as a child; whether he had been the victim of any improper sexual contact as a child; and whether he had a history of sexual abuse in his family.  To understand how Mr. Williams ended up committing such a heinous sexual crime and then explain to the jury any mitigating factors they should consider against the aggravating factor involving a murder in the

commission of a sexual crime, reasonable counsel would have thoroughly inquired into Mr. Williams' background for any explanation for his confessed "problem" with sexual crimes.

But, as discussed in detail *infra*, Mr. Williams' counsel failed to thoroughly question Mr. Williams or any of his family members regarding any aspect of his background.  Counsel did not ask Mr. Williams, his family, or friends a single specific or even general question about Mr. Williams' prior sexual abuse, sexual history or about any sexual abuse history in the family.  That failure was unreasonable given what counsel knew about the sexual nature of Mr. Williams' crime and his statement regarding wanting help for his actions.

### c. Counsel Knew Alcohol and Marijuana Contributed Greatly to Mr. Williams' Crime

Counsel also knew that Mr. Williams' crime involved his abuse of alcohol and marijuana.  *See* (Doc. 84-11 at 39).  Mr. Williams' confessed to law enforcement that "I have let drugs, alchohol [sic], and sex ruin my life."  (Doc. 84-11 at 39).  Mr. Williams stated in another written confession that "I have an alchohol [sic] and drug problem"; that "too much alchohol [sic] and drugs controled [sic] my actions"; and that he wanted help for his alcohol and drug issues.  (Doc. 84-6 at 25).

And Mr. Funderburg testified at the evidentiary hearing that "I think the peg

54

we held our hat on the most was the fact that he had been drinking quite a bit[;] I believe he had smoked pot most of the day or part of the day." (Doc. 91 at 75). Mr. Funderburg also testified that "the mitigation factors" counsel presented involved Mr. Williams not being "in his right mind" because of "the alcohol and marijuana." (Doc. 91 at 232).

In fact, in her opening statement for the penalty phase, Ms. Wilson told the jury that Mr. Williams had been "drinking and doing drugs that day"; that he "admitted he had been out drugging that day"; and  "but for [Mr. Williams'] drinking and drugging, none of us would be here today." (Doc. 84-29 at 13).  She specifically asked the jury to take into consideration as a mitigating factor that Mr. Williams had been drinking and doing drugs the day of the rape and murder.  (Doc. 84-29 at 15).

So, counsel knew that alcohol and drugs played a significant role in Mr. Williams' crime and actually wanted the jury to consider this fact as a mitigating factor.  Reasonable counsel with this knowledge would have thoroughly investigated Mr. Williams' background for any mitigation factors explaining *why* Mr. Williams was under the influence of alcohol and marijuana on the day of the murder.  *See Rompilla v. Beard*, 545 U.S. 374, 382 (2005) (finding deficient performance and prejudice where counsel knew from police reports that Rompilla

55

had been drinking heavily at the time of the offense and a mental health expert reported Rompilla's alcohol issues, but counsel "did not look for evidence of a history of dependence on alcohol that might have extenuating significance").

To explain how Mr. Williams ended up raping and murdering a woman while heavily under the influence of alcohol and drugs, reasonable counsel would have thoroughly questioned Mr. Williams and his family about what age Mr. Williams began abusing alcohol and drugs; his history of abusing alcohol and drugs; and any history of alcoholism or drug abuse in his family.  But, as the court will explain in detail *infra*, Mr. Williams' counsel failed to thoroughly investigate Mr. Williams' background regarding his alcohol and drug issues—the very thing that counsel sought to present as a mitigation factor.  That failure was unreasonable.

### 2.   *What Counsel Failed To Do*

Under the prevailing professional norms in 1999, Mr. Williams' counsel had a constitutional duty to conduct a thorough investigation into his background.  *See Williams*, 529 U.S. at 396.  According to Mr. Funderburg's testimony at the evidentiary hearing, Ms. Wilson assumed the primary responsibility for the penalty phase of Mr. Williams' trial and that his role in the guilt and penalty phase "would have been more of experts."  (Doc. 91 at 17).  Mr. Funderburg testified that he subpoenaed some records for and gave the closing statement in the penalty phase,

but Ms. Wilson filed the motion for a mitigation investigator and conducted the

witness examinations of Charlene and Eloise Williams, the only two witnesses

called during the penalty phase.  And, Mr. Funderburg testified that "Tommie was

primarily responsible for mitigation, talking to fact witnesses, local witnesses, [and]

family members. . . ." (Doc. 91 at 17-18, 58).

And in her opening statement at the penalty phase of Mr. Williams' trial, Ms.

Wilson told the jury that "any life events that influence a person are factors for your

consideration" in mitigation.  (Doc. 84-29 at 13).  Yet, neither she nor Mr.

Funderburg conducted a *thorough* investigation into Mr. Williams' background to

discover those specific life events that negatively influenced his life.  *See Wiggins*,

539 U.S. at 526 ("Though [counsel] told the jury it would "hear that Kevin Wiggins

had a difficult life," counsel never "followed up on that suggestion with details of

Wiggins' history.").

In fact, Mr. Funderburg in his closing statement at the penalty phase, after

counsel called only two family members to testify very scarcely about Mr.

Williams' background, told the jury "I don't know what makes a person do certain

things. I don't know what made Marcus Williams do this in this case."  (Doc. 84-29

at 41).  Mr. Funderburg could not offer powerful mitigating circumstances to

explain Mr. Williams' actions because counsel failed to thoroughly investigate Mr.

57

Williams' background to discover any such mitigation evidence. Counsel failed to discover important mitigating factors that could give the jury some explanation of how Mr. Williams ended up on trial for his life.  Counsel's mitigation efforts were minimal and deficient.

### a. Counsel failed to timely begin any mitigation efforts or collect documentary evidence on Mr. Williams

Even though counsel knew that the penalty phase of the trial was pivotal to Mr. Williams' defense, counsel did not *timely* begin any mitigation efforts or request documentary evidence regarding Mr. Williams' background.  The Supreme Court has endorsed the 1989 ABA Guidelines applicable in death penalty cases as "well-defined norms" for purposes of determining when counsel's performance is objectively unreasonable.  *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding that counsel's conduct "fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred to as 'guides to determining what is reasonable'").  Those Guidelines require that counsel begin independent investigations relating to the penalty phase "immediately upon counsel's entry into the case and should be pursued expeditiously."  1989 ABA Guidelines at 11.4.1(A); *see also Raheem v. GDCP Warden*, 995 F.3d 895, 910 (11th Cir. 2021) (finding counsel not deficient where defense counsel "quickly began investigating Raheem's background and mental

health" upon their appointment as counsel in 1999).

The record in Mr. Williams' case shows that counsel did not conduct a thorough investigation, much less begin any type of mitigation efforts expeditiously. The trial court appointed Ms. Wilson on November 26, 1996 and Mr. Funderburg on May 28, 1997. (Docs. 84-17 at 3 & 84-1 at 54). The trial court originally set Mr. Williams' trial to begin February 9, 1998, but continued it until November 17, 1998 at counsels' request just about a week before the original trial date. (Docs. 84-10 at 82 & 84-11 at 56). The trial that began November 17, 1998 ended in a mistrial because of an insufficient number of qualified jurors. (Docs. 84-16 at 28 & 91 at 25). Mr. Williams' second trial began on February 22, 1999, with the penalty phase starting on February 25, 1999. (Doc. 84-1 at 67).

Mr. Funderburg testified that when he joined the case in May 1997, Ms. Wilson did not have a "plan for the penalty phase of the trial" and had conducted no mitigation investigation. (Doc. 91 at 16). So, for the six months from November 1996 until May 1997, Ms. Wilson failed to begin any type of penalty phase preparation. As of Ms. Wilson's filing of her motion for funds for a mitigation investigator on June 4, 1997, about *seven months* after her appointment in this case, counsel admitted that she had not conducted an "adequate investigation" regarding mitigation. (Doc. 91 at 34).

Mr. Funderburg also testified that as of August 26, 1997, when he completed the "Defense Attorney Information" form for Mr. Williams' pre-trial competency evaluation at Taylor Hardin, he had not reached out to any of Mr. Williams family or friends "to try to get information about Marcus' background." (Doc. 91 at 42). So, between May 1997 and August 1997, Mr. Funderburg conducted no mitigation investigation. And in a letter dated February 2, 1998 to Ms. Wilson, which was only a week before the initial February 1998 trial setting and about the time counsel requested a continuance of the trial, Mr. Funderburg wrote that "there is still much work to be done in preparing the defense." (Doc. 91 at 36).

And at the time of Mr. Funderburg's letter to Ms. Wilson on February 2, 1998, counsel had not requested any school, medical, or Job Corp records for Mr. Williams. A thorough mitigation investigation "must include obtaining all medical, mental health, school, employment and other records that relate to the client." *See Ala. Capital Def. Trial Manual*, at 589 (3d ed. 1997); *see also Raheem v. GDCP Warden*, 995 F.3d 895, 910 (11 th Cir. 2021) (finding counsel not deficient where they "tried to get all records [they] could from [Raheem's] educational past, his medical past, and his counseling past," in addition to his prison records; [they] got every kind of record [they] could think of").

In fact, the only documentary records counsel actually requested were Mr.

Williams' Job Corp records. Even though Mr. Williams' mother Charlene called Mr. Funderburg's office on November 12, 1998 with information to request the Job Corp records from Earl C. Clements, 2302 Hwy 60 East, Morganfield, Kentucky 42437 (doc. 84-11 at 12), Mr. Funderburg waited *three months* to request those records from the U.S. Department of Labor on February 17, 1999—only *five days* prior to the start of Mr. Williams' trial on February 22, 1999. (Doc. 84-1 at 70); *see also Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding counsel was deficient when he did not begin to prepare for the sentencing phase until a week before trial).

And even Mr. Funderburg characterized the timing of his request for the Job Corp records as "Late, late in relation to – short notice before trial." (Doc. 91 at 39). He gave no explanation as to why he waited until right before the February 1999 trial setting to request those records or why he was the one requesting those records given his testimony at the hearing that Ms. Wilson was the primary counsel on the mitigation efforts. And, Mr. Funderburg admitted that he failed to request the Job Corp records before the November 1998 trial ended in a mistrial. (Doc. 91 at 39). Had the November 1998 trial not ended in a mistrial, Mr. Funderburg would have proceeded through that trial without having sought any documentary records regarding Mr. Williams' background. Mr. Funderburg also failed to explain why he failed to request any other documentary evidence for Mr. Williams' case.

61

No reasonable attorney who knows that the penalty phase of the trial would be paramount to Mr. Williams' defense would wait until five days before trial to request Job Corp documents, especially when Mr. Williams' crime occurred only ten days after he was terminated from the Job Corp on October 27, 1996. *See* (Doc. 84-17 at 65). But counsel failed to obtain those records in time to utilize any information in them for mitigation purposes. And counsel failed to even request any other type of documentary evidence on Mr. Williams.

And most telling about the *untimeliness* of counsels' minimal efforts regarding mitigation involved the character letters for Mr. Williams provided to the trial judge for sentencing *after* the penalty phase of the trial before the jury. *See* (Doc. 84-21 at 1-6). Eloise Williams testified at the evidentiary hearing that, *on the day of her testimony at the penalty phase*, counsel asked Eloise to "get[] people to write letters" as character references for Mr. Williams. (Doc. 92 at 137). And two of those letters are dated April 4, 1999, which was after the penalty phase of the trial and before the sentencing before the trial court on April 6, 1999. (Doc. 84-21 at 1-6). Eloise testified that she turned those letters over to counsel, and Mr. Funderburg offered those statements at the sentencing as attachments to the pre-sentence investigation report. (Docs. 92 at 138 & 84-29 at 66).

No reasonable attorney would wait until literally the day of the penalty phase

of the trial to get a family member with whom counsel has hardly communicated to pull together character letters for Mr. Williams at the last minute. Counsel did not bother to solicit names from Eloise Williams or any other family member and then interview those people themselves; instead they waited until literally the last minute to get someone else to do what they should have done long before the day of the penalty phase of the trial. Seemingly, getting those character letters for Mr. Williams seemed like an afterthought to counsel. And given counsels' minimal effort regarding mitigation, the entire penalty phase of Mr. Williams' trial seemed to be the least of counsel's concern.

### b. Counsel failed to utilize mitigation investigation funds or hire a mitigation investigator

Most telling regarding the *lack* of counsels' mitigation efforts was the fact that they failed to utilize any of the $1,500 awarded by the trial court for a mitigation investigation. Counsel indicated in the motion for mitigation investigation funds that they had a constitutional duty to conduct a thorough mitigation investigation; received $1,500 from the trial court to conduct a mitigation investigation; but failed to utilize those funds to conduct a thorough mitigation investigation or to hire anyone to assist with a mitigation investigation.

Ms. Wilson's case file contained a letter addressed to Billy Stephens dated October 29, 1997, indicating that Ms. Wilson wanted Mr. Stephens to help with a

mitigation investigation.[6]  (Docs. 84-26 at 68 & 91 at 101).  But Mr. Stephens

testified at the evidentiary hearing that he did not receive the letter, never met with

Ms. Wilson, and did not assist counsel in any way with mitigation efforts in Mr.

Williams' case.  (Doc. 91 at 100-103).

     Mr. Funderburg testified that "I think Tommie hired another investigator that

did some interviews for her. . . . It would be in her billing, I don't know."  (Doc. 91

at 92).  But the court can find no other evidence in the record to support that Ms.

Wilson contacted any other investigator to assist with mitigation efforts.  In fact, the

court can find no filing with the trial court in which counsel provided the name of

any investigator used for mitigation efforts or the costs of services provided by an

investigator, as required by the trial court's order awarding those funds.  *See* (Doc.

84-51 at 42, 73).  And the court can find no records in either Ms. Wilson or Mr.

Fundeburg's trial counsel files or fee declarations submitted to the trial court to

show that either counsel used the court-ordered funds to hire a mitigation

investigator or used the funds to conduct any type of meaningful mitigation

investigation.

     Instead of using the court-awarded money to conduct a thorough mitigation

---

[6] Ms. Wilson's fee declaration also contains an entry dated "1-29-97" for "Letter to
Billy Stephens RE: Investigator," but the court can find no letter with that date addressed to
Mr. Stephens in Ms. Wilson's case files.  *See* (Doc. 84-17 at 3).

investigation that they knew and acknowledged was paramount to Mr. Williams'

case, Mr. Funderburg testified at the evidentiary hearing that he used $400 of the

$1,500 to serve subpoenas on potential witnesses that investigators previously

identified as suspects in the crime—not to subpoena family members or friends who

could testify about Mr. Williams' background. (Docs. 84-6 at 4-6, 84-11 at 43-44

& 91 at 36-38). And Mr. Funderburg admitted at the evidentiary hearing that he

did not interview any of those subpoenaed witnesses for mitigation purposes. (Doc.

91 at 37).

The other $1,100 of those court-ordered mitigation funds were unused and

not reported on either counsel's fee declaration. Mr. Funderburg testified at the

evidentiary hearing that he did not expend any of the court allocated funds on a

mitigation investigation. *See* (Docs. 84-51 at 42, 73 & 91 at 35, 92). And nothing

in Ms. Wilson's counsel files or fee declaration indicates that she used any of those

funds on a mitigation investigation.

Remarkably, instead of utilizing the court-awarded funds for any mitigation

efforts, Mr. Funderburg filed a "Motion for Extraordinary Expenses" on December

9, 1998, *after* Mr. Williams' November 1998 trial ended in a mistrial, requesting

additional funds for an independent forensic testing laboratory to re-test Mr.

Williams' DNA samples. (Docs. 84-1 at 43 & 91 at 24-25). The trial judge

granted the motion and awarded counsel $2,500 for the DNA re-testing.  (Doc. 91 at 25).  Counsel did not even bother to ask for these additional funds for DNA re-testing *before* his first trial ended in a mistrial. But most shocking is that counsel focused on securing additional funds related to the *guilt* phase although Mr. Williams had confessed to the crime, but counsel failed to utilize existing mitigation funds for the *penalty* phase that the trial court had already awarded to conduct any type of mitigation investigation.

Instead of counsel focusing on the penalty phase of Mr. Williams' trial given his three statements admitting his guilt, Mr. Funderburg spent two months right before the February 22, 1999 trial arranging for Reliagene to conduct independent DNA analysis and awaiting the results of the re-testing.  (Doc. 91 at 25-28).  In the end, those efforts merely confirmed that the DNA from the crime scene matched that of Mr. Williams.  (Docs. 84-1 at 1-23 & 91 at 27).  Counsels' focus on the guilt phase so late in the game when they knew Mr. Williams' confessions would be admitted into evidence was unreasonable.  No reasonable counsel, knowing the importance of the penalty phase because of their client's confessions and existing DNA evidence linking their client to the crime, would fail to spend court-ordered mitigation funds but instead ask for more funds to re-test DNA samples *after* the first trial ended in a mistrial. In fact, choosing to forgo spending any court-ordered

mitigation funds and instead focusing on re-testing DNA at that stage lacked any reasonable basis.

Counsel's failure to utilize the court-ordered mitigation funds to conduct a thorough investigation into Mr. Williams' background was unreasonable in light of their acknowledgment of the importance of the penalty phase in Mr. Williams' case. This case does not involve counsel who thought a thorough mitigation investigation was not necessary and made a strategic decision to not conduct one or end mitigation efforts at a certain point as futile. Counsel in this case asked for funds to hire a mitigation investigator, and the court granted that request. Nothing in the record suggests that counsel made a strategic decision to not use those court-ordered funds to conduct a mitigation investigation. They just did not follow through.

To the contrary, the record shows that counsel knew a mitigation investigation was paramount to Mr. Williams' case and wanted to conduct a thorough mitigation investigation. The problem is that counsel's minimal efforts to conduct a thorough mitigation investigation fell way short of reasonable. Counsel *attempted* to secure a mitigation investigator but failed to follow through with efforts to hire an investigator to assist with mitigation. No reasonable counsel would secure court funds to hire a mitigation investigator; try to secure a mitigation investigator; drop those efforts for no legitimate, strategic reason; and instead focus

67

on re-testing the DNA for the guilt phase when the defendant confessed to the crime.

As Ms. Wilson stated in the motion for mitigation funds, counsel knew they would be "constitutionally ineffective" if they did not conduct a *thorough* mitigation investigation into Mr. Williams' background and needed the help of an investigator to conduct interviews. Yet, counsel failed to use those mitigation funds to hire an investigator to assist them with mitigation efforts and failed to themselves conduct a thorough mitigation investigation into any area of Mr. Williams' background. Reasonable counsel would not seek mitigation funds knowing the importance of a thorough background investigation and then fail to use any of those funds to conduct any type of mitigation efforts themselves or hire a mitigation investigator to assist them. Counsels failed efforts regarding using the court-ordered mitigation funds to hire a mitigation investigator were unreasonable and deficient and in their own words "constitutionally ineffective."

### c. Failure to adequately interview Mr. Williams about his background for mitigation

A thorough, reasonable mitigation investigation would start with counsel thoroughly interviewing their client and collecting background information from him. *See Ala. Capital Def. Trial Manual*, at 588 (the penalty phase investigation "must start at the first client interview"). Based on the professional standards in

both the 1989 ABA Guidelines and the *Alabama Capital Defense Trial Manual*, Mr. Williams' counsel had a "duty to collect information pertaining to 'family and social history (including physical, sexual, or emotional abuse,' and to 'obtain names of persons or sources to verify, corroborate, explain and expand upon [the] information obtained.'" *See Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (quoting 1989 ABA Guidelines 11.4.1(D)).  As the *Alabama Capital Defense Trial Manual* also explains, because the "stakes are so high in a capital case," counsel must spend "a great deal of time with the client" so he will "feel very comfortable and competent during what will be a very difficult experience."  *Ala. Capital Def. Trial Manual*, at 3 (3d ed. 1997).

But, Mr. Williams' counsel spent very minimal time themselves interviewing Mr. Williams regarding any mitigation efforts or in preparing for the penalty phase of Mr. Williams' trial.  Mr. Williams testified that counsel met with him "about a half dozen times," each time from "fifteen to thirty minutes."  (Doc. 91 at 104-105). Mr. Williams stated that those meetings were generally in the courthouse before or after court settings and that none of those meetings were at the jail.  (*Id*. at 105).

Mr. Williams testified that he had "hardly any" relationship with Ms. Wilson because "she didn't really talk to me much."  (Doc. 91 at 105).  Ms. Wilson's fee declaration corroborates this claim.  As the primary counsel responsible for the

penalty phase of Mr. Williams' trial, Ms. Wilson's fee declaration submitted to the

trial court reflects that she spent very little time with Mr. Williams at all, much less

for the penalty phase.[7]

Ms. Wilson's fee declaration contains just a few entries indicating that she

spent any time with Mr. Williams.  *See* (Doc. 84-17 at 2-10).  Ms. Wilson noted in

her fee declaration a 30 minute conference with Mr. Williams on May 28, 1997

regarding "charges, defenses, discovery" on the same day as Mr. Williams'

arraignment.[8] The only other entry prior to Mr. Williams' trial on February 22-25,

1999 regarding meeting with Mr. Williams was for August 3, 1997, where Ms.

Wilson noted that she had an "*Office Conference* with Co-Counsel & Defendant"

for two hours.  (Doc. 84-17 at 5) (emphasis added).  Curiously, Mr. Funderburg's

fee declaration does not contain an entry for August 3, 1997 and does not indicate

that he met with Mr. Williams or Ms. Wilson on that day. *See* (Doc. 84-1 at 68).

And the court is unsure where Ms. Wilson's August 3, 1997 meeting with Mr.

Williams occurred because he was incarcerated at that time and could not meet at

---

[7]  Ms. Wilson submitted her fee declaration to the trial court on June 24, 1999, after Mr. Williams' guilt and penalty phases of his trial on February 22-25, 1999 and sentencing by the trial judge on April 6, 1999.  *See* (Doc. 84-17 at 2-10).

[8]  Mr. Funderburg indicated in his fee declaration that Mr. Williams' arraignment occurred June 10, 1997, and that he spent .25 hours on May 28, 1997 for "Receipt and review of notice of appointment."  *See* (Doc. 84-1 at 67).

Ms. Wilson's "office."

Even though Mr. Williams wrote Ms. Wilson a letter dated February 28, 1997 asking her to meet with him about his background, without interruptions and "without my family being around," Ms. Wilson's records indicate that she possibly met with Mr. Williams only two times as discussed above for at most 2.5 hours prior to his trial that began on February 22, 1999. *See* (Docs. 84-26 at 86 & 91 at 109). So for the two years between his February 1997 letter asking to meet with counsel to discuss his background and his February 1999 trial, Ms. Wilson's records indicate she met with Mr. Williams only twice. And according to Ms. Wilson's fee declaration, she had no meetings or contact with Mr. Williams for almost a year and a six months between the August 3, 1997 meeting and his trial date on February 22, 1999.

Although Ms. Wilson's legal secretary Tina Watson testified that "it is normal practice for [all documents about this case] to be kept in the file," she could not say for sure that all of Ms. Wilson's notes were in her case file submitted to the court. (Doc. 91 at 11-14). And the State argues that "[b]ecause Tommie Wilson is deceased, it is simply impossible to determine how much time she actually spent 'preparing for the sentencing phase.'" (Doc. 89 at 23). But a reasonable attorney would document and include in her fee declaration submitted to the trial court at

least *all* time spent with a defendant in a capital murder trial. The fact that Ms. Wilson included only a few cursory entries in her fee declaration regarding specifically spending time with Mr. Williams supports his statements regarding the minimal amount of time Ms. Wilson devoted to talking with him and investigating Mr. Williams' background for mitigating evidence.

No reasonable counsel in a death penalty case who is primarily responsible for the penalty phase would meet with the defendant only twice in two years when she knows that a thorough mitigation investigation is vital to the case. Mr. Williams was willing to discuss his background with Ms. Wilson, but according to Ms. Wilson's fee declaration she failed to spend any meaningful time with him to discover mitigation evidence in his background.

Ms. Wilson's case file contains no notes regarding her meetings with Mr. Williams or any notes regarding any mitigation investigation efforts with Mr. Williams. Ms. Wilson's minimal contact with Mr. Williams was especially unreasonable given her role as the primary counsel responsible for the penalty phase of his trial and the paramount importance of Mr. Williams' background as a potential source of mitigation evidence.

Although Mr. Funderburg claimed Ms. Wilson was primarily responsible for the penalty phase of the trial, his fee declaration indicates that he spent more time

with Mr. Williams than did Ms. Wilson.  *See* (Doc. 84-1 at 67-71).  And Mr.

Williams testified that he had more contact with Mr. Funderburg than he did with

Ms. Wilson.  (Doc. 91 at 106).  According to Mr. Funderburg's fee declaration, he

met with Mr. Williams only five times and spent at most only about eight hours

total meeting with him from May 1997 when the court appointed Mr. Funderburg

until Mr. Williams' trial in February 1999.  *See* (Doc. 84-1 at 67-70).

Mr. Funderburg testified at the hearing that he met with Mr. Williams about

"nine or ten times" because he *assumed* that the entries in his fee declaration for

"Travel to and from Ashville" would be to meet with Mr. Williams.  (Doc. 91 at

50).  But, in four of the only five entries in his fee declaration where Mr.

Funderburg indicates that he actually met with Mr. Williams, he also included a 1.0

hour entry for "Travel to and from Ashville" on that same date.  In most of the

"Travel to and from Ashville" entries where he did *not* include a meeting with Mr.

Williams, Mr. Funderburg included other things that he did that day, including

"Research and Trial Preparation" and "Receipt/ review of case action summary."

The April 6, 1999 entry where Mr. Funderburg included only "Travel to and from

Ashville" corresponded with the date of Mr. Williams' sentencing hearing.  (Doc.

84-1 at 67-70).  And a reasonable attorney would include in his fee declaration *all*

the time he actually spent with the defendant, especially in a death penalty case.  So,

73

Mr. Funderburg's fee declaration shows that he met with Mr. Williams about five times from June 1997 until his trial in February 1999 for a total of about 8 hours.

And Mr. Funderburg noted that 4.5 hours of those 8 hours were for a "Meeting with District Attorney *and* Defendant," so he presumably met with Mr. Williams *alone* for less than 4.5 hours on that date. *See* (Doc. 84-1 at 68) (emphasis added).

And 1.25 of those 8 hours included Mr. Funderburg meeting with Mr. Williams on August 26, 1997 regarding "psychological forms" for the Taylor Hardin evaluation for Mr. Williams' competency to stand trial (*Id.*)  But those forms were only two pages and contained no background mitigation information on Mr. Williams because counsel had conducted no mitigation investigation into Mr. Williams' background at that point.  (Doc. 84-15 at 22-25).  In fact, question 3 of that form asked counsel to indicate "information from Relatives, Friends, etc. that would Substantiate Defendant's Mental Condition" but Mr. Funderburg wrote in response that "Defense Counsel has been unable to consult with relatives and friends concerning this issue." *Id*. *So*, Mr. Funderburg presumably did not glean any background information from Mr. Williams during that 1.25 hours meeting with him regarding those forms.

And although Mr. Funderburg does not specify about what he met with Mr.

Williams during the rest of his meetings, some of those meetings presumably were about the guilt phase of the trial because Mr. Funderburg testified that his primary responsibility was "forensics and DNA and kind of the technical issues." *See* (Doc. 91 at 57).

So, Mr. Funderburg most likely spent less than eight hours actually meeting with Mr. Williams in a meaningful way to investigate his background for mitigation. That minimal amount of time spent with Mr. Williams was inadequate to thoroughly interview and question Mr. Williams about his background for possible mitigation. *See Daniel v. Comm'r, Ala. Dep't Corr.*, 822 F.3d 1248, 1264 (11th Cir. 2016) (finding deficient performance when no competent attorney in 2003 would have failed to conduct timely and thorough background interviews with the defendant and his immediate family members when they were available to counsel).

Not only did Mr. Funderburg spend very minimal time with his client, Mr. Williams testified that counsel posed to him "just general questions" about his background, including about "parents, brothers, sisters, that sort of deal, school," but did not ask anything specific about his family history or whether he had been sexually, physically, or emotionally abused in his childhood. (Doc. 91 at 106). Mr. Funderburg admitted at the hearing that he asked Mr. Williams only general

75

questions about his background.  (Doc. 91 at 70).  Mr. Funderburg testified that he did not ask Mr. Williams any specific questions regarding his past sexual history, alcohol use, or family background.  Instead, Mr. Funderburg testified that his practice was to ask only "general questions" like "what kind of childhood did you have, where did you grow up, where did you live, how were you treated, were there problems."  (Doc. 91 at 70).  Mr. Funderburg indicated that he understood the importance of physical and sexual abuse as "potential" mitigation evidence, but that he did not try to get that information by asking Mr. Williams "a litmus test of specific questions."  (*Id*. at 69).

Counsel's practice of only asking vague, general questions did not satisfy counsel's duty to thoroughly interview Mr. Williams about his background and was unreasonable in light of the professional norms at the time of Mr. Williams' trial. The 1989 ABA Guidelines specifically required counsel to "[c]ollect information relevant to the sentencing phase of trial," including information about his medical history and any "alcohol and drug use" and "family and social history (including physical, sexual or emotional abuse)."  1989 ABA Guidelines 11.4.1(D).

The *Alabama Capital Defense Trial Manual*, of which Mr. Funderburg had a copy, provides a "list of questions relating to your client's life history[,]" but cautions that the list is "not exhaustive" and that counsel may need to seek

"additional background information and data" not specifically listed in the questions. *Ala. Criminal Def. Trial Manual*, at 55.  The *Manual*'s list of questions instructs counsel to ask about "the name, age and address (where available) of every member of the client's family or household"; the "physical conditions in which the family lived" and whether the client had "adequate food" at home; "any moves made by the client's family" and the reasons for those moves; whether the client or his siblings experienced "sexual abuse (whether or not associated with discipline) or harassment, or aberrant sexual modeling"; "any major disruptions of or trauma to any member of the household;" whether the client "demonstrate[d] any behavioral difficulties"; whether the client "has ingested quantities of alcohol or drugs in such a way as to suggest substance abuse"; and whether the client has any "family history of mental illness, criminal conduct, or alcohol or drug use."  *Ala. Capital Def. Trial Manual*, at 1, 58-61, 64, 72, 68, 78-80.

Mr. Funderburg knew that Mr. Williams's crime involved a sexual offense; that Mr. Williams admitted to police that he had a problem committing sexual crimes and wanted help; that Mr. Williams admittedly had an alcohol and drug problem and wanted help; and that alcohol and drugs contributed greatly to the Mr. Williams' crime.  Yet, counsel failed to ask Mr. Williams any specific questions about his sexual history or alcohol and drug history as required by the 1989 ABA

Guidelines and the *Alabama Capital Defense Manual*. A reasonable investigation would involve *at the least* counsel questioning Mr. Williams *thoroughly* about his prior sexual history, including why he felt that he had a problem committing sexual crimes; at what age he became sexually active; whether he had been exposed to any deviant sexual actions as a child; whether he had been the victim of any improper sexual contact as a child; and whether he had a history of sexual abuse in his family. But counsel did not even broach the subject of Mr. Williams' sexual history or why he thought he had a problem committing sexual crimes. *See Johnson*, 643 F.3d at 907 (finding deficient performance where trial counsel did not specifically ask Johnson if he had been abused by his father, mother, grandparent, or anyone else; counsel "did not broach the subject."). That failure was unreasonable.

Mr. Funderburg's practice of asking only general questions of defendants in death penalty cases was especially unreasonable given what counsel knew about Mr. Williams and the specifics of his sexual crime and his alcohol abuse on the day of the crime. *See Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008) (The Court found deficient performance for failure to investigate for mitigating evidence where counsel "asked no such specific questions" about the defendant's "drug abuse, head injury, psychiatric history, or family dysfunction. . . . Thus, his failure to gather mitigating information did not result from its unavailability; it resulted from

counsel's complete failure to ask any relevant questions."); *McNeill v. Branker*, 601 F. Supp. 2d 694, 717 (E.D.N.C. 2009) (finding trial counsel deficient when he "made only minimal effort to investigate potential mitigating evidence" where his "primary approach to learning about the petitioner's character, background, and upbringing was to ask petitioner and his parents their impression on the subject").

Had counsel simply spent adequate time with Mr. Williams, developed a rapport with him to gain his trust, and specifically asked Mr. Williams about his sexual history, counsel most likely would have discovered the same mitigating evidence uncovered by Mr. Williams' Rule 32 counsel "Karl," who Mr. Williams first told about his sexual abuse by Mario. *See Wiggins*, 529 U.S. at 525 ("Had counsel investigated further, they might well have discovered the sexual abuse later revealed during state post conviction proceedings.").

Mr. Williams testified that he did not tell Karl about the sexual abuse the first time he asked about that issue, but after Karl developed a rapport with Mr. Williams and specifically asked him about his past sexual abuse, he then felt comfortable telling Karl about his past sexual abuse by Mario. (Doc. 91 at 122). Mr. Williams testified at the evidentiary hearing that "Karl was more accessible and more like he wanted to help, interested in what I had to say. Whereas my trial attorneys already had their plan made out so, you know, there was – they had nothing they wanted to

talk to me about or wanted to hear from me about, that's the way I felt." (Doc. 91 at 130).

Likewise, had Ms. Wilson and Mr. Funderburg spent adequate time with Mr. Williams, developed a rapport with him as did Karl, and asked Mr. Williams specific questions relevant to mitigation, Mr. Williams would have told trial counsel that Mario, who Mr. Williams believed was "ten or twelve years older" than him, sexually abused him about three or four times between the ages of four and six; that he felt shame and depression about Mario's sexual abuse of him; that he had thoughts of hurting and killing himself after the sexual abuse; that Mr. Williams began having sexual intercourse at the age of ten; that when he was around ten years old he "was allowed to watch [his eighteen-year-old cousin Brian Williams] have sex as a way of showing me how to do it with a woman"; and that his mother had men in her bed when Mr. Williams was sleeping with her.  (Doc. 91 at 118-134)*; see Daniel*, 822 F.3d at 1265 (finding deficient performance and prejudice where the jury never heard about Daniel's physical, emotional, or sexual abuse "that trial counsel could have gotten from timely and meaningful interviews with Mr. Daniels.").

And, had counsel asked Mr. Williams specific questions about his family background as called for by the prevailing professional norms in 1999, Mr.

Williams also would have told them about the domestic violence he witnessed at the age of twelve between his mother and her boyfriend Jeff Deavers. (Doc. 117-118, 132). Mr. Williams testified at the evidentiary hearing that his mother's relationship with Mr. Deavers was "volatile," meaning they would "get into fights, physical fights"; he saw evidence on his mother that Mr. Deavers had attacked or beaten her, including a black eye and busted lip; and when he was twelve-years-old, he saw Mr. Deavers' strike Mr. Williams' mother with his bare hands, and Mr. Williams responded by "grabb[ing] a knife and tr[ying] to stab him." (Doc. 91 at 117-118).

Mr. Funderburg claimed that he was at the "mercy of what [Mr. Williams was] willing to tell [him]." (Doc. 91 at 70). But Mr. Williams did not give information because counsel failed to even ask. And Mr. Funderburg cannot assign his constitutional duty to thoroughly investigate for mitigation to the client Mr. Williams. *See Rompilla*, 545 U.S. at 381 (Court found deficient performance and prejudice when Rompilla's "own contributions to the case were minimal" and even though he was "even actively obstructive by sending counsel on false leads."). Even if Mr. Williams was not willing to cooperate with counsel, which he was, that fact would not abrogate counsel's duty to thoroughly investigate Mr. Williams' background for mitigation. *See Blanco v. Singletary*, 943 F.2d 1477, 1502 (11th

81

Cir. 1991) (counsel cannot "blindly follow" a client's command to not present mitigating evidence and that command does not end counsel's responsibility to conduct a reasonable mitigation investigation).

Mr. Williams' counsel unreasonably failed to ask Mr. Williams any specific questions about or *thoroughly* investigate any aspect of Mr. Williams' background. That failure constituted deficient performance.

### d. Failure to adequately investigate or interview any family members or friends for mitigation

Not only did counsel fail to adequately spend time with and interview Mr. Williams about his background, counsel also failed to adequately investigate or interview any family members or friends for possible mitigation evidence. When asked at the evidentiary hearing "How would you characterize the amount of work you did in preparation for the sentencing in the Marcus Williams case," Mr. Funderburg testified that "I would say that we tried to contact as many people as we obtained information from from [sic] Marcus' mother and his grandmother." Mr. Funderburg did not know how many people he contacted and said "whatever is in my notes." (Doc. 91 at 28). But both his and Ms. Wilson's case files are silent on the issue of a mitigation investigation and do not contain *any* notes about *any* meetings with or list of *any mitigation* witnesses.

82

Mr. Williams testified that counsel did not discuss with him prior to his trial any witnesses or information that counsel planned to present at the penalty phase or what aspects of his childhood or background that his counsel might argue to the jury. (Doc. 91 at 112-113). But Mr. Williams indicated that before trial his counsel asked him to give them "a list of relatives and friends that I could call as witnesses." (Doc. 91 at 113). Mr. Williams testified that he wrote about twelve or thirteen names, including Glen Smith, Tim Cater, Marlon Bothwell, Tameka Richardson, Charlene Williams, and Eloise Williams, and others names he could not recall on a piece of paper and gave the list to counsel. (Doc. 91 at 113). But the list provided by Mr. Williams is not in Ms. Wilson or Mr. Funderbug's case files in the record. And Mr. Funderburg testified his practice was to keep all papers and documents related to a case in his file. (Doc. 91 at 96).

Counsels' files do, however, contain a *blank* form provided by the trial court on which counsel was to list all possible mitigation witnesses for the penalty phase. (Doc. 84-50 at 70-73). In fact, on September 18, 1997, the trial court provided that form to counsel and ordered that counsel "shall have the defendant fill out and complete a list of any potential witnesses in this cause who might in any way assist counsel in their defense of this case"; that counsel "retain a copy of this list for their files and investigative use"; and that counsel furnish a completed and signed copy

83

of that list to the trial judge within fourteen days of that September 18, 1997 order.
(Doc. 84-11 at 73-74).  The trial court's order also indicates that the list provided to
the trial judge "shall remain under seal in the office of the undersigned judge. Upon
completion of the trial, the sealed list shall be made a part of the record in this
cause. . . ." (*Id.*)  Ms. Wilson's fee declaration indicates that she mailed a copy of
that order to Mr. Williams on September 20, 1997 "to complete and return."  (Doc.
84-17 at 6).  But the only copy of that form that the court can find in the record is
completely blank.

Mr. Funderburg acknowledged that the form provided by the court was blank
and testified at the evidentiary hearing that he "would have produced a list
independent of that form," or "we would have prepared one on our own, not
necessarily using this exact form."  (Doc. 91 at 30, 60).  But the court can find no
list of any mitigation witnesses in either counsel's files.  And Mr. Funderburg
admitted at the evidentiary hearing that his case file contained no list of possible
mitigation witnesses.  (Doc. 91 at 96).  He gave no explanation for why some type
of mitigation list was *not* in his or Ms. Wilson's files for Mr. Williams' case.

In fact, at sentencing, the trial judge inquired about the fact that it had not
received a list of mitigation witnesses from the defendant as he had ordered.  The
trial judge stated at the sentencing hearing that "I think the record will reflect the

Court has previously distributed to the defendant and his attorneys a list for

prospective witnesses that the defendant would request be called.  Quite frankly,

based on that list, I don't know whether any witnesses were listed as to the

sentencing phase."  (Doc. 84-29 at 92).

Mr. Funderburg responded to the trial judge that "[w]e did that through

statements [attached to the pre-sentence report].  [Mr. Williams] read through those

and he said he wanted us to offer those and we did."  (*Id*. at 93).  But the jury did

not see those six written statements on behalf of Mr. Williams because counsel

asked Eloise Williams *on the day of the penalty phase of the trial* to gather those

statements for sentencing before the trial judge.  And Mr. Funderburg did not testify

that counsel talked to or interviewed any of the people who provided character

references before receiving their statements from Eloise Williams.  So, although Mr.

Williams provided a list of possible mitigation witnesses to counsel, they failed to

compile or provide a completed list of possible mitigation witnesses to the trial court

as ordered.  That failure was unreasonable and reflects counsel's complete lack of

effort to conduct any type of mitigation investigation.

The court acknowledges that Mr. Funderburg testified that he did meet with

Mr. Williams and talked about potential mitigation witnesses (doc. 91 at 47, 61)

and that counsel had "contacted or tried to contact everyone that had been

presented" (doc. 91 at 60). But the facts that counsel failed to compile any list of mitigation witnesses, no mitigation list is in either counsels' case files, and the trial judge questioned why counsel failed to provide to the court a list of mitigation witnesses as ordered undermine Mr. Funderburg's testimony. Reasonable counsel would have compiled a list of mitigation witnesses as ordered and provided that list to the trial court. And even if Mr. Funderburg did meet with Mr. Williams and talk about some mitigation witnesses, *talking about* some witnesses would not be enough. Counsel had a duty to *thoroughly interview or investigate* mitigation witnesses, but they failed to fulfill that constitutional duty.

Mr. Funderburg tried to justify this failure by testifying that "[i]f I recall, we actually had an in-camera meeting with [the trial judge] without the State being involved," at which the trial judge questioned Mr. Williams about whether he had any other witnesses he wanted counsel to call as mitigation witnesses, but Mr. Williams answered "no." (Doc. 91 at 60). But the only colloquy from the trial judge that this court can find in the record took place during the actual sentencing hearing on April 6, 1999. (Doc. 84-29 at 92-93). And that colloquy occurred immediately after the trial judge questioned why counsel failed to submit a list of mitigation witnesses. (Doc. 84-29 at 92).

The responsibility to know what evidence is relevant to mitigation,

86

investigate any family members or friends to discover that mitigation evidence, and call them as witnesses during the penalty phase of the trial was on *counsel*, not Mr. Williams.  Mr. Williams' indication to the trial judge that he did not want to call any additional witnesses did not erase counsel's duty to conduct a thorough mitigation investigation *prior* to the penalty phase before the jury and the sentencing hearing before the trial judge.

In addition to the counsels' failure to compile a list of possible mitigation witnesses,  both Ms. Wilson and Mr. Funderburg's fee declarations show very little time meeting with family members at all, much less regarding mitigation.  In her fee declaration, Ms. Wilson indicates that she spent at most only two hours total in conferences with "family," but her declaration does not specify which family members.  And her fee declaration indicates that she reviewed on April 4, 1999 the "character witness letters," but Ms. Wilson did not actually collect those letters herself—counsel tasked Eloise Williams with collecting them.  Ms. Wilson's fee declaration shows no other time investigating or interviewing Mr. Williams's family members or any other witnesses for the penalty phase of the trial. (Doc. 84-17 at 6). The minimal time that Ms. Wilson spent talking to or interviewing family members regarding Mr. Williams' background was unreasonable, especially in light of Mr. Funderburg's claims that Ms. Wilson was the one primarily responsible for any

mitigation efforts for the penalty phase of Mr. Williams' trial.

And, although Mr. Funderburg testified that Ms. Wilson was primarily responsible for the penalty phase of Mr. Williams' trial, Mr. Funderburg's fee declaration submitted to the trial court showed he spent more, albeit minimal, time talking to family members and preparing for the penalty phase of the trial. *See* (Doc. 84-1 at 55-59). But Mr. Funderburg testified at the evidentiary hearing that he could not identify any entry on his fee declaration "referring to interviews of mitigation witnesses." (Doc. 91 at 29). And, at most, Mr. Funderburg spent about twelve hours on the enitre penalty phase of the trial that included two 15 minute phone calls with Charlene on August 27, 1997 and September 5, 1997; a 45 minute "meeting with Eloise" on October 23, 1997; two short phone calls with Charlene regarding "pastoral rights" and a continuation of the trial on November 6, 1997 and January 3, 1998; a 90 minute meeting with "Defendant's family" on November 11, 1998; and two telephone conferences with "witnesses" totaling 2.5 hours on November 16, 1998 and December 14, 1999. And on March 15, 1999, *after* the penalty phase of the trial before the jury in February 1999, Mr. Funderburg researched sentencing preparation and prepared Mr. Williams's sentencing statement for the April 1999 sentencing before the trial judge. His fee declaration states "12.3 Hours at $20.00 per hour = $246 (Sentencing Phase)." (Doc. 84-1 at

55-59).

Generously interpreting Mr. Funderburg's fee declaration, he spent at most about a total of twelve hours preparing for the entire penalty phase of Mr. Williams' trial, including *minimal* contact with Mr. Williams' family.  And his trial counsel file and records do not reflect any additional time spent investigating or interviewing family members or friends for mitigation purposes.  Counsel had no list of mitigation witnesses in their files; no documented plan to secure mitigation evidence; and no notes from conversations with Mr. Williams, Charlene, Eloise, or any of his family members regarding his family background.

Counsel had no reasonable excuse for failing to—at the very least—compile a list of *all* of Mr. Williams family members, including all the relatives with whom Mr. Williams had lived and all of his siblings, and reach out to them to find out about Mr. Williams' childhood background.

The 1989 Guidelines do not establish a specific number of persons that counsel should interview, and the Eleventh Circuit has rejected the idea that there is a "magic number" of witnesses an attorney must interview for mitigation. *See Alderman v. Terry,* 468 F.3d 775, 792 (11th Cir. 2006). But the Eleventh Circuit has "found deficient performance in cases where an attorney's efforts to speak with available witnesses were insufficient to formulate an accurate life profile

of [the] defendant." *Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995)).

Mr. Williams' sisters Lacharo Williams and Sharenda Williams both testified at the evidentiary hearing that they were present at the penalty phase of Mr. Williams' trial in February 1999 but that neither Mr. Funderburg nor Ms. Wilson spoke to or interviewed them about their family background either before or on the day of the penalty phase of the trial. (Docs. 91 at 153 & 92 at 211-212).  LaCharo also testified at the evidentiary hearing that she was with her mother Charlene "when she was talking to [Ms. Wilson before the trial], but Ms. Wilson "didn't have any interaction with me."  (Doc. 92 at 211).   Both LaCharo and Sharenda testified they would have cooperated with Mr. Williams' counsel and talked to them about their family background had counsel reached out to them.  (Docs. 91 at 153 & 92 at 212).  Counsels' failure to interview or investigate Mr. Williams' sisters who were available and present at the penalty phase of the trial was unreasonable.  *See Cooper v. Sec'y, Dep't Of Corr.*, 646 F.3d 1328, 1351-52 (11th Cir. 2011) (finding deficient performance based on an inadequate mitigation investigation where counsel only interviewed Cooper, his mother, and a psychologist, but not other available family members).

Mr. Funderburg's case file also contains a note in his handwriting on which he wrote the names Takeisha Fomby, Barbara Powell, LaCharo Williams, and Sharenda Williams and "need excuse that their appearance was necessary in court on 2-25-99." (Doc. 84-11 at 29). Mr. Funderburg testified at the evidentiary hearing that none of the people listed on the note were called as mitigation witnesses. (Doc. 91 at 33). And Sharenda and LaCharo testified that neither of Mr. Williams' trial counsel ever talked with them prior to, during, or after the trial about mitigation or anything else, even though they were present at the penalty phase of the trial. (Docs. 91 at 153 & 92 at 212); *see Johnson v. Sec'y, DOC*, 643 F.3d 907, 935 (11th Cir. 2011) (finding deficient performance where trial counsel's failure to speak with witnesses was not product of witnesses' unavailability or unwillingness but counsel's lack of effort). Both LaCharo and Sharenda's testimony at the evidentiary hearing was credible and undermine Mr. Funderburg's testimony that he had contacted or tried to contact all possible mitigation witnesses.

And Mr. Williams' childhood friend Marlon Bothwell testified at the evidentiary hearing that he knew Mr. Williams since he was around four-years-old; was living in Ashville in 1999; but no one contacted him about Mr. Williams during the time his case was going to trial. And Marlon Bothwell was one of the names that Mr. Williams testified he wrote on a piece of paper and gave to counsel to

91

contact regarding testifying on Mr. Williams' behalf.  (Doc. 91 at 113).  But counsel failed to reach out to Mr. Bothwell or ask him any questions regarding Mr. Williams' background.  And Mr. Bothwell testified that he would have cooperated with anyone working on Mr. Williams' behalf if they had contacted him and asked what he knew about Marcus' background.  (Doc. 93 at 6, 18-19). Counsels' failure to contact one of Mr. Williams' childhood friends whose name Mr. Williams provided to them was unreasonable and deficient.

When asked at the evidentiary hearing why he failed to contact any family members or friends prior to completing the Taylor Hardin evaluation paperwork on August 26, 1997, Mr. Funderbrug testified that "I don't think at that time there was a lot of cooperation with those – with friends that were also suspects." (Doc. 91 at 42).  The court agrees that Mr. Williams' childhood friend Alister Cook, who was partying with Mr. Williams the night Mr. Williams broke into Lottie Turner's home and attempted to rape her, could have initially been a suspect and may not have cooperated with talking to counsel about Mr. Williams' background; Mr. Cook gave several statements to the police about being with Mr. Williams the night of the Turner burglary and attempted rape. *See* (Doc. 84-6 at 25 & 84-15 at 25-28).

But the record contains no evidence that Mr. Funderburg or Ms. Wilson even *attempted* to talk to Mr. Cook about Mr. Williams' background for mitigation.  In

92

fact, Mr. Funderburg included Mr. Cook on the list of witnesses he subpoenaed to appear for the November 1998 trial, but Mr. Funderburg admitted at the evidentiary hearing that he did not interview any of the subpoenaed witnesses for mitigation purposes. (Doc. 84-11 at 44 & 91 at 37). Counsel's failure to even attempt to talk to Mr. Williams's closest friend Mr. Cook, who was "hanging" with Mr. Williams around the time of the Rowell murder, was deficient.

And Mr. Funderburg admitted that he had not reached out to any of Mr. Williams' family or friends who were *not* suspects in the crime. (Doc. 91 at 42). Mr. Williams' sisters LaCharo and Sharenda and friend Marlon Bothwell who all testified at the evidentiary hearing were *not* suspects in the case. *See* (Doc. 84-6 at 4-6). They were available witnesses that counsel could have interviewed thoroughly about Mr. Williams and his family background. *See Hardwick*, 803 F.3d at 554 (reasonable counsel would have pursued avenues of mitigation by interviewing available family members). But counsel failed to conduct a thorough mitigation investigation, ignored Mr. Williams' sisters who were actually present at the penalty phase of the trial, and failed to thoroughly interview close family members who were willing and available to testify. Those failures were unreasonable.

### e. Failure to Adequately Interview and Prepare the Penalty Phase Witnesses

Counsel also failed to thoroughly interview and prepare prior to Mr. Williams'

93

trial the only two family members they called as witnesses at the penalty

phase—Charlene Williams and Eloise Williams.  Mr. Funderburg testified that "the

mother and the grandmother seems were the primary two we would have met with

on several occasions. . . ."  (Doc. 91 at 30).  But Mr. Funderburg did not have clear

understanding of Mr. Williams' family dynamics because he thought Beulah

Williams was Mr. Williams' grandmother, when she in fact was his great-

grandmother.  *See* (Doc. 91 at 43).  And counsel did not call Beulah Williams to

testify at the penalty phase of the trial; they called his aunt Eloise Williams.

And counsel's decision to call two mitigation witnesses at the penalty phase

whom they failed to thoroughly interview prior to their testimony was deficient.  *See*

*Andrus v. Texas*, 140 S. Ct. 1875, 1882 (2020) (finding deficient performance

where counsel was "barely acquainted" with the mitigation witnesses and "did not

prepare the witnesses or go over their testimony before calling them to the stand").

Eloise testified at the evidentiary hearing that counsel did not meet with her about

her testimony until the day of her testimony at the penalty phase "in a little room at

the courthouse"; that they met "not long at all" about "fifteen minutes"; that counsel

asked her "general things" "about his family life"; and that counsel did not seem to

have an "understanding at that time of Marcus' life story."  (Doc. 92 at 134-135).

Eloise also stated that before the trial date, counsel did "not get in touch with me or

not told me, ask me things"; did not ask her any questions regarding sexual issues in

Marcus' family, behavior issues, or substance abuse history for Mr. Williams or his

family; and did not explain mitigation evidence to her or what would be useful or

helpful for Mr. Williams' case. (Doc. 92 at 135-136). And Mr. Funderburg's

testimony that he primarily met with Mr. Williams' mother and "grandmother"

supports Eloise's testimony that counsel did not thoroughly interview her before her

testimony at the penalty phase of the trial.

Charlene testified that she met with Mr. Williams' counsel "maybe three

times" for "not long," "about thirty minutes." (Doc. 92 at 191-192). She testified

that counsel asked to meet with her one time; that she went herself the other two

times to talk to them about the trial; and that she talked to Ms. Wilson first and then

to Mr. Funderburg. (*Id*.) Charlene testified that when she went to Pell City to meet

with counsel on one occasion, her cousin Gwin Fomby went with her, but counsel

did not attempt to interview Ms. Fomby. (*Id*. at 192). Charlene also testified that

Mr. Williams' trial counsel did not ask her to put them in contact with any other

family members; never came to her home to meet with her; did not explain to her the

meaning of mitigation evidence; did not explain what kind of evidence would be

helpful to Mr. Williams' case; and did not ask her about alcohol or sexual abuse in

the family. She stated that had counsel asked her about these specific things, she

would have cooperated with them and answered their questions.   (Doc. 92 at 192-193).

And the Eleventh Circuit noted in its decision remanding this case that both Charlene and Eloise's testimony at the penalty phase of the trial was "brief" and that counsel "elicited testimony [from them] that portrayed [Mr. Williams] in a negative light" that was "likely more harmful than helpful." *Williams*, 791 F. 3d at 1270. The fact that counsel elicited testimony from Charlene and Eloise that was harmful to Mr. Williams' case indicates that counsel had no real understanding of Mr. Williams' background and had not thoroughly interviewed either Charlene or Eloise about the details of Mr. Williams' background prior to their testimony.

Most telling about counsel's lack of understanding about Mr. Williams' abandonment by his mother involved counsel's questions of Charlene and her testimony at the penalty phase that could have given the jury the impression that she spent considerable amount of time with her son when he was growing up.

Q.    Where was [Mr. Williams] when he wasn't with you?

A.    He lived with my grandmother and my aunt. They helped me
      because I was a young girl.
. . . .

Q.    Prior to this time, had Marcus been a problem child to you
      in any way?

     A.     No, he had never been.

     Q.     Did you spend a lot of time with him when he was
              growing up?

     A.     Yes. Marcus was the baby for five and a half years.

(Doc. 84-29 at 18, 22).  From her testimony, the jury could conclude that Mr.

Williams at times lived with relatives because Charlene was a "young girl"; that she

never had any problems with Mr. Williams when she was raising him; and she spent

a lot of time with him when he was growing up.  None of her testimony revealed the

true dysfunction and troubled history Mr. Williams faced being raised by an

alcoholic mother whose abandonment of him impacted his life in a traumatic way.

Counsel presented but a "hallow shell" of Mr. Williams' traumatic and troubling

childhood.  *See Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir. 1999) (Court

found deficient performance where counsel called *ten* witnesses but the

examinations were "minimal"; "Counsel presented no more than a *hollow shell* of

the testimony necessary for a 'particularized consideration of relevant aspects' of the

defendant's background.").

Counsel failed to ask Charlene about her own alcohol abuse, her inability to

care for her children, her abandonment of her children, the domestic violence she

suffered by Jeff Deavers that Mr. Williams' witnessed, the sexual abuse of her

daughter by Brian Williams that Charlene failed to do anything about, or the fact that she allowed men to sleep with her while in her bed with Mr. Williams.  Counsel failed to ask because they failed to even look for this mitigation evidence.  *See Andrus*, 140 S. Ct. At 1877 ("Andrus' defense counsel not only neglected to present [mitigating evidence]; he failed to even look for it.").

Reasonable counsel would have thoroughly interviewed Charlene and Eloise before their testimony, asked specific questions of them as called for by the prevailing norms at that time, and spoke to other family members who could verify the cycle of dysfunction in which Mr. Williams was raised.  Instead, Mr. Williams put Charlene and Eloise on the stand without thoroughly interviewing them and without a true understanding of Mr. Williams' family dysfunction and troubled history.  *See Wiggins*, 529 U.S. at 534 (Counsel's "partial presentation of a mitigation case suggest[s] that their incomplete investigation was the result of inattention, not reasoned strategic judgment.").

A reasonable attorney would have thoroughly interviewed all family members with whom Mr. Williams lived during his childhood, any family member who could explain how Mr. Williams' grew up, and any friend of his that knew his background.  And a reasonable attorney would have asked specific questions called for by the prevailing norms at that time, especially regarding Mr. Williams and his

family's past history of sexual abuse and alcoholism. Had counsel conducted an adequate and thorough mitigation investigation with Mr. Williams' family members and friends, they would have uncovered evidence of the history of sexual abuse throughout his family, history of alcoholism in his family, and the depth of the dysfunction and chaos in Mr. Williams' troubled family history. Counsel's failure to conduct a thorough investigation into Mr. Williams' family background constitutes deficient performance.

### 3.  *What a Reasonable Investigation Would Have Uncovered*

As the court has thoroughly discussed supra, Mr. Williams' counsel failed to thoroughly investigate Mr. Williams' background for mitigation evidence. Had counsel performed a thorough mitigation investigation, they would have uncovered powerful mitigation evidence about Mr. Williams' background that the jury never heard.

### a.  *Preliminary Matters*

But before the court sets out the mitigation evidence that the court finds a thorough investigation would have uncovered, it must first address a few preliminary issues.

### i.  *Consideration of Strategic Choices*

The court first must address whether counsel's failure to conduct a thorough mitigation investigation and present the mitigation evidence presented at the evidentiary

hearing involved a strategic decision by counsel.  Counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel and can "on occasion, be justified as a strategic choice." *Hardwick*, 803 F.3d at 551.

At the evidentiary hearing, Mr. Funderburg justified his decision not to present evidence concerning Mr. Williams's "future dangerousness" or propensity for sexual violence because he did not want to indicate to the jury that his client was predisposed to sexual violence.  (Doc. 91 at 76). And Mr. Funderburg testified that he successfully kept out of the guilty phase of Mr. Williams' trial any reference to Mr. Williams' attempted rape of Ms. Turner just eighteen days after his rape and murder of Ms. Rowell. (Doc. 91 at 78).

But that strategic decision to keep out the subsequent attempted rape of Ms. Turner did not eradicate counsel's duty to *first* thoroughly investigate Mr. Williams' background for any mitigating evidence that might shed light on why he committed both sexual crimes.   "Strategic choices made *after thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690 (emphasis added).  Counsel's decision not to investigate or present mitigating evidence is "only reasonable, and thus due deference, to the extent that it is based on a professionally reasonable investigation." *Hardwick*, 803 F.3d at 551.

Here, counsel's alleged strategic decision to keep out of evidence Mr. Williams'

subsequent sexual crime may have made sense during the *guilt* phase of the trial, but that decision was not made *after* a thorough investigation of Mr. Williams' background and was not based on a professionally reasonable investigation regarding the *penalty* phase of the trial. Counsel unreasonably failed to even ascertain what mitigation evidence existed regarding Mr. Williams childhood sexual abuse or childhood sexual history. Reasonable counsel would have conducted a thorough mitigation investigation into Mr. Williams' past sexual history, asked Mr. Williams specific questions regarding his past sexual abuse and his sexual experiences, processed that information, and then made a "strategic" decision whether to present that evidence to the jury at the *penalty* stage of the trial. Counsel cannot side-step the first requirement—the thorough mitigation investigation—and then claim they strategically chose to not present mitigating evidence they did not bother to ask about or discover.

So, counsel's claims to have strategically decided to keep out any evidence of the sexual abuse and deviant sexual circumstances to which Mr. Williams was subjected as a child come too late. Counsel could not strategically decide to keep out evidence of which they were not aware because of their unreasonable mitigation investigation.

Mr. Funderburg also testified that he would not have wanted to introduce evidence that conflicted with Mr. Williams' pretrial competency report, in which Dr. Smith with Taylor Hardin stated that Mr. Williams "denied history of childhood sexual,

emotional, or physical abuse." (Doc. 84-10 at 34). But Mr. Williams testified that Dr. Smith did not ask him specifically about whether he had been sexually abused, but instead asked general questions about his background. He admitted at the evidentiary hearing that he did not tell Dr. Smith about the sexual abuse by Mario because she did not specifically ask him about it. (Doc. 91 at 110-111). And if Mr. Williams did not offer that information to Dr. Smith based on her general questions, that circumstance could explain Dr. Smith's notation that Mr. Williams denied any such abuse.

But in any event, as the Eleventh Circuit pointed out in this case, "[a]lthough [the statement regarding Mr. Williams's denial of sexual abuse] may be relevant to [this court's] *Strickland* analysis, it does not by itself foreclose relief." *William*s, 791 F.3d at 1277. The Eleventh Circuit stated that "[b]ecause this report only evaluated Mr. Williams's 'competency to stand trial and mental state at the time of the alleged offense,' it is not an adequate substitute for the '*thorough investigation*' required of attorneys representing capital defendants." *Williams*, 791 F.3d at 1277 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)) (emphasis added); *see also Wiggins*, 539 U.S. at 532 (Counsel's "decision to hire a psychologist sheds no light on the extent of the investigation into petitioner's social background."). And the Eleventh Circuit further stated that the fact that the competency report was not a substitute for a thorough mitigation investigation was "especially true because the competency report itself came

with a significant disclaimer: 'this information should be viewed cautiously without verification by a third party." *Id*.  And Mr. Funderburg testified that neither he nor Ms. Wilson attempted to verify the information contained in the competency report.  (Doc. 91 at 47).  So, the notation in Dr. Smith's report that Mr. Williams denied being sexually abused does not justify counsel's failure to conduct a thorough mitigation investigation into Mr. Williams' background.

Mr. Funderburg also testified that the trial judge would not have granted a motion for an independent mental health evaluation of Mr. Williams, apart from the Taylor Hardin evaluation, unless counsel had a basis for asking for one.  And Mr. Funderburg testified that the he did not see "any need for a mental health evaluation based on the Taylor Hardin report and [his] dealings with Mr. Williams."  (Doc. 91 at 67).

But Dr. Smith's Taylor Hardin evaluation of Mr. Williams only assessed Mr. Williams' competency to stand trial and his mental status *at the time of the crime* and was not for mitigation.  A defendant can be competent to stand trial but have suffered traumatic childhood experiences that deeply affect his psychological development and behavior.  *See Hardwick*, 803 F.3d at 553 ("Dr. Barnard was appointed solely to evaluate Hardwick for competency and sanity, not for mitigation," and counsel did not discuss mitigation evidence with the doctor.).  But because Mr. Williams' trial counsel failed to conduct a thorough mitigation investigation to discover those childhood

experiences, they failed to supply any relevant information to Dr. Smith about Mr.

Williams' past sexual history and lacked any background information to properly

evaluate Dr. Smith's evaluation in light of Mr. Williams' troubling background.  *See*

*Hardwick*, 803 F.3d at 553 (finding deficient performance where counsel, prior to the

competency evaluation, failed to give Dr. Barnard any limited background information

on Hardwick).  Reasonable counsel would have thoroughly interviewing Mr. Williams

and his family members before the competency evaluation and providing that

information to Dr. Smith.

And a reasonable attorney evaluating Dr. Smith's report would have seen red

flags that would have led him to at least ask for an independent mental health

evaluation.  Dr. Smith's report indicates that Mr. Williams "has had difficulty

sustaining interpersonal, dating relationships for longer than three months at any given

time"; that he began drinking at the age of fourteen or fifteen and would consume two

six-packs  of beer to get drunk; that he reported having "vague suicidal ideation from

time to time . . . and 'thoughts of just you know knife . . . jumping off building . . . they

come and go pretty often. . .'"; that on the day of the crime Mr. Williams was "being

driven to 'do something stupid' by 'hearing voices telling me to just do it . . . try

something stupid . . . it was like my own voice, my inner voice telling me to do

something'"; and that Mr. Williams "attributed his behavior on [that day of the crime]

to 'I've always been neglected . . . looked down upon.'" Dr. Smith also indicated in her report that Mr. Williams' "pattern of behavior over time[] is also *consistent with personality disorder*, most likely antisocial." (Doc. 87-1 at 57-64) (emphasis added). Yet, Mr. Williams' counsel "disregarded, rather than explored, the multiple red flags." *See Andrus*, 140 S. Ct. at 1883.

Given what Mr. Williams' trial counsel knew about the sexual nature of the crime and the role of alcohol and drugs in his conduct, these red flags in Dr. Smith's report would have prompted a reasonable attorney to explore any underlying reasons in Mr. William's history for his difficulty maintaining interpersonal relationships, alcohol abuse as a young teenager, suicidal ideation experienced "pretty often," hearing his inner voice telling him to "do something stupid" in a alcohol and drug induced state on the day of the crime, and feelings of severe neglect. *See Hardwick*, 803 F.3d at 553 (Hardwick's competency assessment included red flags that counsel should have investigated including Hardwick's alcohol and drug abuse at an early age and diagnosis of anti-social personality disorder.).

Had Mr. Williams' trial counsel conducted a thorough mitigation investigation into Mr. Williams' background and discovered his troubling sexual history and alcohol abuse at an early age, coupled with these red flags from Dr. Smith's report, they would have had a basis to at least request from the trial judge an independent mental health

evaluation regarding the effects of his past sexual experiences, alcohol abuse,

abandonment by his mother, and overall troubled background on his psychological

development for mitigation purposes.

And, in his January 16, 1998 "Order on Pre-trial Motions Filed to Date," the trial

judge in essence invited a defense motion for independent psychological testing and

stated that "Defendant will be filing motion for funds for independent psychologist for

independent test. Defendant's counsel to advise the Court in advance the basis for said

testing." (Vol. IV, Tab R-27 at 87). But counsel never filed a motion with such

request. Had Mr. Williams' trial counsel conducted a thorough mitigation investigation

and discovered all of the mitigation evidence that a reasonable investigation would have

uncovered, trial counsel would have had a basis to at least ask the trial judge for funds

for an independent mental health evaluation for mitigation purposes. Given the trial

judge's willingness to grant trial counsel's request for independent DNA re-testing even

though Mr. Williams had confessed to the crime and the first round of DNA testing

linked him to the crime, the trial judge would have likely granted a request from trial

counsel for an independent mental health evaluation.

And Mr. Funderburg gave no testimony at the evidentiary hearing that counsel's

trial strategy was to *not* investigate Mr. Williams' background. *See Daniel*, 822 F.3d at

1268 ("It is important to Mr. Daniel's case that this record includes nothing to indicate

that trial counsel's limited investigation into Mr. Daniel's troubled family background was the product of reasonable professional judgment.")  Mr. Funderburg gave no indication that counsels' trial strategy was to *not* talk to all available family members about Mr. Williams' background. In fact, he claimed to have contacted everyone he knew to contact, yet he had no mitigation list or notes from any mitigation interviews in his case file and did not interview Mr. Williams' sisters who testified at the evidentiary hearing.  And Mr. Funderburg gave no testimony at the evidentiary hearing that counsels' trial strategy was to *not* explain to the jury Mr. Williams' and his family's history of alcohol abuse, including by family members with whom Mr. Williams' lived when he was a child.  In fact, counsel specifically asked the jury to take into consideration as a mitigating factor that Mr. Williams had been drinking and doing drugs the day of the rape and murder.  (Doc. 84-29 at 15).

So, the court finds that counsel's failure to thoroughly investigate Mr. Williams' background for possible mitigation evidence and present that evidence at the penalty phase of the trial was not the result of any reasonable trial strategy.

### ii. Consideration of Expert Testimony

The court also must decide whether it can consider as mitigating evidence the testimony and opinions of Dr. Mendel and Dr. Benedict.  Mr. Williams must demonstrate that a reasonable investigation for mitigation evidence would have

107

uncovered the mitigating evidence he presented at the evidentiary hearing.  *See Blanco v. Singletary*, 942 F.2d 1477, 1500 (11th Cir. 1991).  When that mitigation evidence includes expert testimony, a petitioner must show a "reasonable likelihood that an ordinary competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced."  *Elledge v. Dugger*, 823 F.2d 1439, 1446 (11th Cir. 1987) (opinion withdrawn in part on a different issue by 833 F.2d 250 (11th Cir. 1987)).

If Mr. Williams cannot show a reasonable likelihood that a "similar expert could have been found at the pertinent time by an ordinary competent attorney using reasonably diligent effort," he "was not prejudiced by counsel's failure to investigate." *Elledge*, 823 F.2d at 1446.  "Merely proving that someone–years later–located an expert who will testify favorably is irrelevant" unless Mr. Williams can make this showing. *See id*.

### Dr. Mendel

Dr. Mendel testified that he is a clinical psychologist in Raleigh, North Carolina. (Doc. 93 at 34).  He completed his degree at Princeton in 1984 and received his Masters and PhD in clinical psychology from the University of Michigan in 1992.  (*Id*. at 35).

Dr. Mendel found that his testing of Mr. Williams would not support a formal diagnosis of PTSD as a result of Mr. Williams' sexual abuse by Mario and other

traumatic childhood experiences. But Dr. Mendel testified regarding how Mr. Williams' abandonment by his mother, past sexual abuse, alcoholism, family history of both alcoholism and sexual abuse, and overall family dysfunction contributed to Mr. Williams' overall development and later sexual crime. (Doc. 93 at 34-131).

Dr. Mendel testified that, during the time he worked on his dissertation in the "mid eighties or late eighties," the National Center for Child Abuse and Neglect was and still is located in Huntsville, Alabama. He testified that based on the location of that Center in Huntsville, he "think[s] there actually were and still are a lot of experts in the impact of child abuse here in Alabama," but he did not know if any of them were closer than Huntsville. (Doc. 93 at 64).

The court finds that based on Dr. Mendel's testimony a reasonable likelihood exists that Mr. Williams' counsel could have found an expert similar to Dr. Mendel in 1999 in Alabama to testify about the impact of Mr. Williams' abandonment by his mother, history of sexual abuse, alcohol abuse, and overall dysfunctional upbringing. And, the State did not raise any specific objection to the court's consideration of Dr. Mendel's testimony in its post-hearing brief. *See* (Doc. 89 at 31-34). So, the court will consider Dr. Mendel's testimony as mitigation evidence that reasonable counsel could have presented at Mr. Williams' trial in 1999.

### *Dr. Benedict*

Dr. Benedict received his Ph.D in Clinical Psychology in 1992 from the University of North Carolina at Chapel Hill and completed his Postdoctoral Fellowship in Child and Adolescent Clinical Psychology and Neuropsychology at Harvard Medical School in 1993.

Dr. Benedict testified at the evidentiary hearing regarding the affects of Mr. Williams' sexual abuse by Mario and overall dysfunctional upbringing on his development. (Doc. 91 at 166-231). He also testified that Mr. Williams suffered from "complex trauma syndrome," a diagnosis that Dr. Benedict concedes was not in a "diagnostic manual to which [an expert] could have turned." (Doc. 91 at 226).

Dr. Benedict testified that a "suitably trained clinician," such as a social worker, psychologist, psychiatrist, or licensed counsel, with knowledge of the "dynamics of child sexual abuse . . . and neglect, who was current with the literature" in 1999 could have reached the same diagnosis of "complex trauma syndrome" or "complex PTSD." (Doc. 91 at 228-229). Dr. Benedict *assumed* that "child and adolescent trained clinicians" were available to testify regarding "complex trauma syndrome" in Alabama in 1999. (*Id*. at 230).

The State objected to the court's consideration of Dr. Benedict's opinion and testimony regarding his opinion that Mr. Williams suffers from "complex post-

traumatic stress syndrome."  (Doc. 89 at 31).  First, the State argues that Mr. Williams

never raised any claim in his habeas petition "regarding trial counsel's failure to present

expert testimony from a psychologist" and that he never raised a claim of ineffective

assistance of counsel for failure to present psychological testimony in his Rule 32

petition.  (*Id*.). But Mr. Williams specifically argued in his amended habeas petition in

the context of a failure to investigate claim that "[a]lthough a thorough, defense

sponsored, mental health evaluation was essential to Mr. Williams' defense, trial

counsel failed to obtain one."  (Doc. 5 at 36) (citing *Fortenberry v. Haley*, 297 F.3d

1213, 1126 (11th Cir. 2002) ("The duty to investigate requires that counsel 'conduct a

substantial investigation into any of his client's plausible lines of defense.'").  So, the

court finds that Mr. Williams has presented Dr. Benedict's testimony and report as part

of the failure to investigate claim that is properly before this court.

The State also argues that the court should not consider Dr. Benedict's opinion

and testimony regarding his diagnosis of "complex trauma syndrom" because Dr.

Benedict conducted no testing for psychological trauma on Mr. Williams; Dr. Benedict

admitted that Mr. Williams did not describe his encounters with Mario as "traumatic";

the DSM-4 diagnostic manual did not in 1999 and does not currently recognize

"complex trauma syndrome" as a diagnosable mental disorder; and Dr. Benedict

testified that Mr. Williams' alleged "complex post traumatic stress disorder" did not

manifest until 2007, nearly a decade after the trial.  (Doc. 89 at 33-34).

And Dr. King, the State's expert, testified at the evidentiary hearing that neither the DSM-4 or DSM-5 diagnostic manuals contain a diagnosis of "complex trauma syndrome."  (Doc. 92 at 55).  Dr. King also indicated that complex trauma syndrome "was actually originally proposed in 1994, didn't gel in terms of possibility until about 2005, 2006, [and] now is under consideration."  (Doc. 92 at 56).  He explained that this syndrome would be "subsumed under posttraumatic stress disorder," a mental disorder from which both Dr. Mendel and Dr. King found Mr. Williams did not suffer at the time of the crime.  (Doc. 92 at 56-57 & Doc. 93 at 93).

Because the DSM-4 diagnostic manual in effect at the time of Mr. Williams' trial did not include  "complex trauma syndrome" as a recognized diagnosis, the court finds that Mr. Williams' counsel in 1999 could not have found an expert like Dr. Benedict who would have testified that Mr. Williams suffered from that syndrome.  So the court will not consider Dr. Benedict's testimony or opinion regarding his "complex trauma syndrome" diagnosis of Mr. Williams.

But the court finds that Mr. Williams' trial counsel in 1999 could have found an expert like Dr. Benedict who could have testified regarding the impact of Mr. Williams' sexual abuse by Mario and overall dysfunctional upbringing on his psychological development.  So, the court will consider Dr. Benedict's testimony and opinion as it

112

relates to Mr. Williams' childhood experiences on his psychological development for mitigation purposes.

### b. Evidence that a Reasonable Investigation Would have Uncovered

In addition to the evidence that trial counsel already presented during the penalty-phase presentation at Mr. Williams' trial, the jury would have heard the evidence as set out in detail *supra* in the evidentiary hearing section of this Memorandum Opinion. Had Mr. Williams' trial counsel conducted a thorough mitigation investigation, the jury and the trial judge would have heard the following mitigation evidence:

- While in the care of his alcoholic mother, Mr. Williams was sexually abused three or four times between the ages of four and six by an older boy Mario Mostello when Mr. Williams and his mother Charlene lived with the Mostellos. Mr. Williams felt shame and depression, had thoughts of hurting or killing himself, began having nightmares about falling off a cliff or drowning, began wetting the bed after his sexual abuse by Mario, and had difficulty maintaining a relationship with a girl for more than three months.

- Mr. Williams was exposed to adult sexual relations early in his life when living with his mother until around the age of six or seven when Charlene would have boyfriends sleep in the same bed that she shared with Mr. Williams. Mr. Williams would wake up in his mother's bed and find men in the same bed with him.

- Charlene had poor parenting skills; lived with her children in poverty, sometimes in homes without running water, plumbing, or electricity; left the children to fend for themselves; and did not appropriately supervise her children.

- Charlene abandoned Mr. Williams when he was around six or seven years old because of her alcohol use and inability to properly care for him. Mr.

Williams' contact with his mother after the abandonment was inconsistent, resulting in various reunions and painful separations from her.  Because of Charlene's abandonment of Mr. Williams, he bounced between living with different relatives many times and never had a particular place he called home.  Mr. Williams felt unwanted, rejected, abandoned, and betrayed throughout his life because of Charlene's abandonment.

- When Mr. Williams was only ten years old, his teenage cousin Brian arranged for Mr. Williams to watch Brian having sex with girls.  Mr. Williams became sexually active with females at the young age of ten.  Mr. Williams was hypersexual as a young boy and had one hundred fifty to two hundred sexual partners by the time he was arrested in an effort to prove that he was not gay. Mr. Williams also became hypermasculine and aggressive in his teenage years because of his childhood sexual abuse.

- Sexual abuse was rampant throughout Mr. Williams' family.  Mr. Williams's great-grandmother, Beulah, was reportedly raped by her uncle; his grandmother Laura's first child was fathered by her cousin; his aunt Veronica was molested as a child by her aunt's boyfriend; and his cousin Brian Williams, in addition to allowing Mr. Williams to watch him having sex with his girlfriend, molested Mr. Williams's sister LaCharo and his cousin Zakia Fomby.

- When he was twelve or thirteen years old, Mr. Williams witnessed domestic abuse involving his mother Charlene and her boyfriend Jeff Deavers.  Mr. Deavers struck Charlene with his bare hands, and Mr. Williams grabbed a knife and tried to stab Mr. Deavers.

- When Mr. Williams was a teenager and living with Eloise, her husband Robert physically abused Mr. Williams by picking him up in the air and body slamming him to the ground because Mr. Williams walked away from the stove when he was cooking.

- Mr. Williams was raised by and lived with alcoholics during his childhood, including his mother Charlene, his great-grandmother Beulah, and his uncle Robert Williams. Beulah drank so heavily that she would become incoherent and urinate on herself; Charlene would drink heavily and party

114

instead of watching her children, leaving Mr. Williams' susceptible to the sexual abuse by Mario; Charlene was influenced to drink heavily by Beulah and other relatives she saw abusing alcohol; and Robert was a heavy drinker who drank almost every day to the point of intoxication.

● Mr. Williams began drinking alcohol as a young teenager and was heavily drinking and often drunk by the time he was sixteen or seventeen years old. After his expulsion from the Job Corp about ten days before the murder, Mr. Williams was drinking excessively and smoking marijuana.

Counsels' failure to thoroughly investigate Mr. Williams' background deprived the jury and the trial judge from hearing any of this powerful mitigating evidence.

## B. Prejudice

But the ineffective assistance of counsel claim based on an unreasonable mitigation investigation does not end with a finding of deficient performance. Mr. Williams must also show that he was prejudiced by his counsels' deficient performance. In this case, the court finds that, not only was Mr. Williams' counsels' performance deficient because they failed to conduct a thorough mitigation investigation as set out in detail *supra*, that failure prejudiced Mr. Williams.

To prove prejudice, Mr. Williams must show a "*reasonable probability* that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Jones v. Sec'y, Florida Dep't of Corr.*, 834 F.3d 1299, 1312 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 695) (emphasis added). "A reasonable probability is a probability sufficient to

undermine confidence in the outcome, which is a *lesser* showing than a preponderance of the evidence." *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1360 (11th Cir. 2020) (internal quotation marks and citations omitted) (quoting *Strickland*, 466 U.S. at 694) (emphasis added).

In evaluating that probability, this court must "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." *Id*. (*quoting Porter v. McCollum*, 558 U.S. 30, 41 (2009)).  Taking into consideration all of the evidence presented at both the penalty phase of Mr. Williams's trial and the evidence from the evidentiary hearing that a reasonable mitigation investigation would have revealed, this court finds that Mr. Williams has established a reasonable probability that his sentence would have been different but for his trial counsel's deficient performance.

As an initial matter, the court finds that Mr. Williams failed to present any evidence or testimony regarding what Mr. Williams' closest friend Alister Cook would have told the jury about Mr. Williams' background; his family's history of mental illness;  or Mr. Williams' "redeeming characteristics."  Mr. Williams did not call Mr. Cook as a witness at the evidentiary hearing and did not submit an affidavit from him that the court can find; so the court has no evidence about what Mr. Cook would have

testified regarding Mr. Williams' background.  Mr. Williams also did not call any of the individuals he listed in his amended petition as witnesses at the evidentiary hearing who could have testified about Mr. Williams' redeeming characteristics.  *See* (Doc. 5 at 63). And none of the witnesses that testified at the evidentiary hearing testified about any history of mental illness in Mr. Williams' family.

So, Mr. Williams has failed to show how counsels' failures to interview Mr. Cook, investigate Mr. Williams' background for his family's history of mental illness, or present mitigating evidence about his "redeeming characteristics" prejudiced Mr. Williams.  So, the court will deny Mr. Williams' failure to investigate claims on just these three specific grounds.  But the court will grant Mr. Williams failure-to-investigate claims on all other grounds because he has shown both deficient performance and prejudice on those claims.

The court finds that the mitigation evidence presented at the evidentiary hearing "'paints a vastly different picture of [Mr. Williams'] background than that created by the actual penalty-phase testimony'" of Charlene and Eloise.  *See Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1276 (11th Cir. 2014) (quoting *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008)). Charlene's brief testimony at the penalty phase of the trial that her family had to step in to help her raise Mr. Williams because she was a "young girl," that Mr. Williams had never been a problem child to her in any way, and

117

that she spent a lot of time with him when he was growing up failed to touch the

surface of the depth of dysfunction that Mr. Williams experienced being raised solely

by his alcoholic mother until the age of six.  In fact, the court agrees with Mr. Williams

that Charlene's testimony "minimized the instability in Marcus's life" in the eyes of the

jury.  *See* (Doc. 88 at 65).   Likewise, Eloise's brief testimony at the penalty phase of

the trial that Mr. Williams had an unstable life and moved between different family

members did not give the jury a complete picture of Mr. Williams troubled background

as a child.  Although counsel nominally presented a mitigation case, "the record leaves

no doubt that counsel's investigation to support that case was an empty exercise."  *See*

*Andrus*, 140 S. Ct. at 1882.

Contrary to the State's argument, the court finds that all of the powerful

mitigating evidence that Mr. Williams' counsel failed to elicit at the penalty phase of the

trial was not duplicative because the jury never heard any of the specific details of his

troubled background.  And in this case, "the nature, quality, and volume of the

mitigation evidence is significant enough to conclude that it 'bears no relation' to the

*cursory* evidence that trial counsel presented" at the penalty phase of the trial.  *See*

*Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016)

(citing *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (emphasis added).   Trial counsel

barely and vaguely touched the surface of Mr. Williams' troubled childhood and failed

to give the jury powerful mitigation evidence readily available to counsel.

Mr. Williams' trial counsel failed to present any evidence at the penalty phase regarding Charlene's alcohol abuse and the impact it had on her ability to raise Mr. Williams; Charlene's abandonment of Mr. Williams when he was around six or seven years old because she could not adequately take care of or provide for him and the traumatic effect this abandonment had on Mr. Williams; the poverty in which Mr. Williams lived when he lived with Charlene; Mr. Williams' early exposure to adult sexual relations when Charlene allowed boyfriends to sleep in the same bed that she shared with Mr. Williams; Mr. Williams' exposure to domestic violence between Charlene and her boyfriend Jeff Deavers; and Mr. Williams' inconsistent contact with his mother throughout his childhood that led to various reunions and painful separations from her that left him feeling rejected and unwanted.

And Mr. Williams' trial counsel failed to elicit from Eloise at the penalty phase of the trial any testimony regarding Charlene's alcohol abuse and neglect of Mr. Williams when he lived with Charlene until about the age of six or seven; the conditions of poverty in which Mr. Williams was raised; Mr. Williams' family history of alcohol abuse by those with whom he lived at times in his childhood, including Beulah and Eloise's husband Robert; and the extensive history of sexual abuse that was rampant in Mr. Williams' family, including the sexual abuse of his sister by his cousin Brian.

Trial counsel also failed to present any evidence at the penalty phase that Mr. Williams' teenage cousin Brian arranged for Mr. Williams around the age of ten to watch Brian having sexual intercourse with females; that Mr. Williams began having sexual intercourse with girls at the age of ten; or that Mr. Williams was hypersexual and had about one hundred fifty to two hundred sexual partners by the time he was twenty-one years old.  All of this evidence was not duplicative and would constitute powerful mitigating evidence, especially in light of Dr. Mendel's testimony tying these sexual behaviors with Mr. Williams sexual abuse at a young age.

And the evidence of Mr. Williams' sexual abuse by Mario is also powerful mitigation evidence that the jury never heard because of trial counsel's deficient performance.  *See Daniel*, 822 F.3d at 1276 ("Both the Supreme Court and this Court have recognized the long-lasting effects child sexual abuse has on its victims.").  As the Eleventh Circuit stated in this case, evidence of Mr. Williams' sexual abuse at the hands of an older boy was neither "cumulative" nor a "double-edged sword." *Williams*, 791 F.3d at 1277.  In fact, according to the Eleventh Circuit, evidence that Mr. Williams was a victim of sexual abuse during his childhood formative years is "precisely the type of evidence that is 'relevant to assessing a defendant's moral culpability.'" *See id*. (quoting *Wiggins v. Smith*, 539 U.S. 510, 535 (2003)).

The court acknowledges the testimony at the evidentiary hearing that Mario may

not have been "ten or twelve" years older than Mr. Williams; that one of instances of

sexual abuse may have occurred in Missouri and not Ohio; and that the abuse may have

also involved Mr. Williams' touching and penetration of Mario.  But despite these

discrepancies, the court agrees with Dr. Mendel that Mr. Williams' account of his

sexual abuse by Mario is credible.  The court credits Mr. Williams' testimony at the

evidentiary hearing regarding the sexual abuse by Mario and Dr. Mendel's testimony at

the evidentiary hearing that he assessed Mr. Williams' account of his childhood sexual

abuse by Mario with "the greatest level of skepticism" and had no doubt that Mr.

Williams had been sexually abused by Mario.  *See* (Doc. 93 at 85).

Although the court cannot ascertain from the record the exact age of Mario at the

time of his sexual abuse of Mr. Williams, the court finds based on the testimony that

Mario was old enough to babysit Mr. Williams and was probably at least six years older

than Mr. Williams based on the testimony of Eloise.  The fact that Mr. Williams was

left in Mario's care while his mother was not present supports Mr. Williams *belief* that

Mario was ten to twelve years older than him at the time of the sexual abuse.  And the

fact that Mr. Williams was mistaken about the age of Mario does not discredit his belief

that Mario was much older than him at the time of the sexual abuse.

Also, Mr. Williams' mistaken belief that he and Charlene lived with the

Mostellas in Ohio instead of Missouri does not negate that Mario sexually abused him.

In fact, given Mr. Williams young age at the time of his four-month stay in Missouri, the court finds that mistake would not undermine the credibility of the mitigating effects of the sexual abuse.

And even though Mr. Williams was inconsistent about whether he reciprocally penetrated or touched Mario, that fact does not eliminate the mitigating effect that Mario's grooming and sexual abuse of a little boy about six years younger than him could have on a jury. Although Dr. Mendel testified that he could not explain that discrepancy, he still had no doubt that Mr. Williams had been groomed and sexually abused by Mario. And the court credits Dr. Mendel's testimony that he believes strongly that, if Mario had not sexually abused Mr. Williams, he would not have committed sexual violence. The court finds Dr. Mendel's testimony persuasive and credible.

And Dr. King did not testify that he did not believe that the sexual abuse by Mario never happened. Instead, Dr. King testified that Mr. Williams' sexual encounter with Mario was just two pre-pubescent children engaging in homosexual experimentation to which Mr. Williams did not react with horror and did not describe as a "traumatic event." (Doc. 92 at 49). Dr. King testified that Mario's behavior was not abnormal because sixty percent of children under teenage years engage in some kind of homosexual activity. (Doc. 92 at 49).

122

But the court finds that a reasonable probability exists that the jury could credit Dr. Mendel's testimony on this issue as more persuasive.  Dr. Mendel explained that even a four year age difference between Mr. Williams and Mario would be a "significant" age difference in terms of the impact of the sexual abuse on Mr. Williams and a six-year age difference would be "very significant."  (Doc. 93 at 99).  Dr. Mendel acknowledge the study that indicates sixty percent of children under the age of twelve "play doctor" and agreed that sexual touching and exploration between children of similar ages may not "particularly mean anything."  (Doc. 93 at 126).  But Dr. Mendel testified that actual sexual intercourse, like sodomy, initiated by a boy about *six years older* than the victim is not normal sexual exploration for prepubescent children.  (Doc. 93 at 124, 126).  The court finds Dr. Mendel's testimony on this issue more persuasive than Dr. King's testimony.

And although the State's expert Dr. King testified that Mr. Williams did not suffer from PTSD as a result of the sexual abuse by Mario, Dr. King also stated the lack of a PTSD diagnosis "doesn't mean that [Mr. Williams] doesn't have maybe some other kinds of symptoms that would go along with discomfort about previous sexual encounters, sexual activity."  (Doc. 92 at 81).  And Dr. King testified that, even though he believed that Mr. Williams' sexual abuse by Mario was not a "traumatic event" for a PTSD diagnosis, "[t]hat's not to say it wasn't a problematic event in his life."  (Doc. 92

at 49).  So even Dr. King agreed that Mr. Williams' sexual abuse by Mario could have affected Mr. Williams negatively.

The Supreme Court and the Eleventh Circuit have repeatedly held that the failure to investigate and present available mitigating evidence of a troubled childhood, including parental abandonment, alcoholism, domestic violence, poverty, and sexual abuse, during the penalty phase of a capital murder trial is both deficient and prejudicial.  *See Rompilla v. Beard*, 545 U.S. 374 (2005) (petitioner was prejudiced by trial counsel's failure to investigate and present evidence of parent's alcoholism, domestic violence, physical abuse, poverty, and inadequate living conditions); *Wiggins v. State*, 539 U.S. 510 (2003) (petitioner was prejudiced by trial counsel's failure to investigate and present mitigating evidence of an "alcoholic, absentee mother," abandonment, poverty, neglect, and sexual abuse during childhood); *Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011) (petitioner was prejudiced by trial counsel's failure to investigate and present mitigating evidence of parents' alcoholism, childhood abandonment, abuse, family history of drug use, poverty, and neglect).

Moreover, even the State's expert Dr. King testified that the facts that Mr. Williams was "sexually active beginning at age ten," had "multiple sexual partners," had difficulty maintaining a relationship with a girl for more than three months, had an older boy "arrange[] for him to observe that older teenager having sex with women or

girls," never had a place he felt was his home, lived with alcoholics who drank to the point of being drunk, and lived at times with people who "had themselves been sexually abused years previously" were all relevant to evaluate Mr. Williams' "conduct or his mental or emotional condition."  (Doc. 92 at 87-90).  Dr. King explained that all of those facts would be "relevant in terms of understanding his childhood situation, adolescent development," "in terms of he didn't have very good childhood and wasn't given the appropriate kind of stable situation that we like to see children have," and "in terms of the development of what we call personality disorder because that's where those kinds of things start."  (Doc. 92 at 89).  The court finds that those facts would have been particularly relevant and mitigating given the sexual nature of Mr. Williams' crime and the role that alcohol and drugs played in that crime.  But the jury never heard any of those mitigating factors because of trial counsel's deficient performance.

The State argues that the "mitigation factor" of Mr. Williams' "unstable childhood would have been undercut by the fact that he was given a chance at a stable, structured, nurturing home, but rejected it because he didn't like the beneficial rules put in place by his Aunt Eloise."  *See* (Doc. 89 at 30).  But while Mr. Williams lived with Eloise who provided some stability, he was also living with her husband Robert who was an alcoholic who physically abused him by body slamming him to the ground. And while living with Eloise, Mr. Williams struggled with wanting to be with his

mother who he felt rejected and abandoned him.  As Dr. Mendel testified, Mr.

Williams' feelings of abandonment and rejection by his mother greatly impacted his

psychological development.  The jury never heard those facts.

And the court finds that evidence regarding Mr. Williams' alcohol abuse as a

young teenager and his family history of alcoholism was not a "doubled-edged sword."

Mr. Funderburg and Ms. Wilson actually argued to the jury that Mr. Williams' alcohol

and drug abuse on the day of the crime was a mitigating factor for the jury to consider.

And as both Dr. Mendel and Dr. King testified, Mr. Williams would not have been on

trial for his life but for his alcohol and drug abuse the day of the crime.  *See* (Docs. 92

at 86 & 93 at 82).  But because trial counsel presented no evidence at the penalty phase

regarding when Mr. Williams began drinking, his possible predisposition to alcoholism

given his family history, or the excessive drinking modeled by close relatives with

whom he lived, counsel failed to give the jury any background mitigating evidence to

explain his alcohol abuse on the day of the crime.  Instead, the jury was left with the

impression that Mr. Williams' alcohol abuse on the day of the crime was a result solely

of his moral failure with no explanation as to when or why Mr. Williams began abusing

alcohol.

Also, as mitigating circumstances, trial counsel argued at the penalty phase, and

the jury considered, that Mr. Williams was only twenty-one years old at the time of the

crime; that he was under the influence of alcohol at the time of the crime; that he had no

significant prior criminal history; that he cooperated with law enforcement in confessing

to the crime; that he had no disciplinary issues while in jail awaiting trial; and that he

expressed remorse for the crime. (Vol. 3, Tab 21 at 573-74). In sentencing Mr.

Williams, the trial court found the following mitigating circumstances existed: Mr.

Williams's lack of a criminal history; his unstable home life as a child; his frustration

from an injury ending his hopes of an athletic career; his obtaining a GED; and his

remorse. (Vol. 4 at 631-38). The trial court found the following mitigating factors

argued by the defense did not exist: Mr. Williams's age at the time of the offense; his

capacity to appreciate the criminality of his conduct due to marijuana and alcohol use at

the time of the offense; and his cooperation with law enforcement. (*Id*. at 636-37).

Weighing  the mitigating evidence actually presented at the penalty phase and the

additional mitigating evidence that counsel could have presented in the penalty phase

against the *one* aggravating factor the prosecution argued in the penalty phase, the court

finds that the scale tips in favor of a reasonable probability that the jury would have

reached a different conclusion.

During the penalty phase of Mr. Williams's trial, the state argued only one

aggravating circumstance, "[t]hat the capital offense was committed while the

defendant was engaged in commission of or an attempt to commit rape, robbery,

burglary or kidnapping."  (Vol. 3, Tab 18 at 552; Vol. 3, Tab 23 at 584; Vol. 4 at 601).

The court specifically instructed the jury that it could not consider any other aggravating

circumstance.  (Vol. 3, Tab 23 at 584).  If this court granted Mr. Williams' habeas

petition in this case, no doubt the state would again argue the same aggravating

circumstance.  This one aggravating factor does not outweigh the powerful mitigation

evidence present in this case.

The court acknowledges that, if Mr. Williams were granted a new sentencing

hearing, the state could also present evidence of Mr. Williams' future dangerousness

that just eighteen days after the murder of Ms. Rowell on November 6, 1996, Mr.

Williams broke into the home of Lottie Turner during the night of November 24, 1996

and attempted to rape her. (*See* Doc. 84-22 at 59-60).[9]  On May 20, 1997, a St. Clair

---

[9] After his arrest, Mr. Williams confessed in a written statement, to breaking into Ms. Turner's house "with sex in mind." (Petitioner's Exhibit 1 at 525). Mr. Williams explained that he had been drinking and "smok[ing] a lot [of] weed" all day, when he and his friend Alister Cook left the party around midnight to go pick up some girls. (Id.). Mr. Williams got "upset" and "snapped" when his plans "didn't work out with those females." (Id.). Mr. Williams described the crime as follows:

> I walk around to the back of [Lottie Turner's] house and I put my gloves on try to open two bedroom windows, no luck so I tried the ___ one and I was in there. I took off my clothes outside and went in through the window. I found her in bed so I stripped on down out of my underwear and enter the bedroom crawling to the foot of her bed. I went to raise up and crawl on top of her. She wakes up. She tries to hit [me] with something so we tussle and finally I got [her] pin down. I started fondling her breast and rubbing my penis on her breast. At this time I [was] holding her down. I told her all I wanted was sex and not to hurt her. I told her this several times. She grabs my shirt when I was about to leave so I could not leave until she realized that I wasn't going to hurt her. It was 6:30 am [when] she finally let go. So I grab[b]ed my glove and my boxers and jumped out of the window. I threw my clothes on and ran into the woods . . . .

County grand jury indicted Mr. Williams on a charge of first degree burglary in the Lottie Turner case. *See* https://v2.alacourt.com, *State of Alabama v. Marcus Bernard Williams*, Case No. CC-1997-000083.00.[10]  On March 2, 1999, less than a week after the guilt and penalty phases of his capital murder trial, and a month before the sentencing hearing, Mr. Williams entered a plea of guilty to first degree burglary, and was sentenced to twenty-five years' imprisonment. (*Id.*).

Because Mr. Williams had not been convicted in the Turner burglary case at the time of the penalty phase of his trial, the state did not and could not have argued that case as a statutory aggravating circumstance.  *See* Alabama Code § 13A-5-49(2) (a prior *conviction* of a felony involving the use or threat of violence to the person can be used as an aggravating circumstance).  But the trial court took judicial notice of Mr. Williams's conviction in the Turner burglary case. (*Id.* at 634). The trial court did not "consider this subsequent act by [Mr. Williams] for any purposes of aggravation," but did consider it as evidence of his state of mind in determining that Mr. Williams's

---

(*Id.*). Mr. Williams blamed the crime on "lack of sex and too much alcohol and drugs." (Id.). Mr. Williams also apologized "for the two women [he had] hurt," and asked for help "find[ing] his true self again." (Id.).

[10] The court takes judicial notice of the state court records available on the state's Alacourt website. *See Keith v. DeKalb County, Ga.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of DeKalb County Superior Court Online Judicial System pursuant to Federal Rule of Evidence 201); *see also Grider v. Cook*, 522 Fed. Appx. 544, 545 n.2 (11th Cir. 2013) ("the district court was permitted to take judicial notice of Grider's state court criminal proceedings").

capacity to appreciate the criminality of his actions due to his use of marijuana and alcohol, and his cooperation with law enforcement were not mitigating circumstances in his case. (*Id*. at 634-37).

And the State could have presented evidence of this similar crime at the penalty phase of the trial to show Mr. Williams' future dangerousness, but chose not do to so.[11] But, upon re-sentencing, the State could introduce the Turner burglary to show Mr. Williams' future dangerousness.  Alabama Courts have held that remarks on future dangerousness are proper in determining "what weight should be afforded the aggravating circumstances that the State had proven." *Floyd v. State*,  CR-13-0623, 2017 WL 2889566 at 63 (Ala. Crim. App. July 7, 2017). As the *Floyd* court explained:

> Although future dangerousness is not an aggravating circumstance under § 13A-5-49, Ala. Code 1975, "future dangerousness [is] a subject of inestimable concern at the penalty phase of the trial" and evidence and argument about future dangerousness are permissible. *McGriff v. State*, 908 So.2d 961, 1013 (Ala. Crim. App. 2000), *rev'd on other grounds*, 908 So.2d 1024 (Ala. 2004). *See also Whatley v. State*, 146 So.3d 437, 481-82 (Ala. Crim. App. 2010) (holding that evidence of a capital defendant's future dangerousness is admissible during the penalty phase of the trial under § 13A-5-45(d), Ala. Code 1975); and *Arthur v. State*, 575 So.2d 1165, 1185 (Ala. Crim. App. 1990) (holding that prosecutor's remark during penalty phase of capital trial that the defendant would kill again if given the chance was "proper because [it] concerned the valid sentencing factor of [the defendant's] future dangerousness.").

---

[11] Mr. Williams's trial counsel, Erskine Funderburg, testified at the evidentiary hearing that the State tried to get the Turner case into evidence in the *guilt* phase of the trial, "but [defense counsel] were able to keep it out." (Doc. 91 at 76).

*Id*.

But the court finds that the fact that Mr. Williams would never be eligible for parole would undercut the State's future dangerousness evidence.  The Supreme Court has held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."[12]  *Simmons v. South Carolina*, 512 U.S. 154, 156, 162 (1994)*.*  The Court in *Simmons* reasoned that, in assessing future dangerousness during the penalty phase of a capital trial, "the actual duration of the defendant's prison sentence is indisputably relevant" because a jury could "view a defendant who is eligible for parole as a greater threat to society than a defendant who is not.  Indeed, there may be no greater assurance of a defendant's future *nondangerousness* to the public than the fact that he never will be released on parole." *Id*. at 163-64 (emphasis added).  The Supreme Court stated that "the fact that the alternative sentence to death is life without parole will necessarily *undercut* the State's argument regarding the threat the defendant poses to society."  *Id*. at 169 (emphasis

---

[12]   The Court noted that, although South Carolina death penalty statutes "do not mandate consideration of a defendant's future dangerousness in capital sentencing, the State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances." *Simmons*, 512 U.S. at 162-63.  Likewise, Alabama law does not mandate consideration of Williams' future dangerousness, but a jury can consider future dangerousness in capital sentencing.  *See Floyd v. State*, CR-13-0623, 2017 WL 2889566 at 63 (Ala. Crim. App. July 7, 2017).

added).

The Supreme Court again in 2017 reiterated how a sentence of life in prison without the possibility of parole could minimize a defendant's future dangerousness.  In *Buck*, the defendant's sentence of death under Texas law required that the State prove that he posed a threat of future dangerousness.  *Buck*, 137 S. Ct. at 767.  Buck's counsel presented evidence from an expert that "his client is liable to be a future danger because of his race."  *Id*. at 765.  In addressing the *Strickland* standard for ineffective assistance of counsel, the Supreme Court in *Buck* found that "no competent defense attorney would introduce such evidence about his own client."  *Id*. at 775.

In assessing the prejudice prong of *Strickland*, the Court in *Buck* addressed the issue of "whether Buck had demonstrated a reasonable probability that, without Dr. Quitjano's testimony on race, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future."[13] *Id*. at 776.  In finding that Buck was prejudiced by his counsels' deficient performance, the Court addressed whether any mitigating circumstances would minimize Buck's future dangerousness. The Supreme court stated that "Buck's prior violent acts had occurred outside of prison, within the context of romantic relationships with women."  But the Court noted that

---

[13] In Texas, a sentence of death requires an unanimous vote by the jury; if the jury vote is not unanimous, a defendant would receive life without parole.

"[i]f the jury did not impose a death sentence, Buck would be sentenced to life in prison, and no such romantic relationship would be likely to arise. *A jury could conclude that those changes would minimize the prospect of future dangerousness*." *Buck*, 137 S. Ct. at 776 (emphasis added).

Likewise, in Mr. Williams' case, the trial judge instructed the jury that they had two options for in the penalty phase of the trial under Alabama Law: "to sentence the defendant to a term of life in prison without the possibility of parole . . . or to sentence the defendant to death." (Doc. 84-29 at 6). So, even if the State chose to present the subsequent Turner burglary to the jury at the re-sentencing, Mr. Williams's future dangerousness evidenced by that burglary would be *minimized* by the fact that Mr. Williams would never be eligible for parole and would pose no threat to the public at large. Moreover, Mr. Williams' counsel on re-sentencing could present evidence of his prison record evidencing no violent history while incarcerated, which would further minimize the significance of the State's future dangerousness argument.

And the court agrees with Mr. Williams that his attempted rape of Ms. Turner just eighteen days after his rape and murder of Ms. Rowell is "entirely consistent with the portrait of Marcus' psychological unraveling, stemming from his childhood sexual abuse" and his plea for help for his sexual crimes. *See* (Doc. 88 at 90). Had counsel investigated and presented evidence of Mr. Williams' background, especially his

childhood sexual abuse, the jury would have received powerful mitigating evidence to give context for his adult sexual crimes. *See New York v. Ferber*, 458 U.S. 747, 758 n.9 (1982) (in the context of child pornography, the Court noted that "[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, having sexual dysfunctions, and have a tendency to become sexual abusers as adults.") (citations omitted).  And Dr. Mendel testified at the hearing that had Mario not sexually abused Mr. Williams, "there would not have been the sexual violence" by Mr. Williams.  (Doc. 93 at 85-86).  So, evidence of Mr. Williams' childhood sexual abuse by Mario and Mr. Williams' subsequent hypersexualization may have cast his sex-related crimes in a "different light."  *See Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014).

And the Supreme Court and the Eleventh Circuit have time and again found that petitioners were prejudiced by their counsel's deficient performance where the crimes were more highly aggravated than Mr. Williams' case involving only one aggravating factor.  *See Porter v. McCollum*, 558 U.S. 30, 40-44 (2009) (finding prejudice in a two-victim murder case with *three* aggravating factors); *Rompilla*, 545 U.S. at 383 (finding prejudice despite *three* aggravating factors including that the murder was committed in the course of a felony; that the petitioner had a "significant history of felony convictions," including a rape and assault conviction; and the murder was

committed by torture); *Williams v. Taylor*, 529 U.S. 362, 399, 418 (finding prejudice despite the fact that "in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw") (Rehnquist, C.J., dissenting); *Hardwick*, 822 F.3d at 546 (finding prejudice when Hardwick had *five* aggravating factors, including three prior felony convictions); *Johnso*n, 643 F.3d at 911-912, 937-938 (finding prejudice despite Johnson having *five* mitigating factors, including being on parole for burglary at the time of the murders and having prior felony convictions involving the use of violence; Johnson also committed armed robbery and attempted murder in Oregon just one month after he committed the two murders for which a jury sentenced him to death); *Cooper v. Sec'y Dep't of Corr.*, 646 F.3d 1328, 1356 (11th Cir. 2011) (finding prejudice despite a triple homicide and the presence of *six* aggravating factors).

Recently, the Eleventh Circuit in *Dallas v. Warden* affirmed the district court's denial of habeas relief and found that counsel's failure in 1994 to discover and present allegations that Dallas had been sexually assaulted did not prejudice Dallas. 964 F.3d 1285, 1311 (11th Cir. 2020). But that case is distinguishable from Mr. Williams' case for many reasons. In contrast to Mr. Williams' case, counsel in *Dallas* presented a

135

"substantial" mitigation case during the penalty phase of the trial, including calling as witnesses a licensed clinical psychologist, a defense mitigation consultant, two of Dallas' older siblings, the mother of Dallas' children, a long-time friend who was with Dallas around the time of the murder, and Dallas himself.  Dallas and his siblings testified at trial and "described at length" Dallas' "deeply abusive childhood and a thoroughly dysfunctional family."  His sister testified at trial that Dallas knew that she was molested as a teenager and that she "ran away from home at eighteen to escape." But when Dallas' brother testified at the penalty phase of the trial, he did not mention being sexual abused.  *Dallas*, 964 F.3d at 1291-1295.

Years later, Dallas' brother, in a 2007 affidavit for Dallas' federal habeas case, alleged for the first time that he and Dallas were both sexually assaulted.  Dallas' brother explained in the affidavit that he "witnessed Donald being anally raped as well as being forced to perform oral sex on this man"; that the sexual assault happened on at least four occasions; but Dallas' brother "did not identify the name of the abuser, the time, or the location."  *Id*. at 1300.

The Eleventh Circuit in *Dallas* held that "although [the brother's] new allegations paint a darker picture of Dallas' childhood, it does not *standing alone* raise a reasonable probability that the jury would not have recommended that Dallas be sentenced to death."  *Id*. at 1311 (emphasis added).  The Court noted that trial counsel had called

Dallas' brother as a mitigation witness but he failed to mention the sexual abuse even after his sister testified that she had been sexually molested.  And, the Court in Dallas found that "[u]ltimately and most critically, however, the aggravating factors were overwhelming," and that the sexual abuse allegation would not have outweighed the *four* aggravating factors, especially where the "jury [already] heard many details of the abuse and poverty-stricken conditions of Dallas' childhood."  *Id*. at 1311 (emphasis added).

In Mr. Williams' case, unlike in *Dallas*, counsel conducted virtually no mitigation investigation; the jury heard none of the details of Mr. Williams' troubled background; counsel failed to utilize funds for a mitigation investigator; and the case involved only *one* aggravating factor.  In this case, a reasonable probability exists that the sexual abuse of Mr. Williams, in totality with all the other powerful mitigating evidence the jury never heard, would have undermined the confidence in the outcome of Mr. Williams' sentencing.

The fact that Mr. Williams' case is *not* highly aggravated further supports a finding of prejudice in this case.  *See Wiggins v.* Smith, 539 U.S. 510, 537 (2003) (noting that Wiggins did not have a record of violent conduct to offset the mitigating factors); *Williams v. Allen*, 542 F.3d 1326, 1343 (11 th Cir. 2008) ("Further supporting a finding of prejudice is the fact that this case is not highly aggravated."); *Maples*, 729

F. App'x at 827 ("And the probability that one more juror would have been moved to vote for life over death is further compounded by the limited aggravation in this case—the state trial court found only one statutory aggravating factor applicable here.").

And even though the jury heard none of the powerful mitigating evidence produced at the evidentiary hearing, one juror still voted for life without parole. Had the jury heard all of the powerful mitigating evidence about Mr. Williams' sexual abuse and troubling childhood background, a reasonable probability exists that more jurors would have followed suit.

A failure of counsel to conduct a reasonable mitigation investigation is prejudicial where, as in Mr. Williams' case, such an investigation would have uncovered an "'excruciating life history.'" *See Daniel*, 822 F.3d at 1275 (quoting *Wiggins*, 539 U.S. at 537). This mitigation evidence "might well have influenced the jury's appraisal of his moral culpability." *See Williams v. Taylor*, 529 U.S. at 398. Mr. Williams' case is not one where the new evidence "would barely have altered the sentencing profile presented to the sentencing judge." *See Porter*, 558 U.S. at 41 (quotations and citations omitted). The jury and judge in Mr. Williams case heard almost nothing that would allow them to "accurately gauge his moral culpability." *See id*.

A reasonable probability exists that the result of the sentencing proceeding would

have been different had Mr. Williams' counsel discovered, presented, and explained to the jury the significance of all of the available evidence that Mr. Williams presented at the evidentiary hearing. *See Williams v. Taylor*, 529 U.S. at 398. Had the jury and judge been able to "place [Mr. Williams'] life history 'on the mitigating side of the scale," a reasonable probability exists that the jury and sentencing judge "would have struck a different balance." *See Wiggins*, 539 U.S. at 537.

The court has carefully weighed all of the mitigating evidence presented at the both the penalty phase and the evidentiary hearing against the limited aggravating evidence in this case and finds that Mr. Williams has shown a reasonable probability that but for his counsels' deficient performance the jury would not have recommended the death sentence.

## V. CONCLUSION

Under a *de novo* standard of review, and for the reasons stated above, the court finds that Mr. Williams has shown that his trial counsels' performance was deficient for failing to investigate and present mitigation evidence at the penalty phase of the trial. Mr. Williams has also shown that he was prejudiced by his trial counsels' deficient performance. The court therefore will **GRANT** Mr. Williams Amended Petition for Writ of Habeas Corpus (doc. 5) as to all of his claims of ineffective assistance of counsel during the penalty phase of his trial for failing to investigate and present

mitigating evidence EXCEPT counsels' failure to interview Mr. Williams' closest friend Alister Cook, failure to investigate his family history of mental illness, and the failure to present his redeeming characteristics because Mr. Williams has failed to show prejudice on these three claims.

A writ of habeas corpus shall issue directing the State of Alabama to vacate and set aside the death sentence of Marcus Williams unless, within 90 days of this judgment's entry, the State of Alabama initiates proceedings to retry Mr. Williams' sentence. In the alternative, the State of Alabama shall resentence Mr. Williams to life without the possibility of parole.

## VI. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted).

This court's denial of Mr. Williams ineffective assistance of counsel claims involving counsels' failure to interview Mr. Williams' closest friend Alister Cook, failure to investigate his family history of mental illness, and the failure to present his redeeming characteristics because Mr. Williams has failed to show prejudice on these three claims constitutes an adverse ruling on those claims.  But those three claims do not satisfy either standard for a certificate of appealability. Accordingly, a motion for a certificate of appealability is due to be **DENIED** as to those three claims.

The court will enter a separate Order in accordance with this Memorandum Opinion.

**DONE** and **ORDERED** this 23rd day of September, 2021.

_____
        KARON OWEN BOWDRE
        UNITED STATES DISTRICT JUDGE